ACCEPTED
04-15-00136-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
5/11/2015 4:50:47 PM
KEITH HOTTLE
CLERK

NO. 04-15-00136-CV

**IN THE FOURTH COURT OF APPEALS**
**SAN ANTONIO, TEXAS**

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
5/11/2015 4:50:47 PM
KEITH E. HOTTLE
Clerk

GERALD HARRINGTON, M.D.

Appellant,

v.

SANDRA SCHROEDER AND DUANE J. RAMOS, INDIVIDUALLY AND AS
ALL HEIRS OF THE ESTATE OF SYLVIA RAMOS, DECEASED

Appellees.

**APPELLEES' BRIEF**

**LAW OFFICES OF PAT MALONEY, P.C.,**
**BYRON B. MILLER**, State Bar No. 24074716
byron@maloneylawgroup.com
**MICHAEL MALONEY**, State Bar No. 12883300
mikem@maloneylawgroup.com
**ERICA MALONEY**, State Bar No. 24085698
ericam@maloneylawgroup.com
322 W. Woodlawn Ave., Suite 1
San Antonio, Texas 78212
Telephone: (210) 228-0400
Facsimile: (210) 758-5908
*Attorneys for Appellees*

i

## IDENTITY OF PARTIES AND COUNSEL

In accordance with TEX. R. APP. P. 38.2(a)(1)(A), Appellees correct Appellant's list of parties and counsel as follows-

**IDENTITY OF APPELLEES:**

The plaintiffs in the trial Court and the appellees in this action are: Sandra Schroeder and Duane J. Ramos, Individually and as all Heirs to the Estate of Sylvia Ramos, Deceased.

**IDENTITY OF TRIAL AND APPELLATE COUNSEL FOR APPELLEES:**

Byron B. Miller
Michael Maloney
Erica  Maloney
Law Offices of Pat Maloney, P.C.
322 W. Woodlawn Ave., Suite 1
San Antonio, Texas  78212
Telephone:  210-228-0400
Facsimile:  210-758-5908

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................................i

INDEX OF AUTHORITIES.........................................................................................v

STATEMENT REGARDING ORAL ARGUMENT ............................................2

ISSUES PRESENTED.................................................................................2

Whether the Appellant waived his Ch. 74 objections because he failed to serve his Ch. 74 Objections within 21 days of receipt of the Appellee's Ch. 74 Expert Report.

Whether the Appellant waived his objections concerning Dr. Lipson's qualifications to opine as to the standard of care because he did not file and serve such an objection and only raised it on appeal.

Whether the trial Court abused its discretion by holding that that Dr. Lipson was qualified to testify as to causation and the standard of care.

Whether the trial Court abused its discretion by holding that Appellees' section 74.351 expert report set forth at least one viable liability theory against Appellant

STATEMENT OF FACTS ...............................................................................3

SUMMARY OF THE ARGUMENT ...................................................................5

ARGUMENT .............................................................................................7

I.      Standard of Review.................................................................................7

II.     The Appellant waived his Ch. 74 Objections because Appellant failed to serve such objections within the statutorily required 21 days of receipt of the Appellee's Ch. 74 Expert Report……………...............................................7

A.      Appellant has waived all of his objections as a matter of law………………7

B.      Appellant has waived his objections concerning Dr. Lipson's qualifications to opine as to the standard of care. …………………………………………...10

ii

III.    Loren Lipson, M.D. is qualified to testify as to the standard of care………10

A.    Standards for determining qualifications to provide opinion on the standard of care…………………..………………………………….10

B.    Current board certifications are not required when an expert has substantial training and experience in an area of medical practice relevant to the claim………………………………………………….…11

C.    Appellant's argument that Dr. Lipson is not actively practicing in geriatric medicine is false…..................................................................15

IV.    The trial Court did not abuse its discretion in finding Loren Lipson, M.D. qualified to testify as to causation…………………………………17

A.    Standards to determine whether an expert is qualified to opine as to causation…………………………………………………18

B.    Dr. Lipson is qualified to opine as to causation……………………19

C.    Appellant's argument that Dr. Lipson is not qualified to opine on causation because he is not licensed to practice medicine in the State of Texas is incorrect……………………………………………………21

V.    Appellees are entitled to proceed with their healthcare liability claim because their expert report sets forth at least one viable theory of liability against Appellant ...........................................................27

A.    Appellees have asserted a healthcare liability claim against Appellant…....24

B.    The Expert Report requirement ...............................................25

C.    Appellant's "but for" argument ignores the evidence provided in Loren Lipson, M.D.'s report……………………………………..27

D.    Loren Lipson, M.D.'s report is not conclusory as to causation…………30

1.    Failure to give appropriate input into Sylvia Ramos' care plan………….31

2.  Failure to timely and properly assess Sylvia Ramos and accurately document her health conditions..................................................................36

3.  Failure to discharge Sylvia Ramos to a level of care that could meet her health needs.....................................................................................39

VI.   Request for damages for frivolous Appeal……………………………….41

VII.  In the event that the Court determines the report is deficient, Appellee should be granted an opportunity to cure the deficiency.............................42

VIII. Conclusion ...............................................................................................43

PRAYER ..............................................................................................................44

TEX. R. APP. P. 9.4(i)(3) CERTIFICATE OF COMPLIANCE ...........................45

CERTIFICATE OF SERVICE ...........................................................................46

APPENDIX ..........................................................................................................47

# INDEX OF AUTHORITIES

**Cases**

*American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873 (Tex. 2001)........................................................................................7, 25, 26

*Stephanie M. Philipp, P.A. v. McCreedy*, 298 s.w.3d. 682, 686 (Tex. App.—San Antonio 2009, no pet.)…………………………………………………………7, 26

*Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48 (Tex. 2002) .......................................7

*Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex. 1985) ...................7

*Bakhtari v. Estate of Dumas*, 317 S.W.3d 486 (Tex. App. – Dallas 2010, opinion)…………………………………………………………………………10

*Williams v. Mora*, 264 S.W.3d 890 (Tex. App. – Waco 2008, affirmed)…...……10

*Broders v. Heise, 924 S.W.2d 148, 153 (Tex. 1996)*………………………........11, 18

*Pediatrix Med. Servs. Inc. v. De La O*, 368 S.W.3d 34, 40 (Tex.App.—El Paso 2012, no pet.)……………………………………………………………………..18

*Methodist Healthcare System of San Antonio, Ltd., L.L.P. v. Belden*, No. 04-14-00215-CV at *9, (Tex. App.—San Antonio Oct. 29, 2014, mem. op.)……….18, 30

*Livingston v. Montgomery,* 279 S.W.3d 868, 877 (Tex. App.-- Dallas 2009, no pet.)....................................................................................................................19

*Comstock v. Clark*, 09-07-300-CV, 2007 WL3101992, at *4 (Tex. App.—Beaumont Oct. 25, 2007, pet. Denied)(mem. op.)………………………………...19

*Sloman-Moll v. Chavez*, No. 04-06-00589, 2007 WL595134, at *4 (Tex.App.—San Antonio Feb. 28, 2007, pet. denied)(mem. op.)………………………………...19

*Lee v. Mitchell,* 23 S.W.3d 209, 212 (Tex. App.-- Dallas 2000, pet. denied)…….22

*Sweet v. Weise,* 2001 Tex. App. LEXIS 5976, 2001 WL 988114 (Tex. App. Dallas Aug. 30, 2001)…………………………………………………………………22

*Tenet Hosps. Ltd. v. Boada,* 304 S.W.3d 528, 2009 Tex. App. LEXIS 8143 (Tex. App. El Paso 2009)……………………………………………………………….23

*Springer v. Johnson*, 280 S.W.3d 322 (Tex.App.– Amarillo 2008, no pet.)……...22

*Kelly Ryan Cook, P.A. v. Spears,* 275 S.W.3d 577 (Tex.App.—Dallas 2008, opinion issued)…………………………………………………………………….23

*IHS Acquisition No. 140, Inc. v. Travis*, 2008 WL 1822780 at *9 (Tex. App.– Corpus Christ 2008, pet. denied)(not designated for publication)………………..26

*Tovar v. Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P*., 185 S.W.3d 65, 68 (Tex.App.-San Antonio 2005, pet. denied)………………………………………….26

*Kayani v. Stevens*, 2013 WL 174553 (Tex. App. – Beaumont 2013, no pet.)(not designated for publication) ...............................................................................26

*Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552 (Tex.App.Dallas 2009, no pet.) ....................................................................................................26

*VHS San Antonio Partners LLC v. Garcia*, 2009 WL 3223178 (Tex.App.-San Antonio Oct. 7, 2009, pet. denied)(not designated for publication)......................26

*Certified EMS, Inc. v. Potts*, 392 S.W.3d 625 (Tex. 2013) ..............................passim

*Apodaca v. Russo*, 228 S.W.3d 252 (Tex.App.-Austin 2007, no pet.)....................29

*Cooper v. Arizpe*, No. 04-07-00734-CV, 2008 WL 94090, at *3 (Tex.App.—San Antonio Apr. 9, 2008, pet. denied) (mem. op.)…………………………………...30

*Murphy v. Mendoza,* 234 S.W.3d 23, 28 (Tex.App.—El Paso 2007, no pet.)……30

*Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010)……………………………...30

*Owen v. Jim Alle Imps., Inc.*, 380 S.W.3d 276 (Tex. App. – Dallas 2012, no pet.) 42

*Leland v. Brandal*, 217 S.W.3d 60 (Tex. App. – San Antonio 2006), *aff'd* 257 S.W.3d 204 (Tex. 2008)...............................................................................43

*Samlowski v. Wooten*, 332 S.W.3d 404 (Tex. 2011)……………………………...43

*Silsbee Oaks Health Care, L.L.P. v. Chumley*, 2010 WL 5550671 (Tex. App. – Beaumont 2010, pet. denied)(not designated for publication) ...........................28, 29

**NO. 04-15-00136-CV**


**IN THE FOURTH COURT OF APPEALS**
**SAN ANTONIO, TEXAS**

---

GERALD HARRINGTON, M.D.

Appellant,

v.

SANDRA SCHROEDER AND DUANE J. RAMOS, INDIVIDUALLY AND AS
ALL HEIRS OF THE ESTATE OF SYLVIA RAMOS, DECEASED

Appellees.

---

**APPELLEES' BRIEF**

---

TO THE HONORABLE COURT OF APPEALS:

Appellees, Sandra Schroeder and Duane J. Ramos, Individually and as All Heirs to the Estate of Sylvia Ramos, Deceased, ("Appellees") submit this Brief of Appellees in Response to the Brief of Appellant Gerald Harrington, M.D. ("Appellant"). Matters in the Clerk's Record are referred to as "CR ___"; and the Reporter's Record will be referred to as "RR Vol. __, p.___". Matters in the Appendix are referred to as "APP ___".

1

**STATEMENT REGARDING ORAL ARGUMENT**

Appellees respectfully suggest that oral argument in this case is not necessary because the dispositive issue or issues have been authoritatively decided, the facts and legal arguments are adequately presented in the briefs and record, and the appeal is frivolous. However, in the event the Court determines that oral argument is appropriate, Appellees request that they be permitted to argue.

**ISSUES PRESENTED**

1. Whether the Appellant waived his Ch. 74 objections because he failed to serve any Ch. 74 Objections until February 24, 2015, 112 days after such objections were due.

2. Whether the Appellant waived his objections concerning Loren Lipson, M.D.'s qualifications to opine as to the standard of care because he failed to file and serve such objections.

3. Whether the trial court abused its discretion by holding that Loren Lipson, M.D. is qualified to testify as to the standard of care.

4. Whether the trial court abused its discretion by holding that Loren Lipson, M.D. is qualified to testify as to causation.

5. Whether the trial court abused its discretion by holding that Appellees' Section 74.351 expert report sets forth at least one viable liability theory against Appellant.

2

**STATEMENT OF FACTS**

This healthcare liability action arises out of the tragic injuries to and the death of Sylvia Ramos.  Sylvia Ramos was a resident of Trisun Care Center Windcrest nursing home from September 25, 2006 until she sustained a fatal head injury from an altercation with a fellow resident on July 15 2012. (CR 13; APP 1). While a resident at the nursing home, the Appellant, Dr. Gerald Harrington, acted as Sylvia Ramos' primary care physician. Over the course of time Appellant cared for Ms. Ramos, she endured numerous encounters of resident on resident abuse, multiple fractures, approximately 30 falls, instances of institutional scabies, repeated UTI's, signs of sexual assault, and prolonged neglect at the hands of Appellant and the facility's nursing staff. The final incident of abuse ultimately resulted in her death on August 1, 2012. (CR 13-15; APP 1).

Appellees filed this action against Appellant on June 27, 2014.  (CR 11; APP 1).  PM Management – Windcrest NC, LLC d/b/a Trisun Care Center Windcrest, Dr. Rudolfo Zarate, Zarate Medical Group, P.A., and Setters Medical Group, P.A. are also defendants in the action.  (APP 2).  On October 14, 2014, 109 days after filing the action against Appellant, Appellees timely served Appellant with their 120-day expert report prepared by Loren Lipson, M.D. (Dr. Lipson) pursuant to section 74.351 of the Texas Civil Practice and Remedies Code.  (CR 32-33; RR Vol. 3 Ex. 1, p. 1-12; APP 3). Dr. Lipson's *curriculum vita* was also

3

provided. (CR-32-33; APP 4). An additional Ch. 74 Report discussing the liability of the nursing home that had been previously served on the nursing home was re-served on Dr. Harrington and incorporated by reference as Exhibit A to the Ch. 74 Report concerning Dr. Harrington. (RR Vol. 3, Ex. 1, Ex. A; APP 5). This earlier report contained an extensive discussion of the facts relevant to Dr. Harrington's care.

In his report addressing Dr. Harrington's care, Dr. Lipson's report set forth his qualifications (RR Vol. 3 Ex. 1, p. 1-2; APP 3), identified the materials he reviewed (RR Vol. 3 Ex. 1, p. 2; APP 3), provided a factual history of Sylvia Ramos' conditions and discussed the care she received by the Appellant at the nursing home. (RR Vol. 3 Ex. 1, p. 2-5; APP 3), and included a detailed section addressing various liability theories against the Appellant. (RR Vol. 3 Ex. 1, p. 5-12; APP 3).

In the liability section of his report, Dr. Lipson provided a comprehensive description of the standard of care, breaches of the standard of care, and how those breaches of the standard of care caused Sylvia Ramos's injuries, including a pelvic fracture, fifth metacarpal fracture of the left hand, mental anguish, large occipital hematoma, intracranial hemorrhage, and death.  (RR Vol. 3 Ex. 1, p. 8-12; APP 3).

Appellant filed objections to Dr. Lipson's report on October 31, 2014 (CR 26-31; APP 6). However, Appellees were not properly served with Appellant's

Objections to Plaintiffs' Expert Report and, in fact, did not actually receive a copy of the objections until February 24, 2015, at a discovery hearing. (RR Vol. 2, p. 5-21; APP 7). Following a hearing on Appellees' objections to Plaintiffs' Expert Report on March 2, 2015, the trial court overruled the Appellant's objections and denied the Appellant's motion to dismiss on March 9, 2015 (CR 41-42; APP 8) and this appeal ensued.

## SUMMARY OF THE ARGUMENT

Appellant failed to serve his Ch. 74 Objections on Appellees' counsel until February 24, 2015, 112 days following his deadline to serve such objections. Accordingly, Appellant has waived his Ch. 74 Objections as a matter of law. Additionally, Appellant has raised new objections in his Appellant's Brief, specifically concerning the qualifications of Loren Lipson, M.D. to opine as to the standard of care, which were not included in those objections previously filed by the Appellant. Thus, Appellant has waived his right to raise any objections concerning Dr. Loren Lipson's qualifications to opine as to the standard of care.

Even if the Court of Appeals were to find that Appellant's objections were timely served and not waived, Dr. Lipson's Ch. 74 Expert Report and *curriculum vita* satisfy the requirements of Ch. 74. Dr. Lipson's Ch. 74 Expert Report and extensive *curriculum vita* detail his substantial experience in the field of geriatric care, including his many accolades, as well as his work as a physician, his teaching

positions, and consultant positions with U.S. state and federal agencies on geriatric care. Dr. Lipson is well-qualified to provide opinions as to the standard of care concerning Dr. Harrington, a geriatric primary care physician, as well as opinions regarding causal related fall and abuse injuries.

Appellees have pleaded and supported with an expert report at least "one viable liability theory" against Appellant. In that regard, Dr. Lipson's expert report, when viewed in its entirety, provides a "fair summary" of the applicable standard of care with regard to prevention of fall injuries and resident on resident attacks, explains how Appellant failed to meet that standard, and establishes the causal relationship between the failures by the Appellant and the fractures, mental anguish, numerous fall injuries, repeated resident on resident assaults, large occipital hematoma, and fatal intracranial hemorrhage suffered by Sylvia Ramos.

Because Dr. Lipson's report satisfies the requirements of a report under Section 74.351, Appellees are entitled to proceed.

# ARGUMENT

## I.      Standard of Review

This Court reviews the trial court's ruling on Appellant's Section 74.351 Motion to Dismiss for an abuse of discretion. *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Stephanie M. Philipp, P.A. v. McCreedy*, 298 S.W.3d. 682, 686 (Tex. App.—San Antonio 2009, no pet.). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). In reviewing the ruling on a motion to dismiss, the Court may not substitute its judgment for that of the trial court. *Id.* Mere disagreement with the trial court's decision is insufficient to constitute an abuse of discretion. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–242 (Tex. 1985).

## II.     Appellant waived his Ch. 74 Objections because Appellant failed to serve his objections on Appellees' counsel within the statutorily required 21 days of receipt of Appellees' Ch. 74 Expert Report.

### A. Appellant has waived all of his objections as a matter of law

Appellant failed to serve objections on counsel for Appellees' counsel within 21 days after Appellees' expert report was served. When this case was initially filed against Appellant, the law firm representing Apellees was the Marynell Maloney Law Firm, P.L.L.C. However on September 17, 2014, the Marynell Maloney Law Firm, P.L.L.C.,

7

withdrew its representations of Appellees and the Law Offices of Pat Maloney, P.C. was substituted as counsel. (APP 10). On October 14, 2014, Appellees timely served Appellant with their Chapter 74 expert report and *curriculum vita* of Loren Lipson, M.D. (CR 32-33; RR Vol. 3 Ex. 1, p. 1-12; APP 3). Appellant was required to file and serve his objections on Appellees by Nov. 4, 2014. On October 31, 2014 Appellant timely filed objections to Dr. Lipson's expert report (CR 26-31). In his "Certificate of Service," Appellant's counsel provided the correct email and contact information for Appellees' counsel. (CR 30; APP 7; RR Vol. 2, p.7-8; APP 6-7). Appellant's counsel correctly listed the three attorneys of record from Law Offices of Pat Maloney, P.C. and provided their correct contact information, including correct email addresses. However, Appellant's counsel failed to serve these objections on Appellees' counsel. As shown by Appellant's "Notification of Service", Appellant's counsel served his objections electronically at dellak@swbell.net, an email that does not belong to any of the attorneys, and Byron@marynellmaloneylawfirm.com, an email related to the Marynell Maloney Law Firm, P.L.L.C., which had withdrawn representation more than a month before. (RR Vol. 3, Ex. 3; APP 11). This was done despite the fact that the correct firm, attorneys' names, and attorney contact information was on file at the time of service. (RR Vol. 2, p. 8; APP 7). Consequently, Appellees were unaware and not provided with a copy of Appellant's objections until February 24, 2015, at an unrelated discovery hearing, approximately 112 days following the deadline to serve objections. (RR Vol. 2, p. 6; APP 7).

On March 2, 2015, the date of the hearing on Appellant's objections, Appellant's counsel repeatedly argued to the trial court that simply filing objections is sufficient, that

8

service is complete upon providing an email address to an electronic service, and that late service is sufficient. (RR Vol. 2, p.6, 12, and 17; APP 7).These arguments are misrepresentations of the relevant statutes and case law.

According to Texas Civil Practice & Remedies Code Section 74.351(A), "Each defendant physician or health care provider whose conduct is implicated in a report *must file and serve* any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, *failing which all objections are waived*." (APP 9). , TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(A). Additionally, under Rule 21(a) of the Texas Rules of Civil Procedure, which is relevant here, provides as follows:

> Every notice required by these rules, and every pleading, plea, motion, or other form of request required to be served under Rule 21…may be served by delivering a copy to the party to be served, or the party's duly authorized agent or attorney of record.

(APP 12). Tex. R. Civ. P. R. 21(a).

In the present case, Appellant clearly failed to timely serve Appellees' counsel with objections to Dr. Lipson's Ch. 74 expert report, despite the fact that the correct information for Appellees' counsel was on file and known by Appellant's counsel as evidenced by the "Notification of Service." (RR Vol. 3, Ex. 3; APP 11). While appellate Courts do not allow an exception for mistake, in the present case, there is not even any excuse for mistake. The Appellate Courts have routinely stated that the plain language of the Statute means any objections served after the 21-day deadline are deemed waived. *Bakhtari v. Estate of Dumas*, 317 S.W. 3d 486, 493 (Tex. App.—Dallas 2010, opinion);

9

*Williams v. Mora*, 264 S.W.3d 890 (Tex. App.—Waco 2008, affirmed). Consequently, because Appellant failed to meet the deadline for serving objections to Appellees' Ch. 74 expert report, Appellant has waived his objections as a matter of law.

**B. Appellant has waived his objections concerning Dr. Lipson's qualifications to opine as to the standard of care.**

Objections to Dr. Lipson, M.D.'s qualifications to opine as to the standard of care were raised for the first time in the Appellant's brief filed on April 15, 2015. (Appellant's Brief p. 9-13). Absolutely no objections to Dr. Lipson, M.D.'s qualifications to opine as to the standard of care were raised in Appellant's Objections to Plaintiffs' Chapter 74 Expert Report filed on Oct. 31, 2014 or at any time prior to the filing of the Appellant brief. (CR 26-31; APP 6).

Since the Appellant failed to file and serve any objections concerning the qualifications of Loren Lipson, M.D. to opine as to the standard of care by Nov. 4, 2014, within the 21 day deadline for filing and serving objections, Appellant has clearly waived any objections pertaining to Loren Lipson, M.D.'s qualifications to opine as to the standard of care.

**III. Loren Lipson, M.D. is qualified to testify as to the standard of care.**

**A. Standards for determining qualifications to provide opinion on the standard of care.**

As discussed above, Appellant has waived any objections as to Loren Lipson, M.D.'s qualifications to opine as to the standard of care. However, even if this Court were to find that such objections were not waived, it is clear from Loren

Lipson, M.D.'s expert report and *curriculum vita* that Dr. Lipson is more than qualified to opine as to the standard of care in this case.

The Texas Supreme Court has stated that an expert is qualified to testify if the expert has the knowledge, skill, experience, training or education "regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996).

In this case, the specific issue before the Court with regard to Dr. Gerald Harrington was the failure of the treating physician to supervise the medical care of Sylvia Ramos, including the failure to provide input into the resident's care plan, to perform timely and adequate assessments, to properly document Sylvia Ramos' health problems, and coordinate Sylvia Ramos' discharge to a facility that could meet the level of care required. (RR Vol. 3, Ex. 1, p.5-7; APP 3). Thus, to be qualified to testify regarding the applicable standard of care on this issue, the expert report would need to show that the expert is qualified to render an opinion as to the responsibilities of an ordinarily prudent treating physician of a geriatric patient.

      **B. Current board certifications are not required when an expert has substantial training and experience in an area of medical practice relevant to the claim.**

The Appellant incorrectly contends that Dr. Lipson must have current board certifications to provide opinions as to the standard of care. (Appellant's Brief 10-11). While it is true that Dr. Lipson was not certified at the time the claim arose, Section 74.401 specifically states as follows:

> In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is board certified *or has other substantial training or experience in an area of medical practice relevant to the claim;* and (2) is actively practicing medicine in rendering medical care services relevant to the claim.

(APP 17). TEX. CIV. PRAC. & REM. CODE § 74.401.

The Statute clearly states that board certification is merely a consideration. Further, the Appellant fails to mention the fact that the Statute states that a Court may also consider "substantial training or experience in an area of medical practice relevant to the claim", as an alternative active board certifications.

Dr. Lipson's expert report and 47-page *curriculum vita* detail substantial training and experience in geriatric care and long-term care. In the report, Dr. Lipson states:

> During the course of my career, I have been Board Certified in Internal Medicine, Geriatric Medicine, and Utilization Review and Quality Assurance. I have served as Director of the University of California ('USC') Teaching Nursing Home Program and Co-Director of the Los Angeles County USC Medical Center Adult Protection Team-Geriatric Assessment Clinic. I have worked with the Keck School of Medicine at USC for over 29 years, having served as the Chief of the Section of Geriatric Medicine and Associate Professor of

12

Medicine, Gerontology, Clinical Pharmacy, Medical Dentistry and Public Health, and Occupation Science and Occupational Therapy…I have served as a Consultant to the Departments of Administration, Health and Social Services and Law, State of Alaska, in the areas of geriatric medicine and long term care. I also have been the Physician Advisor to USC University Hospital in areas of utilization management and quality assurance.

I have extensive personal experience in primary medical care as well as in subspecialty consultation and long-term care…As a result of my education, training, and experience, I am qualified to render a relevant and reliable expert opinion on the standard of care applicable to the treating physician, Dr. Harrington…Through my extensive personal experience in primary medical care and the various positions I have occupied during the course of my career, I am familiar with the accepted standards of medical care applicable to treating physicians at nursing home facilities.

(RR Vol. 3, Ex. 1, p. 1-2; APP 3).

Within his 47-page *curriculum vita* Dr. Lipson details more than 45 years of experience in geriatric and long-term care, with experiences including:

Director of the two USC Teaching-Nursing Home Programs, 1999-2005 (Hollenbeck Home- Los Angeles; Atherton Baptist Home – Alhambra); Member and Member Board of Director, California Association of Medical Directors, 1992-1999; Consultant – State of Alaska, Department of Administration, Division of Longevity Services Aging Programs and State of Alaska Long Term Care Facilities – the Pioneers' Homes), 1991-2004; Affiliate Professor, College of Health and Social Welfare and College of Arts and Sciences, University of Alaska, Anchorage. Areas of involvement- Alaska Geriatric education Center, Geriatric Assessment, Pre-med and Medical Education, Long Term Care, 2006-Present; Consultant to the University of Alaska, Sitka, Areas of involvement – Care of Elderly Conference – Director, 1994-20101; Consultant in Long Term Care, Elder Abuse and Geriatric Medicine – State of Alaska, Department of Law, 2000-2003; Consultant in Long Term Care, Geriatric Medicine and Elder Abuse- State of California, Department of Justice, Office of

13

the Attorney General, Bureau of Medical Fraud and Elder Abuse, 2000-Present; Consultant in Long Term Care – State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse - Operation Guardians (Nursing home- unannounced inspections), 2000-2009; Consultant in Long Term Care, Geriatric Medicine and Elder Abuse – State of New Mexico, Department of Justice, Office of the Attorney General, Medicaid Fraud and Elder Abuse Unit, 2003- Present; Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Justice, Civil Rights Division and Civil Divisions, 2006- Present; Primary Care Provider for Geriatric Medicine for Long Term Care Patients – Hollenbeck Home, Los Angeles, California, 1998-2004; LAC/USC Medical Center Clinic – Adult Protective Team – Geriatric Medicine – Clinic Co-director, 2000-2004; Member of the America Association of Medical Directors, 2005-2008; USC – Angelus Plaza – Senior Clinic – Founding Director and care provider (1989-1992); Consultant in Geriatric Medicine and Long Term Care- Silverado Senior Living Centers, San Juan Capistrano, 2001-2002; Consultant in Geriatric Program Development and Long Term Care – Keiro Services – the Japanese American Retirement Homes, Los Angeles, 1986-2004; Consultant in Geriatric Program Development and Long Term Care- The Motion Picture and Television Home, Woodlands Hills, CA, 1986-1990.

(RR Vol. 3, Ex. 2 p.16-17; APP 4)

University of Southern California School of Medicine: Associate Professor of Medicine (Division of Geriatric Medicine) 1984-2006, Chief of the Division of Geriatric Medicine 1984-2005; Los Angeles County/ University of Southern California Medical Center, Staff Physician in Medicine (Geriatric Medicine) 1984-2004; University of Southern California University Hospital, Chief of Geriatric Medicine 1991-2005, Attending Staff Physician in Geriatric Medicine for Medical House Staff and students 1991-2005; Development and improvement of Geriatric Medical Curriculum in the Medical School – University of Southern California 1985-2004; Development of Geriatric Medical Core Curriculum for the Medical House Staff- LAC/USC Medical Center, 1985-2004.

14

(RR Vol. 3, Ex. 2 p.5-7; APP 4).

It is baffling that the Appellant failed to mention the "Long Term Care Experience" clearly laid out in Dr. Lipson's *curriculum vita*. (RR Vol. 3, Ex. 2, p. 16-17; APP 4).

### C. Appellant's argument that Dr. Lipson is not actively practicing in geriatric medicine is false.

As mentioned above under Section 74.401 there is a requirement that a physician be actively practicing medicine or rendering medical care services relevant to the claim. The Appellant misrepresents to the Court that Dr. Lipson's report does not evidence that he is actively practicing medicine in an area relevant to the claim at the time the claim arose or currently. With regard to "practicing medicine", Section 74.401(b) provides as follows:

> [F]or the purpose of this section, "practicing medicine" or Medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

(APP 17). TEX. CIV. PRAC. & REM. CODE § 74.401(b).

In his report Dr. Lipson specifically states:

> I am a physician licensed and currently practicing in the State of California...
> I am currently Professor Emiritus of Medicine. I also currently serve as Co-Director in Geriatric Education and as Affiliate Professor at the University of Alaska, Anchorage in the College of Health and in the WWAMI Program for Alaskan Medical Students. I am also

Adjunct Professor at the School of Community and Global Health, Claremont Graduate University…

Additionally, I am a consultant to the Department of Justice, State of California and New Mexico, and U.S. Department of Justice in areas of geriatric care and elder abuse.

(RR Vol. 3, Ex. 1, p. 1; APP 3).

I have extensive personal experience in primary medical care as well as in subspecialty consultation and long-term care. In addition to my academic teaching, research, and administrative responsibilities, I am currently practicing medicine and was doing so at the time the claims described below occurred.

(RR Vol. 3, Ex. 1, p. 2; APP 3).

Moreover, Dr. Lipson's extensive *curriculum vita* details his numerous current practicing positions, such as:

Affiliate Professor, Biomedical WWAMI Program; Affiliate Professor, College of Health University of Alaska Anchorage. Areas of involvement-Alaska Geriatric Education Center, Geriatric Assessment, Pre-med and Medical Education, Long Term Care, 2006-Present.

(RR Vol. 1, Ex.2, p.16; APP 4).

University of Alaska, Anchorage, Faculty Consultant in Geriatrics, Alaska Family Medical Residency, September 2006-Present; U.S. Department of Justice, Civil Division, 2006-Present, Consultant in Long Term Care, Geriatric Care, Elder Abuse; New Mexico Department of Justice office of the Attorney General, Bureau of Medicaid Fraud and Elder Abuse, 2003-Present, Consultant in Long Term Care, Geriatric Care, Elder Abuse. California Department of Justice, Office of Attorney General Bureau of Medical Fraud and Elder Abuse, 2000- Present, Consultant to Operation Guardian and Consultant in Long Term Care, Geriatric Care, Elder Abuse.

(RR Vol. 1, Ex.2, p.6; APP 4)

> Co-Director in Geriatric Education to Alaskan Medical students in the University of Washington Medical School WW AMI Program, University of Alaska, Anchorage, 2006 – Present; Faculty consultant in Geriatrics to Residents of the Alaska Family Residency Program, 2006-Present; Teaching Responsibilities (School of Community and Global Health), Claremont Graduate University January 2011 – Present. Consultant to Claremont Graduate University faculty and students in areas of gerontology and geriatrics including didactic lectures, presentations for both research and general knowledge…Teaching graduate student in special study classes in geriatric health and provision of health care to seniors.

(RR Vol. 1, Ex.2, p.8; APP 4).

Beyond the fact that Dr. Lipson states three times in his report that he is actively practicing medicine, his *curriculum vita* evidences numerous current positions and titles showing that Dr. Lipson is currently practicing medicine specifically in the field of geriatrics. Accordingly, it is disingenuous for Appellant to claim that Dr. Lipson was not practicing medicine at the time the claim arose. For example, Appellant represents to the Court in his Brief that Dr. Lipson's *curriculum vita* is "devoid of any evidence that [h]e is actively practicing medicine in rendering medical care services relevant to the claim…" (Appellant's Brief p. 11). Moreover, he claims: "[Dr. Lipson's] CV fails to show that [he] is currently on the faculty actively training residents or students." A cursory reading of the *curriculum vita* lists numerous active teaching positions. Dr. Lipson's report and *curriculum vita* show his substantial training and experience in geriatric medicine, as well as his current practice in the field. There is no question that Dr. Lipson is qualified to opine as to the standard of care in this case.

17

**IV.    The trial court did not abuse its discretion in finding Loren Lipson, M.D. qualified to testify as to causation.**

Appellant contends that "nothing in Dr. Lipson's report or CV affirmatively shows that [he] is qualified to testify as to causation— the intracranial hemorrhage and death of Sylvia Ramos was caused by documentation, errors, etc.—other than a conclusory statement that [he] is 'competent to testify as an expert on the subject of medical causation in the case of Sylvia Ramos.'" (Appellant's Brief 16-17). However, this contention completely ignores the relevant case law on point and the qualifications clearly laid out in Dr. Lipson's report.

**A. Standards to determine whether an expert is qualified to opine as to causation.**

As discussed above, an expert is qualified to opine if the expert has the knowledge, skill, experience, training, and education "regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders,* 924 S.W.2d at 153. A medical expert from one specialty may be qualified to testify about another specialty if the expert has practical knowledge about what medical experts in the other specialty traditionally do under circumstances similar to those at issue in the case. *Pediatrix Med. Servs. Inc. v. De La O,* 368 S.W.3d 34, 40 (Tex.App.—El Paso 2012, no pet.) The expert's qualifications must be evident from the four corners of the expert report and curriculum vitae. *Id.* The Fourth Court of Appeals and numerous other

18

Appellate Courts have recognized that a physician's expertise may qualify him to testify about complications that commonly occur within his field of expertise. *Methodist Healthcare System of San Antonio, Ltd., L.L.P. v. Belden*, No. 04-14-00215-CV at *9, (Tex. App.—San Antonio Oct. 29, 2014, mem. op.); *Livingston vb. Montgomery*, 279 S.W.3d at 868, 877 (Tex. App.—Dallas 2009, no pet.) (holding board certified OB/GYN's expertise in managing labor and delivery qualified him to opine "on the causal relationship between labor and delivery, including a newborn's neurological injuries"); *Comstock v. Clark, 09-07-300-CV*, 2007 WL3101992, at *4 (Tex. App.—Beaumont Oct. 25, 2007, pet. Denied)(mem. op.)(holding anesthesiologist qualified "to express general opinion that a significant deprivation of oxygen causes brain injury"); *Sloman-Moll v. Chavez, No. 04-06-00589*, 2007 WL595134, at *4 (Tex.App.—San Antonio Feb. 28, 2007, pet. denied)(mem. op.)(holding physician trained as surgeon also trained to manage surgical complications).

### B. Dr. Lipson is qualified to opine as to causation.

Dr. Lipson's *curriculum vita* and expert report clearly demonstrate that Loren Lipson, M.D. has the knowledge, skill, experience, training, and education to opine on the causal relationship between the negligence in this case and Ms. Ramos' various injuries and death from a fatal intracranial hemorrhage caused

when she was attacked by another resident at the nursing home. Dr. Lipson's expert report provides as follows:

> I am competent to testify as an expert on the subject of medical causation in the case of Sylvia Ramos. I am specifically familiar with the type of problems experienced by Sylvia Ramos, including but not limited to the following: falls, wandering, resident on resident abuse, signs and symptoms of sexual abuse, neglect, institutional scabies, fractures, head trauma, and intracranial hemorrhage.

(RR Vol. 3, Ex. 1, p. 2; APP 3).

> Through my education, training and experience, I am familiar with the type of fatal intracranial hemorrhage Mrs. Ramos suffered on 7-16-12. An intracranial hemorrhage is a hemorrhage that occurs within the skull. Intracranial bleeding occurs when a blood vessel within the skull is ruptured, leaks, or is otherwise damaged. Intracranial bleeding can be caused by falls as a consequence of blunt force trauma to the brain. Signs and symptoms of intracranial bleeding include headache, concussion, loss of consciousness, behavioral changes, seizure, vision problems, numbness, muscle ache, eye discomfort, and stiff neck. Ms. Ramos' intracranial hemorrhage was consistent with the mechanics of blunt force head trauma that resulted from the assault on her and her subsequent fall.

(RR Vol. 3, Ex. 1, p. 10-11; APP 3).

Additionally, it is evident from the report and Dr. Lipson's *curriculum vita* that he has substantial experience in geriatric care, including attendant problems with geriatric care, such as neglect, abuse, falls, and fatal head injuries, such as intracranial hemorrhage, which can result from falls. As articulated above, Dr. Lipson's *curriculum vita* discusses his past board certifications in internal medicine, quality assurance and utilization review, and geriatric care, as well as

20

numerous teaching positions, fellowships consultant positions, administrative positions, appointments, editorial and published works, memberships, and long-term care positions, almost all pertaining to geriatric care in the long-term care setting. (RR Vol. 3, Ex. 2, p. 1-47; APP 4).

Because Loren Lipson, M.D.'s expert report and *curriculum vita* evidence substantial experience and training, specifically with long term geriatric care and his familiarity with the specific injuries at hand (intracranial hemorrhage and death), Dr. Lipson is qualified to testify about the complications of long-term geriatric care, including neurological injuries that result when a fall or abuse occurs. Thus, it is clear that Dr. Lipson is qualified to render opinions as to causation in this case.

### C. Appellant's argument that Dr. Lipson is not qualified to opine on causation because he is not licensed to practice medicine in the State of Texas is incorrect.

Furthermore, despite clear case law to the contrary, Appellant argues to the Court that Loren Lipson, M.D. is not qualified to render medical opinions as to causation because he is not licensed to practice medicine in the State of Texas. Appellant argues that Texas Civil Practice & Remedies Code Section 74.001(a)(23), which defines a "physician" as "an individual licensed to practice medicine in this state" should apply. TEX. CIV. PRAC. & REM. CODE §74.001(a)(23). Conversely, the only case law Appellant has cited completely

contradicts the proposition that an expert must be licensed within the state of Texas. Appellant's argument and the accompanying logic associated with Appellant's argument have already been rejected numerous times by Texas appellate Courts. The case law is quite clear that a physician licensed in a state outside of Texas may be qualified to render a Ch. 74 Report as to causation.

Chapter 74 clearly articulates who may be qualified to be an expert as to causation. Section 74.403(a) entitled "Qualifications of Expert Witness on Causation in Health care Liability Claim," provides in part:

> Except as provided by Subsections (b) and (c), in a suit involving a health care liability claim against a physician or health care provider, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(APP 14). TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a).

Nowhere does the plain language of Section 74.403(a) limit experts to those who are licensed within the State of Texas. The Appellate Courts have continually rejected the argument that an expert opining as to causation must be licensed within the State of Texas. *See e.g. Lee v. Mitchell*, 23 S.W.3d 209, 212 (Tex. App.-- Dallas 2000, pet. denied); *Sweet v. Weise,* 2001 Tex. App. LEXIS 5976, 2001 WL 988114 (Tex. App. Dallas Aug. 30, 2001); *Springer v. Johnson*, 280 S.W.3d 322 (Tex.App.– Amarillo 2008, no pet.). This issue was most recently addressed

by the Court of Appeals in Dallas in 2009, where the Court unequivocally held that a physician need not be licensed to practice medicine in Texas to be qualified to provide an expert opinion on causation in an expert report. *Tenet Hosps. Ltd. v. Boada,* 304 S.W.3d 528, 2009 Tex. App. LEXIS 8143 (Tex. App. El Paso 2009). In *Tenet* the Defendant argued that pursuant to the definition of "physician" used within Section 74.351(a) of the Texas Civil Practice & Remedies Code the expert must be licensed in the State of Texas to opine as to the issue of causation. *Id.* This argument was very clearly rejected by the Dallas Court of Appeals. *Id.* The Court held that for the purposes of who constitutes an expert qualified to opine on causation means a "physician" licensed to practice in one or more states in the United States…" *Id.* at 537; *Kelly Ryan Cook, P.A. v. Spears*, 275 S.W.3d 577 (Tex.App.—Dallas 2008, opinion issued) (rejecting the argument that an expert must be licensed in Texas in order to opine as to causation for Chapter 74 purposes).

Because it is clear that a physician licensed to practice outside the State of Texas may opine as to causation for the purposes of providing a Chapter 74 Report, Appellant's argument is clearly frivolous and must fail.

**V.** **Appellees are entitled to proceed with their healthcare liability claim because their expert report sets forth at least one viable theory of liability against Appellant.**

### A. Appellees have asserted a healthcare liability claim against Appellant

Appellees brought this wrongful death and survival action against Appellant as a healthcare liability claim under the provisions of Chapter 74. Chapter 74 defines a health care liability claim as follows:

> 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). (APP 13).

Where, as in the instant case, the plaintiffs are seeking recovery of damages under both wrongful death and survival theories of liability, all of the plaintiffs are treated as a single "claimant" asserting a single health care liability claim. Section 74.001(a)(2) specifically provides:

> 'Claimant' means a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim. All persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant.

TEX. CIV. PRAC. & REM. CODE 74.001(a)(2). (APP 13).

24

## B. The Requirements of the Expert Report

At the time this case was filed, Section 74.351(a) of the Texas Civil Practice & Remedies Code required that a claimant in a health care liability claim serve, within 120 days of filing an action, "one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted." TEX. CIV. PRAC. & REM. CODE § 74.351(a). (APP 9). The Statute defines an expert report as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE §74.351(r)(6). (APP 9).

To comply with the statutory requirements, the report need only provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex. 2001). The Texas Supreme Court has explained that a "fair summary" is not "a full statement of the applicable standard of care and how it was breached." *Id.* at 880. In other words, "there is some level of ambiguity— something less than an absolutely full

25

description—that is subject to the independent analysis of the trial court." *IHS Acquisition No. 140, Inc. v. Travis*, 2008 WL 1822780 at *9 (Tex. App.– Corpus Christ 2008, pet. denied )(not designated for publication). In regard to causation, "a fair summary is something less than all the evidence necessary to establish causation at trial…." *Tovar v. Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P.*, 185 S.W.3d 65, 68 (Tex.App.-San Antonio 2005, pet. denied). "'A plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.'" *Id.* at 70 *quoting Palacios*, 46 S.W.3d at 879. Further, "the report need not 'rule out every other possible cause of the injury, harm, or damages claimed' or 'rule out all other possible scenarios.' *Kayani v. Stevens*, 2013 WL 174553 at *3 (Tex. App. – Beaumont 2013, no pet.)(not designated for publication) *citing Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex.App.-- Dallas 2009, no pet.); *VHS San Antonio Partners LLC v. Garcia*, 2009 WL 3223178 (Tex.App.-- San Antonio Oct. 7, 2009, pet. denied)(not designated for publication). Finally, when reviewing the report, each section of the report should be read in the context of the entire report, not in isolation. *VHS San Antonio Partners LLC*, 2009 WL 3223178 at *3; *Stephanie M. Philipp, P.A. v. McCreedy*, 298 S.W.3d 682, 690-691 (Tex.App.-- San Antonio, no pet.). In the

seminal case *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625 (Tex. 2013), a case Appellant neglected to mention in his Brief, the Texas Supreme Court held that so long as a plaintiff has pleaded and supported with an expert report "one viable liability theory", the plaintiff's health care liability claim "cannot be frivolous" and the plaintiff's suit may proceed. *Id.* at 631.

Even a cursory examination of the Dr. Lipson's expert report (RR Vol. 3, Ex. 1; APP 3) reveals that Appellees have pleaded and supported with an expert report at least "one viable liability theory" against Appellant.[1]

### C. Appellant's "but for" argument ignores the evidence provided in Loren Lipson, M.D.'s report.

Appellant argues in his Brief that "it should be obvious to all that a homicide normally destroys the causal connection of anyone's conduct, but that of the attacker." (Appellant's Brief p. 24). Appellant makes the further argument that the conclusions reached in Dr. Lipson's expert constitute only "but for" arguments. However, through this argument, the Appellant ignores the abundance of evidence in Dr. Lipson's report pertaining to foreseeability and the fact that Dr. Harrington, as the primary care provider for Ms. Ramos, should have been aware of the countless instances of abuse and falls and failed to acknowledge or address them.

---

[1] As evinced by Appellant's Brief, Appellant is not asserting on this appeal that Dr. Lipson was not qualified to opine as to causation regarding Sylvia Ramos's injuries, such as her fractures, mental anguish, and numerous fall and abuse injuries, excluding her intracranial hemorrhage and death.

In support of his argument, Appellant cites to entirely distinguishable and dissimilar cases, many of which pertain to surgical and radiological errors. Rather, a case directly on point was decided by the Beaumont Court of Appeals.

At issue in *Chumley* was an expert report addressing a resident's black eye and broken ribs and breaches of the standard of care by a nursing home and its staff. *Silsbee Oaks Health Care, L.L.P. v. Chumley,* 2010 Tex. App. LEXIS 10337 * 1, 2010 WL 5550671 (Tex. App.-- Beaumont Dec. 30, 2010). Just like Appellant in this case, the defendant in *Chumley* argued that the expert's discussion regarding the standard of care was speculative and conclusory, lacked specificity, failed to provide any factual basis, and erroneously concluded that negligence occurred because injury occurred. *Compare Chumley*, 2010 WL 5550671 at *5-6 to Appellant's Brief at 17-27. Further, like Appellant in this case, the defendant in *Chumley* argued that the report failed to establish the nexus between the breaches of the standard of care and causation. *Compare Chumley*, 2010 WL 5550671 at *6-7 to Appellant's Brief at 17-27. Finally, like the trial court in this case, the trial Court in *Chumley* rejected all of the defendant's arguments and held that the report satisfied the requirements of Section 74.351.

In determining that the trial court did not abuse its discretion, the Court of Appeals in *Chumley* stated:

> Essentially, the report states that the failure to properly monitor the patients, to make periodic rounds, and to train and instruct the nursing staff on assault prevention caused Chumley's injuries. The emergency room records reviewed by Rushing explain that Chumley stated he had been struck in the chest at the nursing home. Dr. Rushing's report addresses the possibility of a fall or an assault by an employee or another patient. Whether the broken ribs are the result of a fall or an assault, the report explains why the experts believe that Chumley's injuries arose from and were caused by the breach of the standard of care by Silsbee Oaks and its employees. At the medical report stage, given the incomplete status of discovery, the plaintiff is not required to prove its claim. *See Apodaca v. Russo*, 228 S.W.3d 252, 255 (Tex.App.-Austin 2007, no pet.). Although the expert report is not required to prove the defendant's liability, it must provide notice of what conduct forms the basis for the plaintiff's complaints. *Id.* Dr. Rushing relied on the history contained in the medical records he reviewed. One purpose of the expert report is to show that a plaintiff has a viable cause of action that is not frivolous or without expert support. Rushing's report sufficiently informs Silsbee Oaks of conduct by Silsbee Oaks that the plaintiff believes caused injury to Chumley. The trial court did not abuse its discretion in denying appellant's motion to dismiss.

*Chumley*, 2010 WL 5550671 at 7. Similar to *Chumley*, similar to his review of the medical chart, Dr. Lipson explains why he believes Sylvia Ramos' fall and abuse injuries arose from and were caused by breaches of the standard of care by Appellant. Dr. Lipson's report sufficiently informs Appellant of conduct by Appellant that Appellees believe caused the fall and abuse injuries to Sylvia Ramos.

29

**D. Loren Lipson, M.D.'s report is not conclusory as to causation.**

Beyond Appellant's argument that Dr. Lipson's expert report fails to adequately set forth breaches in the standard of care, Appellant argues: "Nowhere in [his] report does Dr. Lipson even attempt to articulate any type of explanation as to how Dr. Harrington's alleged failure to follow these standard of care caused Sylvia Ramos' death, or even explain how these alleged violations caused Plaintiff's damages." (Appellant's Brief p. 18). Appellees will address this untrue allegation below by presenting examples of Dr. Lipson's various theories of negligence below.

The Fourth Court of Appeals has agreed with the holding that an opinion is speculative if an expert's opinion is not supported by the established facts but only by an assumption regarding the underlying facts. *Cooper v. Arizpe*, No. 04-07-00734-CV, 2008 WL 94090, at *3 (Tex.App.—San Antonio Apr. 9, 2008, pet. Denied) (mem. op.) (citing *Murphy v. Mendoza*, 234 S.W.3d 23, 28 (Tex.App.—El Paso 2007, no pet.)). As articulated in *Belden*, an expert must explain the basis of his statements and link his conclusions to the facts in order for his opinions not to be conclusory. *Belden*, at *6. (citing *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010)). While the Appellant's sole challenge is that causation is conclusory, and Appellant did not object that Dr. Lipson failed to adequately discuss standard of care and breach of standard of care, in order to comprehensively show how

30

causation is not conclusory, it helps to identify the standard of care, breach of standard of care, and causation for the different theories of liability.

### 1. Failure to give appropriate input into Sylvia Ramos' care plan

The Standard of Care:
- "[T]he standard of care requires that the physician participate in the resident's care planning assessment, monitor changes in the resident's medical status, and provide consultation and treatment when called to do so, which includes prescribing new therapy, ordering a resident be transferred to another level of care, and conducting routine visits…A physician supervising the medical care of a nursing home resident has a duty to assist the facility in providing input into the resident's care plan." (RR Vol. 3, Ex. 1, p.5; APP 3).
- "When faced with a resident who repeatedly wanders and suffers falls at a facility and a resident who is involved in numerous altercations with other residents and the subject of attacks by other residents, the standard of care requires the physician supervising the medical care of the resident to assist the facility in providing input into the resident's care plan to address these problems." (RR Vol. 3, Ex. 1, p. 5; APP 3).

Breach of the Standard of care:
- "Dr. Harrington should have given appropriate input as to the deficiencies in Ms. Ramos' care plan concerning her past falls and wanderings. Such input may have included, but is not limited to, the following: implementing timed toileting programs, regularly orienting Ms. Ramos with her environment to prevent wandering and confusion, monitoring and readjusting medications, investigating the cause of the injuries, lowering her bed, instituting bed rails, maintenance of proper hydration and nutrition, instituting bed alarms, and ordering additional supervision, assistance, modifying her environment, and/or assistive waling devices. Dr. Harrington also should have given appropriate input as to the deficiencies in Ms. Ramos' care plan concerning the physical altercations she as involved in with other residents and the attacks she suffered. Such input may have included, but is not limited to, the following: identifying triggers for threats and attacks by other residents, investigating the cause of the injury/threat and implementing a care plan to address the cause, removing Ms. Ramos from close proximity to aggressive residents, and monitoring and modifying the environment as needed, Dr. Harrington breached the standard of care by failing to adequately review and

31

assist in providing input into Ms. Ramos' care plan." (RR Vol. 3, Ex. 1, p. 6; APP 3).

Supporting Facts:

- "Incredibly, while a resident at Trisun, Ms. Ramos experienced seemingly constant wandering and sustained approximately 30 documented falls, and suffered numerous unexplained bruises and fractures." (RR Vol. 3, Ex. 1, p. 5; APP 3).

- "She also was involved in many altercations with other residents and on numerous occasions was the victim of resident on resident abuse." (RR Vol. 3, Ex. 1, p. 6; APP 3).

- "Ms. Ramos fell numerous times while at the Trisun. Ms. Ramos fell on 1/29/07 and was found on her left side with her arm tucked under her torso, which required further evaluation at the NIX Medical Center Hospital, where she diagnosed with acute vertebral compression fracture. On 2/20/11 Ms. Ramos fell, injured her head, and was transferred to Northeast Baptist Hospital for evaluation. Ms. Ramos suffered a scalp hematoma and elbow injury. Additional falls were noted on 1/30/07, 5/29/07, 6/1/07, 6/20/07, 9/6/07, 9/7/07, 9/12/07, 2/18/08, 8/1/08, 9/07/08, 10/14/08, 10/15/08, 11/3/08, 11/12/08, 3/11/08, 8/30/09, 11/20/09, 6/12/10, 9/12/10, 10/30/10, 5/1/11, 5/16/11, 6/26/11, 8/6/11, 8/24/11, 4/13/12, 5/1/12, 6/16/12, and 6/17/12. Ms. Ramos was noted to have fallen in the past 30 days on 4/9/07, 10/8/07, 1/14/08, 4/17/08, 9/27/08, 10/09/08, 12/04/08, 1/6/09, 1/15/09, 1/21/09, 1/28/09, 2/18/09, 4/7/09, 9/26/09, 10/05/09, 12/09/09, 2/22/10, 5/17/10, 6/14/10, 6/22/10, 6/30/10, 7/05/10, 9/29/10, 9/30/10, 10/28/10, 12/09/10, 2/3/11, 2/17/11, 6/18/11, 7/25/11, 5/2/12, 5/11/12, and 6/19/12." (RR Vol. 3, Ex. 1, Ex. A, Paragraph No. 14; APP 3).

- "In addition to the falls, other incidents in which Ms. Ramos was subjected to extreme risk for harm while at the facility included at least 12 instances of physical aggression involving other residents, including but not limited to the following: 4/3/07, 5/6/07, 4/7/07, 4/11/06, 4/19/07, 4/24/07, 6/20/07, 11/09/07, 12/06/07, 5/12/09, 6/8/09, and 9/21/09." (RR Vol. 3, Ex. 1, Ex. A, Paragraph No. 17; APP 3).

- "Ten additional physical altercations were documented throughout Ms. Ramos' medical records. On 10/5/06, a resident in Room 28 yelled, pulled, pushed, and hit Ms. Ramos. On 6/1/07, another resident grabbed Ms. Ramos by the arm and threw her to the ground. On 11/3/08, a resident turned Ms. Ramos' chair over with her in it knocking her to the

32

ground. On 11/5/08, a resident pushed Ms. Ramos onto the ground. On 3/09/09 and 8/30/09, Ms. Ramos was again knocked out of her chair by another resident. On 8/12/10, Ms. Ramos was grabbed and shoved to the floor by a resident from 13B causing her to hit her head on the wall railing. On 12/1/10, a resident picked up a wet floor sign and hit Ms. Ramos in the face with it. On 2/19/11, Ms. Ramos was pushed into the wall by another resident causing her to strike her head on the rail and sustain a large hematoma. On 5/1/11, patient "Natividad" pushed Ms. Ramos to the floor." (RR Vol. 3, Ex. 1, Ex. A, Paragraph No. 18; APP 3).

Causation:
- *Fall Injuries:*
    - "Specifically, on 11-20-09, Ms. Ramos suffered a left superior and inferior pubic fracture and left sided sacral insufficient fracture as a result fall caused by a staff member bumping into her. In response to Ms. Ramos' injuries, Dr. Harrington noted in the medical records that that it was allowable to get Ms. Ramos up in her wheelchair and ordered Norco 10/325 mg tab 1 every 8 hours and Norco 10/325 every 4 hours for pain as needed. (Trisun 2358, 3148-3151). I am familiar with the fall type of pelvic fracture that occurred to Ms. Ramos on or about 11-20-09. A pelvic fracture is a disruption of the bony structure of the pelvis, including the sacrum and coccyx. The most common cause of this fracture in the elderly is from a fall. Diagnosis is made on the basis of history, clinical features, and x-rays and CTs. Signs and symptoms may include swelling, bruising, and pain. Ms. Ramos' pelvic fracture was consistent with a fall mechanism of injury. The documentation confirms that on 11-20-09 a staff member at Trisun bumped Ms. Ramos causing her to fall." (RR Vol. 3, Ex. 1, p. 8-9; APP 3).
    - "Additionally, on 3-20-10, a nurse identified swelling and bruising on Ms. Ramos' left hand. An x-ray confirmed a diagnosis of the left fifth metacarpal. Although no explanation is given as to the cause of the fracture, the 3-23-10 nursing summary for Ms. Ramos indicates that Ms. Ramos suffered falls within the past 30 days. In reasonable medical probability, Ms. Ramos' fifth metacarpal fracture occurred from a fall as it is a common type of injury that occurs in the elderly as a result of falls, and Ms. Ramos had a documented history of repeated falls." (RR Vol. 3, Ex. 1, p. 9; APP 3).

- ○ "Ms. Ramos' falls and resulting fractures, and specifically including the 11-20-09 and 3-20-10 falls, were proximately caused in part by the aforementioned breaches of the standard of care by Dr. Harrington and Dr. Zarate. Dr. Harrington failed to properly assess Ms. Ramos, including an assessment of her fall risks, and failed to provide proper input into Ms. Ramos' care plan to address falls and fall risks. If Dr. Harrington had properly assessed Ms. Ramos and provided proper input into Ms. Ramos' care plan to address falls, in some of the ways enumerated above, in reasonable medical probability, Ms. Ramos would not have continued to suffer repeated falls and injuries and would not have suffered the 11-20-09 and 3-20-10 falls. Ms. Ramos' 11-20-09 and 3-20-10 falls and injuries were proximately caused by the breaches in the standard of care by Dr. Harrington." (RR Vol. 3, Ex. 1, p. 8-9; APP 3).

- *Mental Anguish:*
  - ○ "I am familiar with the type of mental anguish that occurs when a resident is under persistent threats and attacks by other residents, similar to that mental anguish Ms. Ramos experienced during her residency at Trisun. Signs and symptoms of resulting mental anguish include, fear, anxiety, agitation, anger, non-responsiveness, confusion, unexplained bruises, depression, defensive behavior, and changes in behavior. Ms. Ramos' medical chart is replete with instances of attacks and threats by other residents directed toward Ms. Ramos. Ms. Ramos' medical chart is also replete with instances of Ms. Ramos experiencing fear, anxiety, agitation, anger, non-responsiveness, confusion, unexplained bruises, depression, defensive behavior, and changes in behavior. It is my medical opinion that in all reasonable probability Ms. Ramos suffered mental anguish from the resident on resident abuse she was subjected to at Trisun. Moreover, in all reasonable probability, this mental anguish was proximately caused by the aforementioned breaches in the standard of care by Dr. Harrington and Dr. Zarate." (RR Vol. 3, Ex. 1, p. 9-10; APP 3).
  - ○ "Had Dr. Harrington provided appropriate input in regard to the deficiencies in Ms. Ramos' care plan concerning the physical altercations she was involved in with other residents, such as in the ways enumerated above which included, for example, removing Ms. Ramos from close proximity to aggressive residents or

34

identifying triggers for attacks, Ms. Ramos' would not have suffered the mental anguish associated with continuing attacks and the fear of being a victim of attacks. Ms. Ramos' mental anguish was proximately caused by the breaches in the standard of care by Dr. Harrington." (RR Vol. 3, Ex. 1, p. 10; APP 3).

- *Physical Injuries and Death from Resident on Resident Attacks*
  - "On 2-19-11, a Trisun resident pushed Ms. Ramos, causing Ms. Ramos to strike her head against the railing on a hallway wall and suffer a head injury. Ms. Ramos was transferred to Northeast Baptist Hospital for evaluation. She was diagnosed with a large occipital hematoma. I am familiar with resident-on-resident assault type injuries that occurred to Ms. Ramos throughout her residency, and am specifically familiar with the type of injury that occurred on 2-19-11—the large occipital hematoma. It is my medical opinion that in all reasonable probability, Ms. Ramos' large occipital hematoma was consistent with the blunt force head injury sustained as a result of the blow to her head against the hallway railing." (RR Vol. 3, Ex. 1, p. 10; APP 3).
  - "On 7-16-12 Ms. Ramos suffered a terminal fall. Resident 11191 pushed Ms. Ramos, causing Ms. Ramos to fall and strike her head. Following the fall, Ms. Ramos was admitted to Northeast Baptist Hospital where she was diagnosed with an intracranial hemorrhage. She was then discharged to hospice care at Vitas Innovative Hospice Care on 7-18-12 where she died on 8-1-12. The Bexar County Medical Examiner classified Ms. Ramos' death as a homicide and concluded that Ms. Ramos died due to complications of an acute hemorrhagic stroke following a her terminal fall with blunt force injury to the head." (RR Vol. 3, Ex. 1, p. 10; APP 3).
  - "It is my medical opinion that had Dr. Zarate and Dr. Harrington met the aforementioned standard of care, in all reasonable probability Ms. Ramos would not have suffered continual threats, altercations, and attacks by other residents. Additionally, Ms. Ramos would not have suffered the assault on 2-19-11 that resulted in a large occipital hematoma and she would not have suffered the assault on 7-16-12 that resulted in her death." (RR Vol. 3, Ex. 1, p. 11; APP 3).
  - "If Dr. Harrington had provided appropriate input in regard to the deficiencies in Ms. Ramos' care plan concerning the physical

35

altercations she was involved in with other residents, as required by the standard of care, the care plan for Ms. Ramos would have addressed the issue of resident on resident attacks and measures would have been taken to protect Ms. Ramos from future attacks, such as the measures discussed above…If such measures had been taken, in reasonable medical probability Ms. Ramos would not have been pushed by residents on either 2-9-11 or 7-16-12, and she would not have suffered a large occipital hematoma and intracranial hemorrhage that resulted in her death. Had Dr. Harrington met the standard of care, in reasonable medical probability, Ms. Ramos' untimely death would have been prevented." (RR Vol. 3, Ex. 1, p. 11; APP 3).

o "Dr. Harrington and Dr. Zarate had years to intervene in Ms. Ramos' substandard care, but failed to do so. The numerous injuries Ms. Ramos suffered were not isolated incidents, but were repeated with egregious frequency throughout Ms. Ramos' residency, which should have immediately been recognizable to her physician, Dr. Harrington, and the medical director, Dr. Zarate. Dr. Harrington and Dr. Zarate absolutely had a duty to intervene on Ms. Ramos' behalf and their failure to do so resulted in Ms. Ramos continuing to receive substandard care in an unsafe environment. If Dr. Harrington and Dr. Zarate had intervened in Ms. Ramos' care, Ms. Ramos' untimely death would not have occurred." (RR Vol. 3, Ex. 1, p. 11-12; APP 3).

2. **Failure to Timely and Properly Assess Sylvia Ramos and Accurately Document her Health Conditions.**

Standard of Care

- "The standard of care requires that a treating physician assess a resident as frequently as dictated by the medical needs of the resident. Under Medicaid/Medicare guidelines, at a Medicaid certified skilled nursing facility, a physician is required to see the resident at least once every 30 days for the first 90 days after admission and at least once every 60 days thereafter." (42 CFR §483.40(c)(1-2)). (40 TAC §19.1203(2)(a)). (RR Vol. 3, Ex. 1, p. 6; APP 3).

- "Moreover, when a treating physician does assess a resident, the standard of care requires that the physician review the resident's total program of care, including medication and treatments. The visit should also include an evaluation of the resident's condition and a review of the continued

appropriateness of the resident's current medical regimen." (RR Vol. 3, Ex. 1, p. 6; APP 3).

- "The standard of care requires that documentation accurately reflect care being given and the status of the patient. At each visit with a nursing home facility resident, the treating physician should write, sign and date progress notes recording the resident's progress or problems in maintaining or improving mental and physical status." (42 CFR §483.40(b)(1-3)). (40 TAC §19.1202)." (RR Vol. 3, Ex. 1, p. 6-7; APP 3).

Breach of the Standard of Care

- "Dr. Harrington breached the standard of care by failing to perform timely and adequate assessments of Ms. Ramos." (RR Vol. 3, Ex. 1, p. 6; APP 3).
- "Dr. Harrington breached the standard of care as evidenced by his deficient documentation." (RR Vol. 3, Ex. 1, p. 6; APP 3).

Supporting Facts:

- "In the present case, significant lapses between physician assessments occurred. For example, after Ms. Ramos was assessed on September 7, 2011, she was not assessed again until December 7, 2011. Another lapse in assessment occurred between March 23, 2011 and July 7, 2011. These lapses in assessments occurred despite the recurring falls, wanderings, physical altercations with other residents, and other injuries experienced by Ms. Ramos. Ms. Ramos' condition certainly indicated the need for more frequent assessments." (RR Vol. 3, Ex. 1, p. 6; APP 3).
- "According to the Progress Notes/Nursing Facility Care, Annual Assessment Encounters/History and Physical Updates/UT Medicine Senior Health Long Term Follow-up Care Visits for Ms. Ramos, Ms. Ramos was assessed by a physician/nurse practitioner on the following dates: . . . . Consequently, it appears that significant lapses in assessments occurred, and specifically between the following dates: 9-7-11 and 12-7-11; 3-23-11 and 7-7-11; 7-22-08 and 11-21-08; 1-30-08 and 4-2-08; and 10-31-07 and 12-9-07." (RR Vol. 3, Ex. 1, p. 4-5; APP 3).
- "In his assessments of Ms. Ramos, Dr. Harrington failed to adequately review the total plan of care for Ms. Ramos or adequately evaluate Ms. Ramos' condition. Ms. Ramos suffered numerous unexplained bruises, fractures, and vaginal bleeding during the time she was a resident at Trisun. No investigation into the source of those injuries by Dr.

Harrington is apparent in the medical records. Beyond the fact that there does not appear to have been any investigation, Dr. Harrington seemingly ignored Ms. Ramos' ongoing issues. For example, on 11-03-09 and 11-04-10, Dr. Harrington noted that Ms. Ramos had no new issues and to continue with the present care on 11-03-09 and 11-04-10." (RR Vol. 3, Ex. 1, p. 6; APP 3).

- "As discussed above, Ms. Ramos suffered numerous unexplained bruises, fractures, approximately 30 documented falls, dozens of threats and physical altercations with other residents, and vaginal bleeding during the time she was a resident of Trisun. On numerous occasions, Dr. Harrington failed to properly document these problems and Ms. Ramos' associated declining mental and physical status in his progress notes." (RR Vol. 3, Ex. 1, p. 7; APP 3).

Causation:

- *Fall Injuries:*
  - "Ms. Ramos' falls and resulting fractures, and specifically including the 11-20-09 and 3-20-10 falls, were proximately caused in part by the aforementioned breaches of the standard of care by Dr. Harrington and Dr. Zarate. Dr. Harrington failed to properly assess Ms. Ramos, including an assessment of her fall risks, and failed to provide proper input into Ms. Ramos' care plan to address falls and fall risks. If Dr. Harrington had properly assessed Ms. Ramos and provided proper input into Ms. Ramos' care plan to address falls, in some of the ways enumerated above, in reasonable medical probability, Ms. Ramos would not have continued to suffer repeated falls and injuries and would not have suffered the 11-20-09 and 3-20-10 falls. Ms. Ramos' 11-20-09 and 3-20-10 falls and injuries were proximately caused by the breaches in the standard of care by Dr. Harrington." (RR Vol. 3, Ex. 1, p. 8-9; APP 3).

- *Physical Injuries and Death from Resident on Resident Attacks*
  - "It is my medical opinion that had Dr. Zarate and Dr. Harrington met the aforementioned standard of care, in all reasonable probability Ms. Ramos would not have suffered continual threats, altercations, and attacks by other residents. Additionally, Ms. Ramos would not have suffered the assault on 2-19-11 that resulted in a large occipital hematoma and she would not have suffered the

38

assault on 7-16-12 that resulted in her death." (RR Vol. 3, Ex. 1, p. 11; APP 3).

- o "If Dr. Harrington had provided appropriate input in regard to the deficiencies in Ms. Ramos' care plan concerning the physical altercations she was involved in with other residents, as required by the standard of care, the care plan for Ms. Ramos would have addressed the issue of resident on resident attacks and measures would have been taken to protect Ms. Ramos from future attacks, such as the measures discussed above…If such measures had been taken, in reasonable medical probability Ms. Ramos would not have been pushed by residents on either 2-9-11 or 7-16-12, and she would not have suffered a large occipital hematoma and intracranial hemorrhage that resulted in her death. Had Dr. Harrington met the standard of care, in reasonable medical probability, Ms. Ramos' untimely death would have been prevented." (RR Vol. 3, Ex. 1, p. 11; APP 3).

- o "Dr. Harrington and Dr. Zarate had years to intervene in Ms. Ramos' substandard care, but failed to do so. The numerous injuries Ms. Ramos suffered were not isolated incidents, but were repeated with egregious frequency throughout Ms. Ramos' residency, which should have immediately been recognizable to her physician, Dr. Harrington, and the medical director, Dr. Zarate. Dr. Harrington and Dr. Zarate absolutely had a duty to intervene on Ms. Ramos' behalf and their failure to do so resulted in Ms. Ramos continuing to receive substandard care in an unsafe environment. If Dr. Harrington and Dr. Zarate had intervened in Ms. Ramos' care, Ms. Ramos' untimely death would not have occurred." (RR Vol. 3, Ex. 1, p. 11-12; APP 3).

3. **Failure to Discharge Sylvia Ramos to a Level of Care that Could Meet Her Health Needs.**

Standard of Care:
- "When a nursing home facility cannot meet a resident's needs, and the treating physician becomes aware of this information, the standard of care requires the physician to coordinate discharge of the resident to a facility that can meet the level of care required by the patient. (RR Vol. 3, Ex. 1, p. 7; APP 3).

Breach of the Standard of Care:

39

- "Dr. Harrington breached the standard of care by failing to discharge Ms. Ramos from Trisun to another facility when it became clear that Trisun could not meet Ms. Ramos' needs." (RR Vol. 3, Ex. 1, p. 7; APP 3).

Supporting Facts:
- "Based on the sheer number falls and wanderings, and the injuries Ms. Ramos suffered as a result of her falls, Dr. Harrington should have recognized that Trisun was not meeting Ms. Ramos' health needs and should have discharged Ms. Ramos. Additionally, as a result of the numerous physical altercations with other residents, close proximity to aggressive residents, constant wandering, instances of unexplained vaginal bleeding and bruising, and fractures, Dr. Harrington should have recognized that Trisun could not meet Ms. Ramos' health needs and should have discharged Ms. Ramos." (RR Vol. 3, Ex. 1, p. 7; APP 3).

Causation:
- *Physical Injuries and Death from Resident on Resident Attacks*
  - "It is my medical opinion that had Dr. Zarate and Dr. Harrington met the aforementioned standard of care, in all reasonable probability Ms. Ramos would not have suffered continual threats, altercations, and attacks by other residents. Additionally, Ms. Ramos would not have suffered the assault on 2-19-11 that resulted in a large occipital hematoma and she would not have suffered the assault on 7-16-12 that resulted in her death." (RR Vol. 3, Ex. 1, p. 11; APP 3).
  - "If Ms. Ramos continued to suffer attacks and threats by other residents and Trisun was unable to keep Ms. Ramos safe, Dr. Harrington should have discharged Ms. Ramos to a facility that could meet her needs. If such measures had been taken, in reasonable medical probability Ms. Ramos would not have been pushed by residents on either 2-9-11 or 7-16-12, and she would not have suffered a large occipital hematoma and intracranial hemorrhage that resulted in her death. Had Dr. Harrington met the standard of care, in reasonable medical probability, Ms. Ramos' untimely death would have been prevented." (RR Vol. 3, Ex. 1, p. 11; APP 3).
  - "Dr. Harrington and Dr. Zarate had years to intervene in Ms. Ramos' substandard care, but failed to do so. The numerous injuries Ms. Ramos suffered were not isolated incidents, but were repeated with egregious frequency throughout Ms. Ramos'

40

residency, which should have immediately been recognizable to her physician, Dr. Harrington, and the medical director, Dr. Zarate. Dr. Harrington and Dr. Zarate absolutely had a duty to intervene on Ms. Ramos' behalf and their failure to do so resulted in Ms. Ramos continuing to receive substandard care in an unsafe environment. If Dr. Harrington and Dr. Zarate had intervened in Ms. Ramos' care, Ms. Ramos' untimely death would not have occurred." (RR Vol. 3, Ex. 1, p. 11-12; APP 3).

Dr. Lipson's report fairly summarizes the applicable standard of care with regard to the care and treatment of Sylvia Ramos by Dr. Gerald Harrington, explains how the Appellant failed to meet that standard, and establishes the causal relationship between the failures and Sylvia Ramos' multiple injuries, including her intracranial hemorrhage and death. The standard of care, breaches, and causation injuries resulting from such breaches are clearly linked and supported by the evidence in the report.

Because Dr. Lipson's report satisfies the requirements of a report under Section 74.351 as to the Appellees' multiple theories of liability related to Sylvia Ramos' injuries, including her intracranial hemorrhage and death, any of which would make the report sufficient, Appellees are entitled to proceed with all theories of liability in their suit against Appellant. *Potts*, 392 S.W.3d at 630. The trial court properly denied Appellant's motion to dismiss.

## VI.   Request for Damages for Frivolous Appeal

Pursuant to the Texas Rule of Appellate Procedure Rule 45, Appellees hereby respectfully request that the Court award Appellees damages for the

41

expense associated with Appellant's frivolous appeal. (APP 15). TEX. R. APP. P. R.45. Accordingly, Appellees have included an Affidavit of expenses associated with responding to Appellant's frivolous appeal. (APP 16).

Given the record regarding multiple theories of negligence included within the expert report, the holding in *Potts*, and the discretion vested in the trial court, this appeal is clearly frivolous.

Appellant's various arguments regarding purported deficiencies in Dr. Lipson's report lack legitimacy and merit. Appellant's arguments, when viewed in the context of the entirety of Dr. Lipson's report and the controlling case law, exemplify that this is a frivolous appeal under Rule 45 of the Texas Rules of Appellate Procedure. *See Owen v. Jim Alle Imps., Inc.*, 380 S.W.3d 276, 290 (Tex. App. – Dallas 2012, no pet.)("An appeal is frivolous when the record, viewed from the perspective of the advocate, does not provide reasonable grounds for the advocate to believe that the case could be reversed."). (APP 15).

**VII.  In the event that the Court determines the report is deficient, Appellees should be granted an opportunity to cure the deficiency.**

In the event the Court finds that Dr. Lipson's report is for some reason deficient, Appellees request that the Court remand the case to the trial court so that Appellees may seek a 30-day extension in which to cure the deficiency. *See* TEX. CIV. PRAC. & REM. CODE §74.351(c)(APP 9); *Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex.2008) ("We agree with the court of appeals that section 74.351's plain

42

language permits one thirty-day extension when the court of appeals finds deficient a report that the trial court considered adequate."); *Leland v. Brandal*, 217 S.W.3d 60, 64 (Tex. App. – San Antonio 2006), *aff'd* 257 S.W.3d 204 (Tex. 2008)(reversing trial court's order denying motion to dismiss and remanding to trial court for consideration of plaintiff's request for a 30-day extension to cure deficiencies). *See also, Samlowski v. Wooten*, 332 S.W.3d 404, 411 (Tex. 2011)("[C]ourts should err on the side of granting claimants' extensions to show the merits of their claims.").

## VIII. Conclusion

Appellant has waived his objections as a matter of law. Even if such objections were not waived, Appellees' expert, Loren Lipson, M.D. is qualified to render the opinions provided in his Ch. 74 Expert Report. Moreover, Appellees have indisputably pleaded and supported with an expert report at least "one viable liability theory" against Appellant. As such, the trial court did not abuse its discretion when it denied Appellant's Motion to Dismiss. The trial court's decision should be affirmed.

## PRAYER

For the reasons stated above, Appellees respectfully request that this Court affirm the trial court's order denying Appellant's Motion to Dismiss and grant Appellees' request for attorneys' fees associated with responding to Appellant's

43

frivolous appeal. Alternatively, should the Court determine for some reason that Appellees' expert report is deficient, then Appellees pray that the matter be remanded to the trial court so that Appellees may seek a 30-day extension in which to cure the deficiency. Appellees further request such other and further relief to which Appellees are justly entitled.

Respectfully submitted,

Law Offices of Pat Maloney, P.C.

By: _____/s/ Byron B. Miller_____
        Byron B. Miller, State Bar No. 24074716
        byron@maloneylawgroup.com
        Michael Maloney, State Bar No. 12883300
        mikem@maloneylawgroup.com
        Erica Maloney, State Bar No. 24085698
        ericam@maloneylawgroup.com
        322 W. Woodlawn Ave., Suite 1
        San Antonio, Texas 78212
        Telephone: 210-228-0400
        Facsimile: 210-735-8431
        **Attorneys for Appellees**

**TEX. R. APP. P. 9.4(i)(3) CERTIFICATE OF COMPLIANCE**

I hereby certify that this computer generated document, excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement or procedural history, signature, proof of service, certification, certificate of compliance and appendix contains 11,099 words based on the word count of the software used to generate the document.

_____/s/ Byron B. Miller_____
Byron B. Miller

**CERTIFICATE OF SERVICE**

I hereby certify that on this, the <u>11th</u> day of May, 2015, this document was served on the parties to this appeal as follows:

**By Certified Mail, Return Receipt Requested**
**and by e-mail to Mail@Hole&Alvarez.com**
Ronald G. Hole
Hole & Alvarez, L.L.P.
P.O. Box 720547
McAllen, Texas 78504-0547
*Attorney for Appellant*

Ms. Emily J. Davenport
Reed, Claymon, Meeker
& Hargett, P.C.
5608 Parkcrest Drive, Suite 200
Austin, Texas 78731
E-Mail: edavenport@rcmhlaw.com
*Attorney for Defendant, PM Management – Windcrest NC, LLC*
*d/b/a Trisun Care Center Windcrest*

Mr. W. Richard Wagner
Wagner & Cario, LLP
7705 Broadway
San Antonio, Texas 78209
E-Mail: rwagner@wagnercario.com
*Attorneys for Defendant, Setters Medical Group, P.A.*

Ms. Lisa A. Rocheleau
Boone, Rocheleau & Rodriguez, P.L.L.C.
10101 Reunion Place, Suite 600
San Antonio, Texas 78209
E-Mail: lrocheleau@br-lawfirm.com
*Attorneys for Defendants, Rodolfo Zarate, M.D. and*
*Zarate Medical Group, P.A.*

_____/s/ Byron B. Miller_____
Byron B. Miller

# APPENDIX

Plaintiffs' 1st Amended Original Petition (CR 11-21) ...............................................1

Plaintiffs' 2nd Amended Original Petition…………………………………………….2

Loren Lipson, M.D.'s Expert Report as to Dr. Harrington (RR Vol. 3 Ex. 1) ……. 3

Loren Lipson, M.D.'s *Curriculum Vita*………………………………………...4

Loren Lipson, M.D.'s Expert Report as to Trisun Care Center Windcrest (RR Vol. 3 Ex. 1, Ex. A)..................................................................................................5

Defendant Gerald Harrington, M.D.'S Objections toPlaintiffs' Expert Report Pursuant to Section 74.351 of the Texas Civil Practice & Remedies Code (CR 26-31)…………………………………………………………………………………..6

RR Vol. 2, p. 1-52……………………………….……………………………………7

Order Denying Motion to Dismiss (CR 41-42) .......................................................8

TEX. CIV. PRAC. & REM. CODE § 74.351......................................................9

Order Granting Motion for Withdrawal and Substitution of Counsel…………….10

Appellant's Deficient Notification of Service (RR Vol. 3, Ex. 3) ………..………11

Tex. R. Civ. P. R. 21(a)………………………….…………………………………12

TEX. CIV. PRAC. & REM. CODE § 74.001...................................................13

TEX. CIV. PRAC. & REM. CODE § 74.403(a)………..…………………………14

TEX. R. APP. P. R.45………………………………………………………...15

Affidavit as to Appellees' expenses..................................................................16

TEX. CIV. PRAC. & REM. CODE § 74.401…………………………………………...17

# APP 1

FILED
6/27/2014 3:30:07 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Maria Jackson

CAUSE NO. 2014-CI-06284

| | | |
|---|---|---|
| SANDRA SCHROEDER AND DUANE J. RAMOS, INDIVIDUALLY AND AS ALL HEIRS TO THE ESTATE OF SYLVIA RAMOS, DECEASED, | § § § § § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § § | |
| VS. | § § | 288th JUDICIAL DISTRICT |
| PM MANAGEMENT – WINDCREST NC, LLC D/B/A TRISUN CARE CENTER WINDCREST, AND GERALD HARRINGTON, M.D. | § § § § § | |
| DEFENDANTS. | § | BEXAR COUNTY, TEXAS |

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

Plaintiffs, Sandra Schroeder and Duane J. Ramos, Individually and as all Heirs to the Estate of Sylvia Ramos, deceased (hereinafter "Plaintiffs"), file this Plaintiffs' First Amended Original Petition and Request for Disclosure complaining of PM Management – Windcrest NC, LLC D/B/A Trisun Care Center Windcrest and Gerald Harrington, M.D. and for cause of action show the Court the following:

### I. Discovery Control Plan

1. Pursuant to Tex.R.Civ.P. § 190.1, Plaintiffs intend to conduct discovery under Level 3.

### II. Parties

2. Plaintiff Sandra Schroeder is an individual residing in Bexar County, Texas. Plaintiff Duane J. Ramos is an individual residing in Comal County, Texas. Plaintiffs constitute all heirs and all wrongful death beneficiaries of Sylvia Ramos, deceased.

3. Defendant PM Management – Windcrest NC, LLC D/B/A Trisun Care Center Windcrest (hereinafter "Trisun Care Center") is a Texas limited liability company with its principal

11

place of business in Bexar County. The Defendant was served with process by serving its Registered Agent, CT Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

4. Defendant Gerald Harrington, M.D. (hereinafter "Dr. Harrington") is a physician licensed to practice in the State of Texas and may be served with process at 8038 Wurzbach, Suite 340, San Antonio, Texas 78229 or wherever he may be found.

### III. Chapter 74 Notice

5. Pursuant to Sections 74.051 and 74.052 of the Texas Civil Practice and Remedies Code, Plaintiffs provided notice to Trisun Care Center of the healthcare liability claims made the subject of this action on February 7 and 12, 2014 and Dr. Harrington On June 4, 2014. As such, the applicable statute of limitations has been tolled and includes a period of 75 days following the giving of the notice, and the tolling applies to all parties and potential parties to this action. *See* TEX. CIV. PRAC. & REM. CODE §74.051(c). Notice was appropriately accompanied by a medical authorization in the form required.

### IV. Venue and Jurisdiction

6. Venue is proper in Bexar County because all or a substantial part of the events or omissions giving rise to the claims occurred in Bexar County, and Trisun Care Center has its principal office in Bexar County.

7. This Court has jurisdiction because the claims and causes of action herein have resulted in damages to Plaintiffs within the jurisdictional limits of this Court and arise under the statutory and common law of the State of Texas. Plaintiffs are prohibited by Tex. Civ. Prac. & Rem. Code §74.053 from specifying the amount claimed in damages. As such,

2

Plaintiffs are not required to meet the requirements of newly amended Tex. R. Civ. Proc. 47(c) and hereby inform the court and Defendant that, pursuant to Tex. R. Civ. Proc. 169(a)(2), the expedited actions process does not apply to a suit in which a party had filed a claim governed by Chapter 74 of the Civil Practice & Remedies Code.

## IV. Causes of Action

### A. Background

8. Sylvia Ramos, now deceased as a result of the negligence of Trisun Care Center Windcrest, was a resident of Trisun Care Center Windcrest from September 25, 2006 through July 16, 2012. During the period of time that she was a resident at Trisun Care Center Windcrest, Ms. Ramos—a vulnerable, elderly individual—required Alzheimer's care. As early as May 14, 2007, Ms. Ramos' care plan stated that she "needs constant supervision on the locked unit."

9. While at Trisun Care Center Windcrest, Ms. Ramos was forced to endure a litany of instances of neglect and abuse, specifically including at least thirty (30) separate falls and resulting injuries such as numerous hematomas, a fracture of the lumbar vertebrae-close, a pelvic fracture, a fracture of the left fifth metacarpal, an acute vertebral compression fracture, and repeated head trauma. She also suffered three separate instances of institutional scabies and repeated urinary tract infections.

10. Furthermore, Ms. Ramos exhibited numerous signs and symptoms of sexual assault, which went uninvestigated, including but not limited to the following: multiple instances of vaginal bleeding, blood in her urine samples which varied from trace to large amounts of blood, institutional scabies, and times where she was found in the bed of other

3

residents.

11. Another constant and immediate physical threat to Ms. Ramos' life was the persistent verbal and physical assaults on Ms. Ramos by other residents. In fact, Ms. Ramos was exposed to numerous and constant physical altercations with other residents, including but not limited to altercations on April 3, 2007, May 6, 2007, April 7, 2007, April 11, 2006, April 19, 2007, April 24, 2007, June 20, 2007, November 9, 2007, December 6, 2007, May 12, 2009, June 8, 2009, and September 21, 2009. By September 26, 2009, her *RAP Worksheet* finally evidenced awareness of these resident-on-resident dangers to her safety: "environmental concerns included proximity to aggressive resident."

12. Trisun Care Center Windcrest failed to adequately address these assaults and, as a result, Ms. Ramos suffered many additional attacks by other resident and many resulting injuries during her time at Trisun Care Center Windcrest. These daily threats to her safety included instances where other residents *threw her to the ground, yelled and threatened her, pushed her over, punched her, shoved her out of her seat, grabbed her, pushed her into walls, struck her in the face with a "Wet Floor" sign,* and ultimately culminated in *a fatal assault* on July 16, 2012.

13. On July 16, 2012, Resident 11191 violently shoved Ms. Ramos into the wall causing her to fall to the floor and strike her head. She was transferred to Northeast Baptist Hospital, where she was diagnosed with intracranial hemorrhage. On July 18, 2012, she was placed on hospice care and transferred to Vitas Innovative Hospice Care where she died August 1, 2012 as the result of complications of an acute hemorrhagic stroke following a fall with blunt force injury of the head. The Bexar County Medical Examiner lists her manner

4

of death as *homicide*.

**B. Negligence and Gross Negligence of PM Management – Windcrest NC, LLC D/B/A Trisun Care Center Windcrest**

14. During the time that Ms. Ramos was a resident of Trisun Care Center Windcrest's facility, Trisun Care Center failed to properly and timely render appropriate medical and nursing care, failed to provide a safe environment, and failed to ensure that Ms. Ramos was free from abuse and neglect. Tragically, these failures proved fatal to Ms. Ramos.

15. Trisun Care Center was required to maintain a safe and comfortable environment for its residents. This included maintaining a physical environment free from any actual or perceived threats or hazards and any potential sources of injury and a non-threatening psychological environment; this, Trisun Care Center failed to do. Residents should feel comfortable and safe without fear of injury or abuse from staff or other residents; in the case of Ms. Ramos, Trisun Care Center failed. The legal rights of a resident in the nursing home setting include freedom from abuse. Many residents of nursing facilities, like Ms. Ramos, are, by virtue of varying disabilities, frail and quite vulnerable to a loss or infringement of their rights. Most troubling is the potential for them to be the victims of abuse by staff or other residents in a facility that fails to protect the rights of these residents. Because of this, the nursing staff is bound to maintain the rights of the residents and to protect them from any form of abuse; this, Trisun Care Center failed to do. If abuse is suspected, it is the duty of the staff to investigate the abuse, intervene when appropriate and to report the abuse to the proper authorities; this, Trisun Care Center failed to do. Nursing staff are bound to closely monitor the residents and to maintain a safe environment; this, Trisun failed to do. The staff is specifically bound to report any

5

potential symptoms of abuse such as those described and to investigate any potential abuse thoroughly, to document the circumstances of any event thoroughly in the medical records, and to ensure the circumstances found to cause the injury are prevented from recurring; this, Trisun Care Center failed to do.

16. At the time of the many incidents made the basis of this lawsuit, the registered nurses ("RNs"), licensed vocational nurses ("LVNs"), certified nursing assistants ("CNAs"), and other healthcare providers, excluding physicians, involved in the care of Ms. Ramos were employees of the Trisun Care Center working within the course and scope of their employment with Trisun Care Center. As such, the Trisun Care Center is responsible for all of these employees' negligent acts and/or omissions under the theory of respondeat superior and vicarious liability. In that regard, Trisun Care Center is liable for these employees' breaches of the applicable standard of care described below.

17. By failing to properly and timely render appropriate medical and nursing care, failing to provide a safe and secure physical and psychological environment, failing to investigate the abuse, intervene when appropriate and report the abuse to the proper authorities, and failing to ensure that Ms. Ramos was free from abuse and neglect, Trisun Care Center was negligent. Such negligence was a proximate cause of damages to Plaintiffs, including extreme pain, suffering and mental anguish, as well as the death of Ms. Ramos.

18. Defendant Trisun Care Center had a duty to exercise such reasonable care for the safety and well-being of Ms. Ramos, as her known mental and physical conditions required. Trisun Care Center breached this duty. Further, Trisun Care Center had a duty to provide medical/nursing care and treatment to Ms. Ramos within the recognized and accepted

6

standards of care for a nursing home facility, and Trisun Care Center breached this duty by failing to timely, properly, and adequately care for Ms. Ramos. Finally, Trisun Care Center had a duty to ensure a safe and secure environment in which to live, and Trisun Care Center breached this duty by failing to provide such an environment, which was evidenced by the many, many physical attacks on her by other residents.

19. Additionally, Trisun Care Center was negligent in the management and operation of Defendant facility, Trisun Care Center Windcrest, which is a long-term care facility, by: failing to provide adequate training, personnel, nursing and administrative policies and procedures, and supervisory oversight of employees and residents; failing to ensure that appropriate decisions were made pertaining to staffing and quality of care issues for the residents of Defendant facility, Trisun Care Center Windcrest; and failing to prevent systemic abuse of its residents.

20. Further, Trisun Care Center, having control over all management, budgetary, and financial matters affecting Defendant facility, Trisun Care Center, ignored the needs of Ms. Ramos and ignored the need for resources necessary to provide essential care at said nursing home facility. These acts and/or omissions, whether taken singularly or in combination, constitute negligence. Such negligence by the Trisun Care Center, as the governing body of Defendant facility, Trisun Care Center Windcrest, and the failure of Trisun Care Center to honor its obligation to use the resources of Defendant facility, Trisun Care Center Windcrest, to effectively and efficiently attain or maintain the highest practicable physical, mental, and psychosocial well-being of Ms. Ramos, as set forth in Tex. Admin. Code Ann. § 19.901, resulted in Ms. Ramos' extreme suffering; this

7

negligence was a direct and proximate cause of the injuries suffered by the Plaintiffs herein, including wrongful death and survival damages, for which Plaintiffs seek recovery herein.

21. Further, Trisun Care Center failed to ensure that Ms. Ramos received proper, adequate, and timely preventive, chronic, routine, acute, follow-up, and emergency medical care in accordance with generally-accepted standards of care. Further, Trisun Care Center failed to provide the necessary healthcare and services to enable Ms. Ramos to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with a comprehensive assessment and plan of care.

22. The above-described acts and/or omissions by Trisun Care Center constitute negligence and gross negligence and that such negligence and grossly negligent acts and/or omissions, taken singularly or in combination with others, caused Plaintiffs to suffer injuries, including the death of Ms. Ramos with resultant damages to Plaintiffs. The injuries, damages, and death described above were directly and proximately caused by Trisun Care Center's breaches of one or more of the above-stated duties.

## C. Negligence of Gerald Harrington, M.D.

23. Dr. Harrington was negligent in the care and treatment of Sylvia Ramos. Dr. Harrington's negligent care was a proximate cause of the pain and suffering, injuries, and death of Ms. Ramos.

24. Plaintiffs would show that the negligent acts and omissions of Dr. Harrington constitute negligence and that such negligent acts and/or omissions, taken singularly or in combination with others, were a direct and proximate cause of Sylvia Ramos' pain and

8

suffering, injuries, death, and the damages being sought herein by the Plaintiffs.

## V. Damages

25. The damages directly and proximately caused by the negligence and gross negligence of Defendants for which Plaintiffs sue include:

a. Physical pain, suffering and mental anguish of Sylvia Ramos, deceased;

b. Funeral and burial expenses incurred on behalf of Sylvia Ramos, deceased;

c. Medical and hospital expenses incurred in connection with care and treatment of Sylvia Ramos, deceased;

d. The mental anguish sustained in the past, and that, in reasonable probability, will be sustained in the future by Plaintiffs Sandra Schroeder and Duane J. Ramos, as the result of the death of Sylvia Ramos;

e. The loss of companionship and society sustained in the past, and that, in reasonable probability, will be sustained in the future by Plaintiffs, Sandra Schroeder and Duane J. Ramos, as the result of the death of Sylvia Ramos;

f. Pecuniary loss sustained in the past, and that, in reasonable probability, will be sustained in the future by Plaintiffs, Sandra Schroeder and Duane J. Ramos, as the result of the death of Sylvia Ramos;

g. Pre-judgment and post-judgment interest as permitted by law;

h. Punitive damages; and

i. All such other damages permitted by law.

## VI. Jury Demand

26. Plaintiffs hereby demand a trial by jury on all issues herein.

9

## VII. Notice of Intention to Take Oral Video Depositions

27. By filing this petition Plaintiffs put Defendants on notice of their intention to take the oral/video depositions of Dr. Harrington and Trisun Care Center and its employees and administrators as soon as possible and accordingly request that counsel for Defendant immediately contact Plaintiffs' counsel to set up mutually convenient dates and times for the taking of the Defendant witness depositions, which include, but are not limited to the following: Dr. Harrington; Curtis Duane Cheeves, LVN; Taneka, NP; Catherine Hazur, RN; Nancy Marks, RN; those CNAs, LVNs, and RNs who regularly provided care to Resident 11191 at and around the time of the fatal assault; those CNAs, LVNs, and RNs who regularly provided care to Sylvia Ramos during the final six months of her life; as well as the the Director of Nursing, Assistant Director of Nursing, the Administrator, the Medical Director, and the Director of the Skilled Nursing Unit at the time the fatal incident made the subject of this litigation.

## VIII. Plaintiffs' Request for Disclosure

28. In accordance with Tex. R. Civ. P. 194, Defendant, Gerald Harrington, M.D. is requested to disclose within fifty (50) days of service of this request, the material described in Tex. R. Civ. P. 194.2(a)-(l)

## Prayer

Wherefore, premises considered, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon full jury trial herein, Plaintiffs have judgment against Defendants as alleged, together with pre and post judgment interests at the highest legal rate, costs of the Court, and for such other and further relief, at law or in equity, to which they may be justly entitled.

10

Respectfully submitted,

MARYNELL MALONEY LAW FIRM, PLLC
115 East Travis Street, 18th Floor
San Antonio, Texas 78205
Telephone: (210) 212-8000
Telecopier: (210) 212-8385

By: _____
MARYNELL MALONEY
State Bar No. 12883200
marynell@marynellmaloneylawfirm.com
GAVIN MCINNIS
State Bar No. 13679800
gavin@marynellmaloneylawfirm.com
BYRON MILLER
State Bar No. 24074716
byron@marynellmaloneylawfirm.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of *Plaintiffs' First Amended Original Petition and Request for Disclosures* has been forwarded, pursuant to Tex. R. Civ. P. 21a, on this 27th day of June 2014, to the following counsel of record:

Emily J. Davenport
Kemp Smith, LLP
816 Congress Avenue, Suite 1260
Austin, Texas 78701-2443
Telephone: (512) 320-5466
Facsimile: (512) 320-5431
*Attorney for Defendant*
*PM Management – Windcrest NC, LLC*
*D/B/A Trisun Care Center Windcrest*

_____
Byron B. Miller

11

# APP 2

FILED
8/29/2014 5:12:55 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Marc Garcia

CAUSE NO. 2014-CI-06284

| | | |
|---|---|---|
| SANDRA SCHROEDER AND DUANE J. RAMOS, INDIVIDUALLY AND AS ALL HEIRS TO THE ESTATE OF SYLVIA RAMOS, DECEASED, | § § § § § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § § § | |
| VS. | § § | 288th JUDICIAL DISTRICT |
| PM MANAGEMENT – WINDCREST NC, LLC D/B/A TRISUN CARE CENTER WINDCREST, GERALD HARRINGTON, M.D., SETTERS MEDICAL GROUP, P.A., RUDOLFO ZARATE, M.D., AND ZARATE MEDICAL GROUP, P.A. | § § § § § § § § | |
| DEFENDANTS. | § | BEXAR COUNTY, TEXAS |

## PLAINTIFFS' SECOND AMENDED ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

Plaintiffs, Sandra Schroeder and Duane J. Ramos, Individually and as all Heirs to the Estate of Sylvia Ramos, deceased (hereinafter "Plaintiffs"), file this Plaintiffs' Second Amended Original Petition and Request for Disclosure complaining of PM Management – Windcrest NC, LLC D/B/A Trisun Care Center Windcrest, Gerald Harrington, M.D., Setters Medical Group, P.A., Rudolfo Zarate, M.D., and Zarate Medical Group, P.A. and for cause of action show the Court the following:

### I. Discovery Control Plan

1. Pursuant to Tex.R.Civ.P. § 190.1, Plaintiffs intend to conduct discovery under Level 3.

### II. Parties

2. Plaintiff Sandra Schroeder is an individual residing in Bexar County, Texas. Plaintiff Duane J. Ramos is an individual residing in Comal County, Texas. Plaintiffs constitute all heirs and all wrongful death beneficiaries of Sylvia Ramos, deceased.

3. Defendant PM Management – Windcrest NC, LLC D/B/A Trisun Care Center Windcrest (hereinafter "Trisun Care Center") is a Texas limited liability company with its principal place of business in Bexar County. The Defendant was served with process.

4. Defendant Gerald Harrington, M.D. (hereinafter "Dr. Harrington") is a physician licensed to practice in the State of Texas and was served with process.

5. Defendant Setters Medical Group, P.A. is a professional association registered in Texas and doing business Bexar County and may be served with process by serving its registered agent, Arelene E.A. Phillips at 8038 Wurzbach Road, Suite 340, San Antonio, Texas, 78229.

6. Defendant Rudolfo Zarate, M.D. (hereinafter "Dr. Zarate") is a physician licensed to practice in the State of Texas and may be served with process at 414 Navarro St., Suite 1422, San Antonio, Texas 78205 or wherever he may be found.

7. Defendant, Zarate Medical Group, P.A., is a professional association registered in Texas and doing business in Bexar County and may be served with process by serving its registered agent, Rudolfo Zarate, M.D., at 414 Navarro Street, Suite 1422, San Antonio, Texas 78205.

### III. Chapter 74 Notice

8. Pursuant to Sections 74.051 and 74.052 of the Texas Civil Practice and Remedies Code, Plaintiffs provided notice to Trisun Care Center of the healthcare liability claims made the subject of this action on February 7 and 12, 2014, Dr. Harrington on June 4, 2014, and Zarate Medical Group, P.A., Rudolfo Zarate, M.D., and Setters Medical Group, P.A. on August 29, 2014. As such, the applicable statute of limitations has been tolled and

2

includes a period of 75 days following the giving of the notice, and the tolling applies to all parties and potential parties to this action. *See* TEX. CIV. PRAC. & REM. CODE §74.051(c). Notice was appropriately accompanied by a medical authorization in the form required.

### IV. Venue and Jurisdiction

9. Venue is proper in Bexar County because all or a substantial part of the events or omissions that give rise to this claim occurred within Bexar County, and the Defendants each resided in Bexar County or maintained a principal office in Bexar County, Texas, at the time Plaintiffs' cause of action accrued.

10. This Court has jurisdiction because the claims and causes of action herein have resulted in damages to Plaintiffs within the jurisdictional limits of this Court and arise under the statutory and common law of the State of Texas. Plaintiffs are prohibited by Tex. Civ. Prac. & Rem. Code §74.053 from specifying the amount claimed in damages. As such, Plaintiffs are not required to meet the requirements of newly amended Tex. R. Civ. Proc. 47(c) and hereby inform the court and Defendants that, pursuant to Tex. R. Civ. Proc. 169(a)(2), the expedited actions process does not apply to a suit in which a party had filed a claim governed by Chapter 74 of the Civil Practice & Remedies Code.

### V. Causes of Action

**A. Background**

11. Sylvia Ramos, now deceased as a result of the negligence of Trisun Care Center Windcrest, was a resident of Trisun Care Center Windcrest from September 25, 2006 through July 16, 2012. During the period of time that she was a resident at Trisun Care

3

Center Windcrest, Ms. Ramos—a vulnerable, elderly individual—required Alzheimer's care. As early as May 14, 2007, Ms. Ramos' care plan stated that she "needs constant supervision on the locked unit."

12. While at Trisun Care Center Windcrest, Ms. Ramos was forced to endure a litany of instances of neglect and abuse, specifically including at least thirty (30) separate falls and resulting injuries such as numerous hematomas, a fracture of the lumbar vertebrae-close, a pelvic fracture, a fracture of the left fifth metacarpal, an acute vertebral compression fracture, and repeated head trauma. She also suffered three separate instances of institutional scabies and repeated urinary tract infections.

13. Furthermore, Ms. Ramos exhibited numerous signs and symptoms of sexual assault, which went uninvestigated, including but not limited to the following: multiple instances of vaginal bleeding, blood in her urine samples which varied from trace to large amounts of blood, institutional scabies, and times where she was found in the bed of other residents.

14. Another constant and immediate physical threat to Ms. Ramos' life was the persistent verbal and physical assaults on Ms. Ramos by other residents. In fact, Ms. Ramos was exposed to numerous and constant physical altercations with other residents, including but not limited to altercations on April 3, 2007, May 6, 2007, April 7, 2007, April 11, 2006, April 19, 2007, April 24, 2007, June 20, 2007, November 9, 2007, December 6, 2007, May 12, 2009, June 8, 2009, and September 21, 2009. By September 26, 2009, her *RAP Worksheet* finally evidenced awareness of these resident-on-resident dangers to her safety: "environmental concerns included proximity to aggressive resident."

4

15. Trisun Care Center Windcrest failed to adequately address these assaults and, as a result, Ms. Ramos suffered many additional attacks by other resident and many resulting injuries during her time at Trisun Care Center Windcrest. These daily threats to her safety included instances where other residents *threw her to the ground, yelled and threatened her, pushed her over, punched her, shoved her out of her seat, grabbed her, pushed her into walls, struck her in the face with a "Wet Floor" sign*, and ultimately culminated in *a fatal assault* on July 16, 2012.

16. On July 16, 2012, Resident 11191 violently shoved Ms. Ramos into the wall causing her to fall to the floor and strike her head. She was transferred to Northeast Baptist Hospital, where she was diagnosed with intracranial hemorrhage. On July 18, 2012, she was placed on hospice care and transferred to Vitas Innovative Hospice Care where she died August 1, 2012 as the result of complications of an acute hemorrhagic stroke following a fall with blunt force injury of the head. The Bexar County Medical Examiner lists her manner of death as *homicide*.

## B. Negligence and Gross Negligence of PM Management – Windcrest NC, LLC D/B/A Trisun Care Center Windcrest

17. During the time that Ms. Ramos was a resident of Trisun Care Center Windcrest's facility, Trisun Care Center failed to properly and timely render appropriate medical and nursing care, failed to provide a safe environment, and failed to ensure that Ms. Ramos was free from abuse and neglect. Tragically, these failures proved fatal to Ms. Ramos.

18. Trisun Care Center was required to maintain a safe and comfortable environment for its residents. This included maintaining a physical environment free from any actual or perceived threats or hazards and any potential sources of injury and a non-threatening

5

psychological environment; this, Trisun Care Center failed to do. Residents should feel comfortable and safe without fear of injury or abuse from staff or other residents; in the case of Ms. Ramos, Trisun Care Center failed. The legal rights of a resident in the nursing home setting include freedom from abuse. Many residents of nursing facilities, like Ms. Ramos, are, by virtue of varying disabilities, frail and quite vulnerable to a loss or infringement of their rights. Most troubling is the potential for them to be the victims of abuse by staff or other residents in a facility that fails to protect the rights of these residents. Because of this, the nursing staff is bound to maintain the rights of the residents and to protect them from any form of abuse; this, Trisun Care Center failed to do. If abuse is suspected, it is the duty of the staff to investigate the abuse, intervene when appropriate and to report the abuse to the proper authorities; this, Trisun Care Center failed to do. Nursing staff are bound to closely monitor the residents and to maintain a safe environment; this, Trisun failed to do. The staff is specifically bound to report any potential symptoms of abuse such as those described and to investigate any potential abuse thoroughly, to document the circumstances of any event thoroughly in the medical records, and to ensure the circumstances found to cause the injury are prevented from recurring; this, Trisun Care Center failed to do.

19. At the time of the many incidents made the basis of this lawsuit, the registered nurses ("RNs"), licensed vocational nurses ("LVNs"), certified nursing assistants ("CNAs"), and other healthcare providers, excluding physicians, involved in the care of Ms. Ramos were employees of the Trisun Care Center working within the course and scope of their employment with Trisun Care Center. As such, the Trisun Care Center is responsible for

6

all of these employees' negligent acts and/or omissions under the theory of respondeat superior and vicarious liability. In that regard, Trisun Care Center is liable for these employees' breaches of the applicable standard of care described below.

20. By failing to properly and timely render appropriate medical and nursing care, failing to provide a safe and secure physical and psychological environment, failing to investigate the abuse, intervene when appropriate and report the abuse to the proper authorities, and failing to ensure that Ms. Ramos was free from abuse and neglect, Trisun Care Center was negligent. Such negligence was a proximate cause of damages to Plaintiffs, including extreme pain, suffering and mental anguish, as well as the death of Ms. Ramos.

21. Defendant Trisun Care Center had a duty to exercise such reasonable care for the safety and well-being of Ms. Ramos, as her known mental and physical conditions required. Trisun Care Center breached this duty. Further, Trisun Care Center had a duty to provide medical/nursing care and treatment to Ms. Ramos within the recognized and accepted standards of care for a nursing home facility, and Trisun Care Center breached this duty by failing to timely, properly, and adequately care for Ms. Ramos. Finally, Trisun Care Center had a duty to ensure a safe and secure environment in which to live, and Trisun Care Center breached this duty by failing to provide such an environment, which was evidenced by the many, many physical attacks on her by other residents.

22. Additionally, Trisun Care Center was negligent in the management and operation of Defendant facility, Trisun Care Center Windcrest, which is a long-term care facility, by: failing to provide adequate training, personnel, nursing and administrative policies and procedures, and supervisory oversight of employees and residents; failing to ensure that

7

appropriate decisions were made pertaining to staffing and quality of care issues for the residents of Defendant facility, Trisun Care Center Windcrest; and failing to prevent systemic abuse of its residents.

23. Further, Trisun Care Center, having control over all management, budgetary, and financial matters affecting Defendant facility, Trisun Care Center, ignored the needs of Ms. Ramos and ignored the need for resources necessary to provide essential care at said nursing home facility. These acts and/or omissions, whether taken singularly or in combination, constitute negligence. Such negligence by the Trisun Care Center, as the governing body of Defendant facility, Trisun Care Center Windcrest, and the failure of Trisun Care Center to honor its obligation to use the resources of Defendant facility, Trisun Care Center Windcrest, to effectively and efficiently attain or maintain the highest practicable physical, mental, and psychosocial well-being of Ms. Ramos, as set forth in Tex. Admin. Code Ann. § 19.901, resulted in Ms. Ramos' extreme suffering; this negligence was a direct and proximate cause of the injuries suffered by the Plaintiffs herein, including wrongful death and survival damages, for which Plaintiffs seek recovery herein.

24. Further, Trisun Care Center failed to ensure that Ms. Ramos received proper, adequate, and timely preventive, chronic, routine, acute, follow-up, and emergency medical care in accordance with generally-accepted standards of care. Further, Trisun Care Center failed to provide the necessary healthcare and services to enable Ms. Ramos to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with a comprehensive assessment and plan of care.

8

## C. Negligence of Gerald Harrington, M.D.

25. Dr. Harrington was negligent in the care and treatment of Sylvia Ramos, including but not limited to the following failures:

   a. Failing to perform timely and adequate assessments of Ms. Ramos;

   b. Failing to issue appropriate orders for Ms. Ramos;

   c. Failing to manage the overall care provided to Ms. Ramos;

   d. Failing to provide appropriate input as to Ms. Ramos' care plan;

   e. Failing to document Ms. Ramos' medical care accurately;

   f. Failing to discharge Ms. Ramos, such that she could receive appropriate medical attention; and

   g. Failing to intervene on Ms. Ramos' behalf when it was readily apparent she was not receiving adequate care as her conditions required.

26. Dr. Harrington's negligent care was a proximate cause of the pain and suffering, injuries, and death of Ms. Ramos.

27. Plaintiffs would show that the negligent acts and omissions of Dr. Harrington constitute negligence and that such negligent acts and/or omissions, taken singularly or in combination with others, were a direct and proximate cause of Sylvia Ramos' pain and suffering, injuries, death, and the damages being sought herein by the Plaintiffs.

## D. Negligence of Setters Medical Group, P.A.

28. At the time of the incident made the basis of this lawsuit, Gerald Harrington, M.D., the nurse practitioners, and its nursing staff were caring for Sylvia Ramos and were employees of Setters Medical Group, P.A. working within the course and scope of their

employment with Setters Medical Group, P.A.. As such Setters Medical Group, P.A. is responsible for all of Dr. Harrington's, the nurse practitioners', and its nursing staffs' negligent acts and/or omissions under the theory of respondeat superior and vicarious liability.

29. Setters Medical Group, P.A.'s negligent care was a proximate cause of the pain and suffering, injuries, and death of Ms. Ramos.

30. Plaintiffs would show that the negligent acts and omissions of Setters Medical Group, P.A. constitute negligence and that such negligent acts and/or omissions, taken singularly or in combination with others, were a direct and proximate cause of Sylvia Ramos' pain and suffering, injuries, death, and the damages being sought herein by the Plaintiffs.

E. **Negligence of Rudolfo Zarate, M.D.**

31. Dr. Zarate was negligent in that he failed to develop and implement resident care policies and coordinate medical care in the facility as required by T.A.C. Section 19.1907(b) and 42 C.F.R. 483.75(i)(2)(i)(ii), specifically with regard to Sylvia Ramos. Further, Dr. Zarate was negligent in the care and treatment of Sylvia Ramos.

32. Dr. Zarate's negligent care was a proximate cause of the pain and suffering, injuries, and death of Ms. Ramos. Plaintiffs would show that the negligent acts and omissions of Dr. Zarate constitute negligence and that such negligent acts and/or omissions, taken singularly or in combination with others, were a direct and proximate cause of Sylvia Ramos' pain and suffering, injuries, death, and the damages being sought herein by the Plaintiffs.

F. **Negligence of Zarate Medical Group, P.A.**

10

33. At the time of the incident made the basis of this lawsuit, Rudolfo Zarate, M.D. was caring for Sylvia Ramos and was an employee of Zarate Medical Group, P.A. working within the course and scope of his employment with Zarate Medical Group, P.A.. As such Zarate Medical Group, P.A. is responsible for all of Dr. Zarate's negligent acts and/or omissions under the theory of respondeat superior and vicarious liability.

34. Zarate Medical Group, P.A.'s negligent care was a proximate cause of the pain and suffering, injuries, and death of Ms. Ramos. Plaintiffs would show that the negligent acts and omissions of Zarate Medical Group, P.A. constitute negligence and that such negligent acts and/or omissions, taken singularly or in combination with others, were a direct and proximate cause of Sylvia Ramos' pain and suffering, injuries, death, and the damages being sought herein by the Plaintiffs.

### V. Damages

35. The above-described acts and/or omissions by Defendants, Trisun Care Center, Dr. Zarate, Dr. Harrington, Setters Medical Group, P.A., and Zarate Medical Group, P.A., constitute negligence and gross negligence and that such negligence and grossly negligent acts and/or omissions, taken singularly or in combination with others, caused Plaintiffs to suffer injuries, including the death of Ms. Ramos with resultant damages to Plaintiffs. The injuries, damages, and death described above were directly and proximately caused by Defendants' breaches of one or more of the above-stated duties.

36. The damages directly and proximately caused by the negligence and gross negligence of Defendants, Trisun Care Center, Dr. Zarate, Dr. Harrington, Setters Medical Group, P.A., and Zarate Medical Group, P.A., for which Plaintiffs sue include:

11

a.  Physical pain, suffering and mental anguish of Sylvia Ramos, deceased;

b.  Funeral and burial expenses incurred on behalf of Sylvia Ramos, deceased;

c.  Medical and hospital expenses incurred in connection with care and treatment of Sylvia Ramos, deceased;

d.  The mental anguish sustained in the past, and that, in reasonable probability, will be sustained in the future by Plaintiffs Sandra Schroeder and Duane J. Ramos, as the result of the death of Sylvia Ramos;

e.  The loss of companionship and society sustained in the past, and that, in reasonable probability, will be sustained in the future by Plaintiffs, Sandra Schroeder and Duane J. Ramos, as the result of the death of Sylvia Ramos;

f.  Pecuniary loss sustained in the past, and that, in reasonable probability, will be sustained in the future by Plaintiffs, Sandra Schroeder and Duane J. Ramos, as the result of the death of Sylvia Ramos;

g.  Pre-judgment and post-judgment interest as permitted by law;

h.  Punitive damages; and

i.  All such other damages permitted by law.

## VI. Jury Demand

37. Plaintiffs hereby demand a trial by jury on all issues herein.

## VII. Notice of Intention to Take Oral Video Depositions

38. By filing this petition Plaintiffs put Defendants on notice of their intention to take the oral/video depositions of Dr. Harrington, Dr. Zarate, and Trisun Care Center and its employees and administrators as soon as possible and accordingly request that counsel

12

for Defendants immediately contact Plaintiffs' counsel to set up mutually convenient dates and times for the taking of the Defendant witness depositions, which include, but are not limited to the following: Dr. Harrington; Dr. Zarate, Curtis Duane Cheeves, LVN; Taneka, NP; Catherine Hazur, RN; Nancy Marks, RN; those CNAs, LVNs, and RNs who regularly provided care to Resident 11191 at and around the time of the fatal assault; those CNAs, LVNs, and RNs who regularly provided care to Sylvia Ramos during the final six months of her life; as well as the Director of Nursing, Assistant Director of Nursing, the Administrator, and the Director of the Skilled Nursing Unit at the time the fatal incident made the subject of this litigation.

### VIII. Plaintiffs' Request for Disclosure

39. In accordance with Tex. R. Civ. P. 194, Defendant, Setters Medical Group, P.A., Dr. Zarate, and Zarate Medical Group, P.A. is requested to disclose within fifty (50) days of service of this request, the material described in Tex. R. Civ. P. 194.2(a)-(l)

### Prayer

Wherefore, premises considered, Plaintiffs pray that Defendants, Setters Medical Group, P.A., Dr. Zarate, and Zarate Medical Group, P.A. be cited to appear and answer herein, and that upon full jury trial herein, Plaintiffs have judgment against Defendants as alleged, together with pre and post judgment interests at the highest legal rate, costs of the Court, and for such other and further relief, at law or in equity, to which they may be justly entitled.

13

Respectfully submitted,

MARYNELL MALONEY LAW FIRM, PLLC
115 East Travis Street, 18th Floor
San Antonio, Texas 78205
Telephone: (210) 212-8000
Telecopier: (210) 212-8385


By: _____/s/Byron Miller_____
MARYNELL MALONEY
State Bar No. 12883200
marynell@marynellmaloneylawfirm.com
GAVIN MCINNIS
State Bar No. 13679800
gavin@marynellmaloneylawfirm.com
BYRON MILLER
State Bar No. 24074716
byron@marynellmaloneylawfirm.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of *Plaintiffs' Second Amended Original Petition and Request for Disclosures* has been forwarded, pursuant to Tex. R. Civ. P. 21a, on this 29th day of August 2014, to the following counsel of record:

*Via Facsimile: (512) 320-5431*
Emily J. Davenport
Kemp Smith, LLP
816 Congress Avenue, Suite 1260
Austin, Texas 78701-2443
*Attorney for Defendant*
*PM Management – Windcrest NC, LLC*
*D/B/A Trisun Care Center Windcrest*

*Via Facsimile: (956) 631-2415*
Ronald G. Hole
HOLE & ALVAREZ, L.L.P.
P.O. Box 720 547
McAllen, Texas 78504-0547
*Attorney for Defendant Gerald*
*Harrington, M.D.*

_____/s/Byron Miller_____
Byron B. Miller

14

**APP 3**

Ch. 74 Report of Loren G. Lipson, MD, regarding the care provided by Gerald Harrington, MD and Rudolfo Zarate, MD to Sylvia Ramos

Dear Mr. Miller:

The following is my Texas Civil Practice and Remedies Code Section 74.351 Expert Report regarding the care by Gerald Harrington, MD and Rudolfo Zarate, MD with respect to the care and treatment provided to Sylvia Ramos. My opinions, presented below, are based upon a reasonable degree of medical probability. This report constitutes a fair summary of my opinions as of the date of this document and given the materials outlined below regarding applicable standards of care, breaches of the standard of care by Dr. Harrington and Dr. Zarate, and the causal relationship between the breaches of the standard of care by Dr. Harrington and Dr. Zarate and the injuries and death of Ms. Ramos.

For the purpose of convenience and to avoid unnecessary repetition of facts and my previously expressed opinions, I refer and incorporate those facts and opinions contained within my Texas Civil Practice and Remedies Code Section 74.351 Expert Report applicable to Trisun Care Center Windcrest—titled "Report of Loren G. Lipson MD, regarding the care of Sylvia Ramos at Trisun Care Center Windcrest" (hereafter "Trisun Report")—in which I opined on the care provided to Sylvia Ramos by Trisun Care Center Windcrest at 8800 Fourwinds Dr., San Antonio, Texas 78239 (hereafter "Trisun" or "facility"). The Trisun Report is attached to this report as **Exhibit A.**

## I. Qualifications

As evidenced by my Curriculum Vitae, which is attached to this report, I am a physician licensed and currently practicing in the State of California.

During the course of my career, I have been Board-Certified in Internal Medicine, Geriatric Medicine, and Utilization Review and Quality Assurance. I have served as Director of the University of California ("USC") Teaching Nursing Home Program and Co-Director of the Los Angeles County USC Medical Center Adult Protection Team-Geriatric Assessment Clinic. I have worked with the Keck School of Medicine at USC for over 29 years, having served as the Chief of the Section of Geriatric Medicine and Associate Professor of Medicine, Gerontology, Clinical Pharmacy, Medical Dentistry and Public Health, and Occupational Science and Occupational Therapy. I am currently Professor Emeritus of Medicine. I also currently serve as Co-Director in Geriatric Education and as Affiliate Professor at the University of Alaska, Anchorage in the College of Health and in the WWAMI Program for Alaskan Medical Students. I am also Adjunct Professor at the School of Community and Global Health, Claremont Graduate University.

Additionally, I am a consultant to the Departments of Justice, State of California and New Mexico, and U.S. Department of Justice in areas of geriatric care and elder abuse. I have served as a Consultant to the Departments of Administration, Health and Social Services and Law, State of Alaska, in the areas of geriatric medicine and long term care. I also have been the Physician Advisor to USC University Hospital in areas of utilization management and quality assurance.



I have extensive personal experience in primary medical care as well as in subspecialty consultation and long-term care. In addition to my academic teaching, research, and administrative responsibilities, I am currently practicing medicine and was doing so at the time the claims described below occurred.

As a result of my education, training and experience, I am qualified to render a relevant and reliable expert opinion on the standard of care applicable to the treating physician, Dr. Harrington, and medical director, Dr. Zarate, in this case. Through my extensive personal experience in primary medical care and the various positions I have occupied during the course of my career, I am familiar with the accepted standards of medical care applicable to treating physicians at nursing home facilities. Beyond the fact that I am familiar with the State and Federal Regulations and Codes pertaining to the nursing home facilities of the type at which Sylvia Ramos was treated, my work as a consultant and advisor to various governmental departments and healthcare institutions as well my various interactions with medical directors make me intimately familiar with medical director standard of care. Additionally, as a result of my education, training and experience, I am competent to testify as an expert on the subject of medical causation in the case of Sylvia Ramos. I am specifically familiar with the types of problems experienced by Sylvia Ramos, including but not limited to the following: falls, wandering, resident on resident abuse, signs and symptoms of sexual abuse, neglect, institutional scabies, fractures, head trauma, and intracranial hemorrhage.

## II. Records Reviewed

My opinions expressed in this report are based upon my review of records concerning the care of Ms. Ramos provided to me by the Marynell Maloney Law Firm, PLLC/Law Office of Pat Maloney, PC. These included:

a. Death certificate of Sylvia Ramos;
b. Bexar County Medical Examiner's autopsy report for Sylvia Ramos;
c. Texas Department of Aging and Disability Services' most recent survey and citations regarding Trisun Care Center Windcrest;
d. Medicare's staffing chart information, staffing standards, staffing reports, and health inspection summaries regarding Trisun Care Center Windcrest;
e. Vitas Innovative Hospice Care – Letter from Vitas dated July 25, 2012;
f. Two Trisun Care Center Windcrest Handout Packets and their "Rights of Nursing Facility Residents";
g. Northeast Baptist Hospital medical records for Ms. Ramos;
h. Trisun Care Center Windcrest medical records for Ms. Ramos; and
i. Chronology of care and treatment.

There is a possibility that the records provided to me incomplete. I reserve the right to modify this report with opinions regarding additional records if and when such records are provided to me.

## III. History/Timeline of Events

As described in the Trisun report, Ms. Ramos suffered numerous injuries and problems during her admission to Trisun, including repeated falls, hematomas, a pelvic fracture, a fracture of the left 5th metacarpal, repeated heard trauma, continuous threats to her safety by residents, physical altercations with other residents, attacks by other residents, overall physical and mental decline, pain and suffering, mental anguish and an intracranial hemorrhage. Finally, in July of 2012, Ms. Ramos was pushed by another resident, causing Ms. Ramos to fall and suffer a head injury which ultimately resulted in her death on August 1, 2012. A brief summary of facts, and particularly those facts relevant to the involvement of Dr. Harrington and Dr. Zarate in Ms. Ramos' care, is provided below. For a much more detailed and comprehensive history of events and the care provided to Ms. Ramos, please see the Trisun Report.

1. On 03-20-09, Dr. Harrington ordered that Elimite be applied to Ms. Ramos as a precautionary measure for treatment of possible scabies. (Trisun 2359).

2. On 11-03-09, Dr. Harrington charted that there were no new care issues with Ms. Ramos and to continue with present care. (Trisun 1745).

3. On 11-20-09, Dr. Harrington was notified that Ms. Ramos suffered a left superior and inferior pubic fracture and left sided sacral insufficient fracture. In response, Dr. Harrington noted that that it was allowable to get Ms. Ramos up in her wheelchair and ordered Norco 10/325 mg tab 1 every 8 hours and Norco 10/325 every 4 hours for pain when needed. (Trisun 2358, 3148-3151).

4. On 12-28-09, 12-30-09, and 1-4-10, Ms. Ramos was noted to have small amounts of bright red vaginal bleeding. (Trisun 2354, 2351, 3215, 3179, and 2373).

5. On 1-08-10, Dr. Harrington reviewed Ms. Ramos' labs. The urinalysis indicated that Ms. Ramos had a urinary tract infection. (Trisun 3215). Ms. Ramos was placed on UTI tracking. (Trisun 2373).

6. On 3-20-10, Trisun notified Dr. Harrington that Ms. Ramos was found to have "swelling & bruising to her [left] hand which measured 1x2 cm." Dr. Harrington ordered an x-ray of Ms. Ramos' left hand. Ms. Ramos was diagnosed with a fracture of the left 5th metacarpal. (Trisun 2378, 3217, 3162, and 4092). An explanation for the cause of the fracture is not provided in the records made available to me, and Dr. Harrington did not evaluate the potential cause of the fracture.

7. On 3-27-10, upon finding that Ms. Ramos' left hand fingertips were turning blue, Trisun called Dr. Harrington's office. Dr. Harrington ordered that Ms. Ramos be transferred to Northeast Baptist Hospital. (Trisun 2382). However, according to contradictory notes, Ms. Ramos was diagnosed with ecchymosis of right hand and forearm. (Trisun 1756). Dr. Harrington did not examine Ms. Ramos' injury.

8. On 9-10-10, Dr. Harrington, without giving a reason, declined a trial dose reduction of the medication Depakote suggested by a consultant pharmacist, thereby allowing for the potential of an overdose of psychotropic medication. (Trisun 3225).

9. On 11-04-10, Dr. Harrington noted that Ms. Ramos has no new issues and to continue with present care. (Trisun 1743).

10. On 1-26-11, Dr. Harrington again disagreed with the consultant pharmacist's recommendation that Ms. Ramos' Effexor 37.5 mg qd be stopped for a trial period, thereby placing Ms. Ramos at risk for potential overmedication. (Trisun 3224).

11. On 2-19-11, a Trisun resident pushed Ms. Ramos, causing Ms. Ramos to strike her head against the railing on a hallway wall and suffer a head injury.

12. On 4-05-11, Dr. Harrington again declined a trial dose reduction of Depakote sprinkle suggested by the consulting pharmacist. (Trisun 3223).

13. On 12-10-11, the consultant pharmacist notified Dr. Harrington that Ms. Ramos was due for an antipsychotic drug evaluation per OBRA guidelines pertaining to use in patients with dementia-related behavioral patterns. The pharmacist noted, "The last MDS 3.0 assessment did not show any behavioral symptoms present." Dr. Harrington disagreed. (Trisun 3218). Dr. Harrington again disregarded the pharmacist's warnings as to the need for reduction of psychotropic medications even though there appeared to be no active issues for which such medications were needed. Dr. Harrington also refused to follow OBRA guidelines as to the use of psychotropic medications.

14. On 4-23-12, Trisun called Dr. Harrington and notified him that Ms. Ramos suffered a bruise to the left knee, which was related to a fall on 4-13-12. (Trisun 2438). Orders were given to monitor the bruising and Ms. Ramos' ankle each shift for 14 days and to reassess at that point. (Trisun 541, 2557).

15. On 6-16-12, Trisun left a message with Dr. Harrington's office notifying him that Ms. Ramos slipped out of her chair. (Trisun 490 and 2431). Orders were given to monitor for bruises to right and left hand and re-evaluate in 14 days. (Trisun 2438 and 511). Dr. Harrington did not issue any orders as to the prevention of further falls.

16. According to the Progress Notes/Nursing Facility Care, Annual Assessment Encounters/History and Physical Updates/UT Medicine Senior Health Long Term Follow-up Care Visits for Ms. Ramos, Ms. Ramos was assessed by a physician/nurse practitioner on the following dates: 9-27-06, 9-29-06, 3-21-07, 5-7-07, 8-6-07, 10-10-07, 10-31-07, 12-9-07, 1-30-08, 4-2-08, 5-5-08, 6-23-08, 7-22-08, 11-21-08, 12-19-08, 1-26-09, 2-17-09, 3-17-09, 4-17-09, 5-15-09, 6-8-09, 7-8-09, 8-3-09, 9-9-09, 10-6-09, 11-3-09, 11-25-09, 12-30-09, 1-21-10, 2-23-10, 3-3-10, 3-23-10, 4-21-10, 5-19-10, 5-31-10, 6-17-10, 7-28-10, 8-25-10, 9-21-10, 10-27-10, 11-4-10, 11-23-10, 12-22-10, 1-24-11, 2-23-11, 3-23-11, 7-7-11, 8-10-11, 9-7-11, 12-7-11, 1-13-12, 2-16-12, 3-21-12, 4-18-12, 5-4-11, 5-6-12, 6-1-11, 6-18-12, and 7-16-12. (Trisun 1736-1830, 469, 528).

Ms. Ramos also had evaluations completed by Vitas Hospice between 9-29-06 and 11-25-08. Consequently, it appears that significant lapses in assessments occurred, and specifically between the following dates: 9-7-11 and 12-7-11; 3-23-11 and 7-7-11; 7-22-08 and 11-21-08; 1-30-08 and 4-2-08; and 10-31-07 and 12-9-07.

17. On 7-16-12, Ms. Ramos was standing in the hallway when Resident 11191 pushed Ms. Ramos causing her to fall and strike her head. Ms. Ramos was transferred to Northeast Baptist Hospital where she was diagnosed with an intracranial hemorrhage. (Trisun 521, 2444, 511, and 2556).

18. The 7-16-12 physician discharge summary states that Ms. Ramos sustained a pelvic and lumbar fracture prior to her admission at Trisun. (Trisun 1565). However, the records show that Ms. Ramos actually sustained these fractures while a resident at Trisun. Even though these fractures occurred at Trisun, the physician progress notes make no reference to them. (Trisun 528 and 1769).

19. On 7-18-12, Ms. Ramos was transferred to Vitas Hospice where she died on 8-1-12. Her cause of death was a cerebrovascular accident as the result of complications of an acute hemorrhagic stroke following a fall with blunt force injury of the head. Her death certificate listed her cause of death as a homicide.

## IV. Standard of Care and Breaches of Standard of Care

As discussed above, I am familiar with the standard of care applicable to Dr. Harrington and Dr. Zarate with regard to the care of Ms. Ramos. Below I set forth the applicable standard of care and the breaches.

### A. Gerald Harrington, MD

When a physician supervises the care of a resident at a nursing home facility, the standard of care requires that the physician participate in the resident's care planning assessment, monitor changes in the resident's medical status, and provide consultation and treatment when called to do so, which includes prescribing new therapy, ordering a resident be transferred to another level of care, and conducting routine visits. As elucidated below, Dr. Harrington breached the standard of care when he failed to adequately supervise the medical care of Ms. Ramos. Dr. Harrington also failed to intervene in regard to the substandard care provided to Ms. Ramos at Trisun.

A physician supervising the medical care of a nursing home resident has a duty to assist the facility in providing input into the resident's care plan. When faced with a resident who repeatedly wanders and suffers falls at a facility and a resident who is involved in numerous altercations with other residents and the subject of attacks by other residents, the standard of care requires the physician supervising the medical care of the resident to assist the facility in providing input into the resident's care plan to addresses these problems. Incredibly, while a resident at Trisun, Ms. Ramos experienced seemingly constant wanderings and sustained approximately 30 documented falls, and suffered numerous unexplained bruises and fractures.

She also was involved in many altercations with other residents and on numerous occasions was the victim of resident on resident abuse. Dr. Harrington should have given appropriate input as to the deficiencies in Ms. Ramos' care plan concerning her past falls and wanderings. Such input may have included, but is not limited to, the following: implementing timed toileting programs, regularly orienting Ms. Ramos with her environment to prevent wandering and confusion, monitoring and readjusting medications, investigating the cause of the injuries, lowering her bed, instituting bed rails, maintenance of proper hydration and nutrition, instituting bed alarms, and ordering additional supervision, assistance, modifying her environment, and/or assistive walking devices. Dr. Harrington also should have given appropriate input as to the deficiencies in Ms. Ramos' care plan concerning the physical altercations she was involved in with other residents and the attacks she suffered. Such input may have included, but is not limited to, the following: identifying triggers for threats and attacks by other residents, investigating the cause of the injury/threat and implementing a care plan to address the cause, removing Ms. Ramos from close proximity to aggressive residents, and monitoring and modifying the environment as needed. Dr. Harrington breached the standard of care by failing to adequately review and assist in providing input into Ms. Ramos' care plan.

Dr. Harrington breached the standard of care by failing to perform timely and adequate assessments of Ms. Ramos. The standard of care requires that a treating physician assess a resident as frequently as dictated by the medical needs of the resident. Under Medicaid/Medicare guidelines, at a Medicaid certified or Medicare skilled nursing facility, a physician is required to see the resident at least once every 30 days for the first 90 days after admission and at least once every 60 days thereafter. (42 CFR §483.40(c)(1-2)). (40 TAC §19.1203(2)(a)). In the present case, significant lapses between physician assessments occurred. For example, after Ms. Ramos was assessed on September 7, 2011, she was not assessed again until December 7, 2011. Another lapse in assessment occurred between March 23, 2011 and July 7, 2011. These lapses in assessments occurred despite the recurring falls, wanderings, physical altercations with other residents, and other injuries experienced by Ms. Ramos. Ms. Ramos' condition certainly indicated the need for more frequent assessments. Moreover, when a treating physician does assess a resident, the standard of care requires that the physician review the resident's total program of care, including medication and treatments. The visit should also include an evaluation of the resident's condition and a review of the continued appropriateness of the resident's current medical regimen. In his assessments of Ms. Ramos, Dr. Harrington failed to adequately review the total plan of care for Ms. Ramos or adequately evaluate Ms. Ramos' condition. Ms. Ramos suffered numerous unexplained bruises, fractures, and vaginal bleeding during the time she was a resident at Trisun. No investigation into the source of those injuries by Dr. Harrington is apparent in the medical records. Beyond the fact that there does not appear to have been any investigation, Dr. Harrington seemingly ignored Ms. Ramos' ongoing issues. For example, on 11-03-09 and 11-04-10, Dr. Harrington noted that Ms. Ramos had no new issues and to continue with the present care on 11-03-09 and 11-04-10. Consequently, Dr. Harrington breached the standard of care by failing to perform timely and adequate assessments of Ms. Ramos.

The standard of care requires that documentation accurately reflect care being given and the status of the patient. At each visit with a nursing home facility resident, the treating physician should write, sign and date progress notes recording the resident's progress or problems in

maintaining or improving mental and physical status. (42 CFR §483.40(b)(1-3)). (40 TAC §19.1202). As discussed above, Ms. Ramos suffered numerous unexplained bruises, fractures, approximately 30 documented falls, dozens of threats and physical altercations with other residents, and vaginal bleeding during the time she was a resident of Trisun. On numerous occasions, Dr. Harrington failed to properly document these problems and Ms. Ramos' associated declining mental and physical status in his progress notes. Dr. Harrington breached the standard of care as evidenced by his deficient documentation.

When a nursing home facility cannot meet a resident's needs, and the treating physician becomes aware of this information, the standard of care requires the physician to coordinate discharge of the resident to a facility that can meet the level of care required by the patient. Based on the sheer number falls and wanderings, and the injuries Ms. Ramos suffered as a result of her falls, Dr. Harrington should have recognized that Trisun was not meeting Ms. Ramos' health needs and should have discharged Ms. Ramos. Additionally, as a result of the numerous physical altercations with other residents, close proximity to aggressive residents, constant wandering, instances of unexplained vaginal bleeding and bruising, and fractures, Dr. Harrington should have recognized that Trisun could not meet Ms. Ramos' health needs and should have discharged Ms. Ramos. Dr. Harrington breached the standard of care by failing to discharge Ms. Ramos from Trisun to another facility when it became clear that Trisun could not meet Ms. Ramos' needs.

## B. Rudolfo Zarate, MD

The standard of care requires a medical director of a nursing home facility to actively play a leadership and managerial role in assisting the facility to provide quality care to its residents. A medical director is also responsible for implementing resident care policies and coordinating medical care in the facility. The standard of care for a nursing home facility medical director requires that a medical director provide input into the facility's scope of services provided to residents, such as the capacity to care for residents with complex or special care needs, the appropriateness of care, processes for accurate assessment, care planning, treatment implementation, and service monitoring. Further, the standard of care requires that the medical director assist the facility in reviewing and updating policies and procedures to reflect current standards of practice.

The standard of care required Dr. Zarate, as medical director, to assist the facility in ensuring that it had policies and procedures in place to prevent patient falls and wanderings. Policies and procedures that would address wanderings and falls include, but are not limited to, policies and procedures pertaining to wander guards, increased monitoring for high risk patients, regular orientation of patients to the environment, performance of fall risk assessments, improving environmental design, memory boxes, a time toileting program, provision of devices for ambulatory assistance, monitoring of medications which may increase falls monitoring the effectiveness of fall prevention programs and ensuring that falls are reported and investigated. Ms. Ramos repeatedly wandered and suffered continuous falls at Trisun during the course of her admission, clearly signifying that Dr. Zarate and Trisun failed to collaborate to ensure that there were adequate policies in place or properly implement policies to prevent patient falls or wanderings. Dr. Zarate also breached the standard of care when he failed to ensure that the

secured unit where Ms. Ramos resided at Trisun had adequate policies in place to address resident on resident threats and abuse. Policies that would address such threats and abuse include but are not limited to policies pertaining to recognizing signs of abuse, removing residents from close proximity to dangerous residents, increasing supervision, investigating the source of residents' injuries, creating and modifying residents' care plans when abuse is suspected, providing a safe home-like environment to residents, and reporting abuse as required by state regulations. Ms. Ramos suffered repeated incidents of attacks and threats from other residents, with the final act of abuse culminating in her death. Dr. Zarate clearly failed to perform his duty to collaborate with Trisun to ensure that Trisun had adequate policies in place to prevent resident on resident abuse.

Dr. Zarate also breached the standard of care by failing to adequately coordinate medical care in the facility. Ms. Ramos' treating physician, Dr. Harrington, among other failures, failed to perform timely and adequate assessments, failed to provide adequate input into Ms. Ramos' care plan, and failed to adequately document the status of the patient, as outlined above. Such care continued for many years despite repeated falls, injuries and other problems suffered by Ms. Ramos. As discussed above, the standard of care requires the medical director to coordinate medical care in the facility. Coordinating medical care involves evaluating the medical care within the facility by, among other things, reviewing and evaluating aspects of physician care, assuring that a system exists to monitor the performance of the health care practitioners, and discussing with a health care practitioner medical care that is inconsistent with applicable current standards of care. In the present case, Dr. Zarate failed to ensure that that there was an adequate system in place to monitor the performance of Dr. Harrington as Dr. Harrington delivered substandard care to Ms. Ramos for years that went unnoticed. Dr. Zarate failed to discuss the potential deficiencies in care with Dr. Harrington or to transfer Ms. Ramos' care to another physician if those deficiencies were not met.

Moreover, as mentioned above, the standard of care also requires a medical director to provide input into the facility's scope of services provided to residents, including its capacity to care for residents with complex or special care needs and the appropriateness of care. Trisun was unable to keep Ms. Ramos safe on its "secured" unit. As medical director, Dr. Zarate had the duty to provide input into whether Trisun had the capacity to care for patients like Ms. Ramos and provide her a safe environment.

V.   Causation

A. Fall Injuries

As discussed above, Ms. Ramos experienced wanderings and numerous falls resulting in injuries during her admission to Trisun. Specifically, on 11-20-09, Ms. Ramos suffered a left superior and inferior pubic fracture and left sided sacral insufficient fracture as a result fall caused by a staff member bumping into her. In response to Ms. Ramos' injuries, Dr. Harrington noted in the medical records that that it was allowable to get Ms. Ramos up in her wheelchair and ordered Norco 10/325 mg tab 1 every 8 hours and Norco 10/325 every 4 hours for pain as needed. (Trisun 2358, 3148-3151). I am familiar with the fall type of pelvic fracture that occurred to Ms. Ramos on or about 11-20-09. A pelvic fracture is a disruption of the bony

structure of the pelvis, including the sacrum and coccyx. The most common cause of this fracture in the elderly is from a fall. Diagnosis is made on the basis of history, clinical features, and x-rays and CTs. Signs and symptoms may include swelling, bruising, and pain. Ms. Ramos' pelvic fracture was consistent with a fall mechanism of injury. The documentation confirms that on 11-20-09 a staff member at Trisun bumped Ms. Ramos causing her to fall. Additionally, on 3-20-10, a nurse identified swelling and bruising on Ms. Ramos' left hand. An x-ray confirmed a diagnosis of the left fifth metacarpal. Although no explanation is given as to the cause of the fracture, the 3-23-10 nursing summary for Ms. Ramos indicates that Ms. Ramos suffered falls within the past 30 days. In reasonable medical probability, Ms. Ramos' fifth metacarpal fracture occurred from a fall as it is a common type of injury that occurs in the elderly as a result of falls, and Ms. Ramos had a documented history of repeated falls.

Ms. Ramos' falls and resulting fractures, and specifically including the 11-20-09 and 3-20-10 falls, were proximately caused in part by the aforementioned breaches of the standard of care by Dr. Harrington and Dr. Zarate. Dr. Harrington failed to properly assess Ms. Ramos, including an assessment of her fall risks, and failed to provide proper input into Ms. Ramos' care plan to address falls and fall risks. If Dr. Harrington had properly assessed Ms. Ramos and provided proper input into Ms. Ramos' care plan to address falls, in some of the ways enumerated above, in reasonable medical probability, Ms. Ramos would not have continued to suffer repeated falls and injuries and would not have suffered the 11-20-09 and 3-20-10 falls. Ms. Ramos' 11-20-09 and 3-20-10 falls and injuries were proximately caused by the breaches in the standard of care by Dr. Harrington.

The fact that Ms. Ramos suffered over 30 documented falls during her time at Trisun is inexcusable. If Dr. Zarate had even minimally overseen the care provided by Dr. Harrington to Ms. Ramos or implemented a system to review and evaluate aspects of physician care, it would have been apparent that Ms. Ramos repeatedly suffered preventable injuries at Trisun and that Dr. Harrington took little to no action to address these issues. If Dr. Zarate had discussed the deficiencies in care with Dr. Harrington and transferred Ms. Ramos' care to another physician if those deficiencies were not met, in all reasonable probability Ms. Ramos would not have continued to suffer repeated falls, including the 11-20-09 and 3-20-10 falls. Moreover, if Dr. Zarate had collaborated with Trisun to either create new policies or procedures or properly implement existing policies and procedures to address falls, as required by the standard of care, Ms. Ramos would not have suffered over 30 documented falls, including the 11-20-09 fall. Ms. Ramos' 11-20-09 and 3-20-10 falls and injuries were proximately caused by the breaches in the standard of care by Dr. Zarate.

B. <u>Mental Anguish from Resident on Resident Attacks, Threats and Abuse</u>

I am familiar with the type of mental anguish that occurs when a resident is under persistent threats and attacks by other residents, similar to that mental anguish Ms. Ramos experienced during her residency at Trisun. Signs and symptoms of resulting mental anguish include, fear, anxiety, agitation, anger, non-responsiveness, confusion, unexplained bruises, depression, defensive behavior, and changes in behavior. Ms. Ramos' medical chart is replete with instances of attacks and threats by other residents directed toward Ms. Ramos. Ms. Ramos' medical chart is also replete with instances of Ms. Ramos experiencing fear, anxiety, agitation, anger, non-

Page 9 of 12

responsiveness, confusion, unexplained bruises, depression, defensive behavior, and changes in behavior. It is my medical opinion that in all reasonable probability Ms. Ramos suffered mental anguish from the resident on resident abuse she was subjected to at Trisun. Moreover, in all reasonable probability, this mental anguish was proximately caused by the aforementioned breaches in the standard of care by Dr. Harrington and Dr. Zarate.

Had Dr. Harrington provided appropriate input in regard to the deficiencies in Ms. Ramos' care plan concerning the physical altercations she was involved in with other residents, such as in the ways enumerated above which included, for example, removing Ms. Ramos from close proximity to aggressive residents or identifying triggers for attacks, Ms. Ramos' would not have suffered the mental anguish associated with continuing attacks and the fear of being a victim of attacks. Ms. Ramos' mental anguish was proximately caused by the breaches in the standard of care by Dr. Harrington.

Moreover, the recurring problem of resident on resident abuse at Trisun should have been readily apparent to Dr. Zarate as medical director. If Dr. Zarate had performed his leadership responsibilities as the medical director of the facility and the secured unit and ensured that adequate policies and procedures were in place and implemented to protect patients from resident on resident abuse, such as the policies discussed above, in all medical probability Ms. Ramos would not have suffered continued threats and attacks by other residents and the accompanying mental anguish. Consequently, Ms. Ramos' mental anguish was proximately caused by the breaches in the standard of care by Dr. Zarate.

### C. Physical Injuries and Death from Resident on Resident Attacks, Threats and Abuse

On 2-19-11, a Trisun resident pushed Ms. Ramos, causing Ms. Ramos to strike her head against the railing on a hallway wall and suffer a head injury. Ms. Ramos was transferred to Northeast Baptist Hospital for evaluation. She was diagnosed with a large occipital hematoma. I am familiar with resident-on-resident assault type injuries that occurred to Ms. Ramos throughout her residency, and am specifically familiar with the type of injury that occurred on 2-19-11—the large occipital hematoma. It is my medical opinion that in all reasonable probability, Ms. Ramos' large occipital hematoma was consistent with the blunt force head injury sustained as a result of the blow to her head against the hallway railing.

On 7-16-12 Ms. Ramos suffered a terminal fall. Resident 11191 pushed Ms. Ramos, causing Ms. Ramos to fall and strike her head. Following the fall, Ms. Ramos was admitted to Northeast Baptist Hospital where she was diagnosed with an intracranial hemorrhage. She was then discharged to hospice care at Vitas Innovative Hospice Care on 7-18-12 where she died on 8-1-12. The Bexar County Medical Examiner classified Ms. Ramos' death as a homicide and concluded that Ms. Ramos died due to complications of an acute hemorrhagic stroke following a her terminal fall with blunt force injury to the head. Through my education, training and experience, I am familiar with the type of fatal intracranial hemorrhage Ms. Ramos suffered on 7-16-12. An intracranial hemorrhage is a hemorrhage that occurs within the skull. Intracranial bleeding occurs when a blood vessel within the skull is ruptured, leaks or is otherwise damaged. Intracranial bleeding can be caused by falls as a consequence of blunt force trauma to the brain. Signs and symptoms of intracranial bleeding include headache, concussion, loss of

consciousness, behavioral changes, seizure, vision problems, numbness, muscle ache, eye discomfort, and stiff neck. Ms. Ramos' intracranial hemorrhage was consistent with the mechanism of blunt force head trauma that resulted from the assault on her and her subsequent fall.

It is my medical opinion that had Dr. Zarate and Dr. Harrington met the aforementioned standard of care, in all reasonable probability Ms. Ramos would not have suffered continual threats, altercations, and attacks by other residents. Additionally, Ms. Ramos would not have suffered the assault on 2-19-11 that resulted in a large occipital hematoma and she would not have suffered the assault on 7-16-12 that resulted in her death.

If Dr. Harrington had provided appropriate input in regard to the deficiencies in Ms. Ramos' care plan concerning the physical altercations she was involved in with other residents, as required by the standard of care, the care plan for Ms. Ramos would have addressed the issue of resident on resident attacks and measures would have been taken to protect Ms. Ramos from future attacks, such as the measures discussed above. If Ms. Ramos continued to suffer attacks and threats by other residents and Trisun was unable to keep Ms. Ramos safe, Dr. Harrington should have discharged Ms. Ramos to a facility that could meet her needs. If such measures had been taken, in reasonable medical probability Ms. Ramos would not have been pushed by residents on either 2-9-11 or 7-16-12, and she would not have suffered a large occipital hematoma and intracranial hemorrhage that resulted in her death. Had Dr. Harrington met the standard of care, in reasonable medical probability, Ms. Ramos' untimely death would have been prevented.

In Dr. Zarate had properly overseen the care provided by Dr. Harrington to Ms. Ramos or implemented a system to review and evaluate aspects of physician care, it would have been immediately apparent that Ms. Ramos repeatedly suffered resident on resident abuse at Trisun and that Dr. Harrington took little to no action to address these issues. If Dr. Zarate had discussed the deficiencies in care with Trisun or Dr. Harrington and transferred Ms. Ramos' care to another physician if those deficiencies were not met, in all reasonable probability Ms. Ramos would not have continued to suffer resident on resident abuse at Trisun. Therefore, she would not have suffered the attack on 2-19-11 that resulted in a large occipital hematoma and she would not have suffered the attack on 7-16-12 that resulted in her death. Moreover, if Dr. Zarate had collaborated with Trisun to either create new policies or procedures or properly implement existing policies and procedures to address the issue of resident on resident abuse, as required by the standard of care, Ms. Ramos would not have suffered the attack on 2-19-11 that resulted in a large occipital hematoma or the 7-16-12 attack that resulted in her death. Had Dr. Zarate met the standard of care, in reasonable medical probability, Ms. Ramos' untimely death would have been prevented.

Dr. Harrington and Dr. Zarate had years to intervene in Ms. Ramos' substandard care, but failed to do so. The numerous injuries Ms. Ramos suffered were not isolated incidents, but were repeated with egregious frequency throughout Ms. Ramos' residency, which should have immediately been recognizable to her physician, Dr. Harrington, and the medical director, Dr. Zarate. Dr. Harrington and Dr. Zarate absolutely had a duty to intervene on Ms. Ramos' behalf and their failure to do so resulted in Ms. Ramos continuing to receive substandard care in an

unsafe environment. If Dr. Harrington and Dr. Zarate had intervened in Ms. Ramos' care, Ms. Ramos' untimely death would not have occurred.

## VI.    Conclusion

This report is by no means to be construed as an exhaustive recitation of all of my opinions with regard to the care and treatment that Ms. Ramos received while she was under the care of Dr. Gerald Harrington and Dr. Zarate. I expressly reserve my right to amend, modify, and/or supplement the opinions expressed herein upon the review of additional information.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Date: __10|10|14__

LOREN G. LIPSON, M.D.

**APP 4**

# CURRICULUM VITAE

## Loren G. Lipson, M.D.

## May 1, 2014

### A. Personal Information

1.   Name:    Loren G. Lipson, M.D.

2.   Titles:    Professor Emeritus of Medicine
Keck School of Medicine of the University of Southern California,

Affiliate Professor, Biomedical WWAMI Program,
and
Affiliate Professor, College of Health
University of Alaska Anchorage.

Adjunct Professor, School of Community and Global Health, Claremont Graduate University

3.   Mailing Address:    P.O. Box J
South Pasadena, California 91031

4.   Business Telephone:  626-403-0169

5.   Fax:    626-403-0165

### B. Education

1.   High School – Birmingham High School, Van Nuys, California. Graduated, June 1961.

2.   University – U.C.L.A.: B.S. in Chemistry with a minor in Math and English.
(Summa Cum. Laude), June 1965.

3.   Medical School – The Johns Hopkins University School of Medicine, Baltimore, Maryland: M.D., June 1969

4.   Internship – The Johns Hopkins Hospital, Osler Medical Service, 1969 – 1970.

RECEIVED

5.     Residency - The Johns Hopkins Hospital, Osler Medical Service, 1970 – 1971

6.     Fellowships:

    a.     The Johns Hopkins University School of Medicine, Baltimore, Maryland: Clinical Fellow in Medicine, 1969-1971

    b.     The National Institutes of Health, Bethesda, Maryland: Research Associate – Protein Chemistry, Physical Biochemistry, Molecular Biology – Laboratory of Chemical Biology, National Institute of Arthritis, Metabolic and Digestive Diseases (NIAMDD), 1971-1973.

    c.     Massachusetts General Hospital, Boston, Massachusetts: Clinical and Research Fellow in Medicine (Endocrinology and Metabolism), 1973-1976

    d.     Harvard Medical School, Boston, Massachusetts: Clinical and Research Fellow in Medicine (Endocrinology and Metabolism),1973-1975.

    e.     Harvard Medical School, Boston, Massachusetts: John A. Hartford Senior Scholar in Geriatric Medicine, Division of Aging,1984-1985

    f.     Beth Israel Hospital, Boston, Massachusetts: Clinical Fellow in Medicine (Gerontology), 1984-1985

    g.     Brigham – Women's Hospital, Boston, Massachusetts: Clinical Fellow in Medicine (Gerontology), 1984-1985

    h.     Hebrew Rehabilitation Center for the Aged, Boston, Massachusetts: Clinical Fellow in Geriatric Medicine, 1984 -1985.

    i     Institute of Advanced Studies on Gerontology, Ethel Percy Andrus Gerontology Center, USC, Los Angeles, California: Fellow in Institute, Area – Drugs in the Elderly, 1985-1987

    j.     Geriatric Research Institute, Ethel Percy Andrus Gerontology Center, USC, Los Angeles, California: Senior Research Associate, 1985-1989.

7. Honors and Award

1965                    Phi Beta Kappa; Recipient of Merck Award in Chemistry; Outstanding Undergraduate in Chemistry Award of Phi Lambda Upsilon; Medal for Scholarship of the American Institute of Chemists; The Ramsey Prize in Physical Chemistry; Sigma XI– All at U.C.L.A.

1968 – 1969         Henry Strong Denison Scholarship for Research in Medicine, The Johns Hopkins University School of Medicine.

1975 - 1977         National Research Service Award in Diabetes (NIAMDD), National Institutes of Health.

1975 – 1978         Daland Fellowship in Clinical Medicine, American Philosophical Society.

1977 – 1978         Clinical Investigator Award in Diabetes, NIAMDD, National Institutes of Health.

1984 – 1985         John A. Hartford Senior Scholar Award in Geriatric Medicine, Division of Aging, Harvard Medical School.

1989                    The Genesis Award, For Innovative Health Care Delivery, Los Angeles Business Journal.

1989                    Professional Leadership Program Award, Volunteer Center of Los Angeles.

1999                    One of Top 20 Physicians in the Greater Los Angeles Area (and only Geriatrician named), Los Angeles Business Journal.

2000                    One of Top Primary-Care Physicians in the U.S., Town and Country Magazine.

2002                    One of Top Ten Physicians in Los Angeles, America-On-Line.

8. Licensure: California.

9.    Boards:    American Board of Internal Medicine, 1974.

American Board of Quality Assurance and Utilization Review Physicians, 1995

Certificate of Expertise in Geriatric Medicine, American Board of Internal Medicine, 1996

## C.    Professional Background

### 1A.    Academic Appointments

a.    The Johns Hopkins University School of Medicine, Baltimore, Maryland; Clinical Fellow in Medicine, 1969-1971.

b.    Massachusetts General Hospital, Boston, Massachusetts; Clinical and Research Fellow in Medicine (Endocrinology and Metabolism), 1973-1976.

c.    Harvard Medical School, Boston, Massachusetts; Clinical and Research Fellow in Medicine (Endocrinology and Metabolism), 1973-1975.

d.    Harvard Medical School, Boston, Massachusetts; Instructor in Medicine (Diabetes), 1975-1978.

e.    Massachusetts General Hospital, Boston, Massachusetts; Clinical Assistant in Medicine (Diabetes Unit), 1976-1978.

f.    University of Southern California School of Medicine, Los Angeles, California; Assistant Professor of Medicine (Diabetes Division), 1978-1981.

g.    University of Southern California School of Medicine, Los Angeles, California; Assistant Professor of Medicine, with tenure (Division of Diabetes and Clinical Nutrition), 1981 – January 1984.

h.    Los Angeles County/University of Southern California Medical Center, Los Angeles, California; Staff Physician in Medicine (Diabetes Service), 1978 – January 1984

i. University of Southern California School of Medicine, Los Angeles, California; Associate Professor of Medicine (Division of Geriatric Medicine), January 1984 – September 2006.

j. University of Southern California School of Medicine, Los Angeles, California; Chief, Division of Geriatric Medicine in the Department of Medicine, January 1984 – 2005.

k. University of Southern California, Los Angeles, California; Associate Professor of Gerontology, Leonard Davis School of Gerontology, Ethel Percy Andrus Gerontology Center, January 1984 – September 2006.

l. University of Southern California, Los Angeles, California; Associate Professor of Clinical Pharmacy, U.S.C. School of Pharmacy, October 1989 – September 2006.

m. Los Angeles County/University of Southern California Medical Center, Los Angeles, California; Staff Physician in Medicine, (Geriatric Medicine), 1984-2004.

n. Sabbatical Leave, Harvard Medical School, Boston, Massachusetts; Division of Aging, John A. Hartford Senior Scholar in Geriatric Medicine, 1984 – 1985.

o. Brigham & Women's Hospital, Boston, Massachusetts; Clinical Fellow in Medicine (Geriatric Medicine), 1984 -1985.

p. Beth Israel Hospital, Boston, Massachusetts; Clinical Fellow in Medicine (Geriatric Medicine), 1984 – 1985

q. University of Southern California, Los Angeles, California; Senior Research Associate, Gerontology Research Institute, Ethel Percy Andrus Gerontology Center, 1985 – 1989.

r. University of Southern California, Los Angeles, California; Fellow Institute of Advance Study, Ethel Percy Andrus Gerontology Center, 1985 – 1987.

s. University of Southern California University Hospital, Los Angeles, California; Chief of Geriatric Medicine, 1991- 2005

t. University of Southern California – School of Dentistry – Associate Professor of Medical Dentistry and Public Health, 1994 – September 2006.

u. University of Southern California – School of Independent Health Professionals – Associate Professor of Occupational Science and Occupational Therapy, 1998- September 2006.

v. University of Alaska, Anchorage – Adjunct Associate Professor of Human Biology, 2001 – September 2006.

w. University of Alaska Southeast, Sitka – Adjunct Associate Professor of Human Studies, 2001 - 2006.

x. University of Alaska, Anchorage, Affiliate Professor, College of Health and Social Welfare, 2006 – April 2012.

y. University of Alaska Anchorage, Affiliate Professor, Biomedical WWAMI Program, College of Arts and Sciences, 2006 – April 2012.

z. University of Alaska, Anchorage, Faculty Consultant in Geriatrics, Alaska Family Medical Residency, September 2006 – Present.

aa. University of Southern California, Keck School of Medicine, Professor Emeritus of Medicine, September 2006 – Present.

bb. School of Community and Global Health, Claremont Graduate University.
Adjunct Professor, 1/1/11 to Present.

cc. University of Alaska, Anchorage, Affiliate Professor, Biomedical WWAMI Program, April 2012 – Present

dd. University of Alaska, Anchorage, Affiliate Professor, College of Health, April 2012 – Present.

1B. Government Appointments (Current)

a. Citizens Financial Oversight Committee for the California Stem Cell Research and Cures Act California State Controller's Office, 2007 – present Committee Member.

b. U.S. Department of Justice, Civil Division, 2006 – Present, Consultant in Long Term Care, Geriatric Care, Elder Abuse.

c. New Mexico Department of Justice Office of the Attorney General, Bureau of Medicaid Fraud and Elder Abuse, 2003 – Present, Consultant in Long Term Care, Geriatric Care, Elder Abuse.

d. California Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse, 2000 – Present, Consultant to Operation Guardian and Consultant in Long Term Care, Geriatric Care, Elder Abuse.

2A. Teaching Responsibilities (University of Southern California)

a. Attending Staff Physician LAC/USC Medical Center on the General Medical Service – teaching and supervising patient care, both inpatient and outpatient to house staff and students 1985 – 2004.

b. Attending Staff Physician at USC University Hospital in Geriatric Medicine for Medical House Staff and students. 1991 – 2005.

c. In charge of the Fellowship Program – Geriatric Medicine. 1985 – 2004.

d. Development and improvement of Geriatric Medical Curriculum in the Medical School – University of Southern California. 1985 – 2004

e. Development of Geriatric Medical Core Curriculum for the Medical House Staff – LAC/USC Medical Center, 1985 – 2004

f. Member of Steering Committee, Key Faculty and Study Site Coordinator – Pacific Geriatric Education Center at the University of Southern California (DHHS), 1984 – 1993.

g. Attending Physician Year III Medicine Rotation, 1992.

h. Director and lecturer in various courses at the Ethel Percy Andrus Gerontology Center including Gerontology 599 – Geriatric Health Issues.

i. Director – Geriatrics Update – A Board Review Course.

j. Director – History of Medicine in the Health Sciences Program, 1994 – 2001.

2B. Teaching Responsibilities (University of Alaska)

a. Director – Care of the Elderly Conference, University of Alaska, Southeast – Sitka, 1994 – 2010.

b. Instructor – Promoting Best Practices in Aging, University of Alaska, Anchorage, 2006 – 2010.

c. Co-Director – University of Washington Medical School 598 – Human Biology – Course for Alaskan Students – Multi-Disciplinary and Ethnicity in Gerontology and Geriatrics. (University of Alaska, Anchorage - Spring and Fall, 2009 and then yearly).

d. Co-Director in Geriatric Education to Alaskan Medical Students in the University of Washington Medical School WW AMI Program, University of Alaska, Anchorage, 2006 – Present

e. Faculty consultant in Geriatrics to Residents of the Alaska Family Medicine Residency Program. 2006 – Present.

2C. Teaching Responsibilities (University of Wyoming)

a. Consultant in Geriatric Medicine and Lecturer – University of Wyoming WWAMI Medical School Program. 2009.

b. Lecturer in Geriatrics to Residents of the University of Wyoming Family Practice Residency Program. 2009.

2D Teaching Responsibilities (School of Community and Global Health), Claremont Graduate University. January 2011 – Present.

a. Consultant to Claremont Graduate University faculty and students in areas of gerontology and geriatrics including didactic lectures, presentations for both research and general knowledge.

b. Lead – Investigations into diminished longevity in native peoples in America.

c. Teaching graduate student in special study classes in geriatric health and provision of health care to seniors.

3. Administrative Responsibilities

a. Chief of the Division of Geriatric Medicine, Department of Medicine, University of Southern California School of Medicine. In charge of staff and fellow recruitment and training; divisional budget; grant procurement; program development and supervision of research and clinical activity. 1984 – 2005.

b.  Study Site Coordinator and Key Faculty of the Pacific Geriatric Education Center, University of Southern California School of Medicine, 1984 – 1993.

c.  Senior Staff Physician in charge of Geriatric Programs at Los Angeles County/University of Southern California Medical Center, 1985 – 2004.

d.  Chief of Geriatric Medicine at the USC University Hospital, 1991 – 2004.

e.  Faculty liaison between Geriatric Medicine and University affiliated hospitals and long term care facilities. Director of Geriatric Medicine Private Practice Plan. 1984 – 2004

f.  Director of the USC Ambulatory Health Center sites at the Japanese Retirement Homes and Angelus Plaza, 1985 – 1993.

g.  Director of the Division of Geriatric Medicine's Program at the V.A. Outpatient Clinic in downtown Los Angeles, 1986 – 2001.

h.  Director of the USC Teaching Nursing Home Program at Hollenbeck Home and Atherton Baptist Home, 1999 – 2005.

i.  Director of the Senior Cancer Center at Norris Comprehensive Cancer Center and Hospital, 1999 – 2001.

j.  Director of the Senior Care Program – USC Care and USC Physicians. 1998 – 2002.

k.  Co-Director – Adult Protective Team – Geriatric Medicine Program – LAC/USC Medical Center, 2000 – 2004.

l.  Director – Care of the Elderly Conference, University of Alaska Southeast, Sitka, 1994 – 2010.

m.  Co-Director – Geriatric Education for Alaskan Medical Students in the WWAMI Program, University of Alaska, Anchorage. 2006 – Present.

n.  Medical Director – Alaska Geriatric Education Center, University of Alaska, Anchorage. 2005 – 2010.

o.  Medical Director – National Resource Center for Studies in Native American, Alaskan, and Hawaiian Elders, University of Alaska, Anchorage, 2006 – Present.

p. Director — Courses in gerontology and geriatrics, School of Community and Global Health, Claremont Graduate University. January 2011 – Present.

4. Service

A. University Service (University of Southern California)

a. Medical Executive Committee, Department of Medicine, USC 1985 – 2003.

b. Utilization Management Committee, USC University Hospital, 1991 – 1999, 2003 – Present, Chairman of this Committee, 1994 – 1999.

c. Pharmacy and Therapeutics Committee, LAC/USC Medical Center, 2001 – 2004.

d. Pharmacy and Therapeutics Committee, USC University Hospital, 1991 – 2005, Chairman, 1996 – 2000.

e. Patient Care Evaluation Committee, USC University Hospital, 1994 – 1999.

f. Lecturer in School of Pharmacy, University of Southern California, 1985 -2004.

g. Continuing Medical Post-Graduate Education Lectures at outlying hospitals, 1979 – 2004.

h. Core Curriculum Committee for the New Medical School Curriculum, USC School of Medicine, 1998 – 2002

i. County Operations Committee, Department of Medicine, LAC/USC Medical Center, 1997 – 2000

j. Development Committee, Department of Medicine, LAC/USC Medical Center, 1997 – 2000.

k. Senior Health Care Program, USC Care, (chair/member), USC 1998 – 2002.

l. Executive Committee, USC Norris Comprehensive Cancer Center and Hospital – Senior Cancer Care Center, 1998 – 2001.

m. Co-Director – Adult Protective Team – Geriatric Medicine Program – LAC/USC Medical Center, 2000 – 2004.

B. Public Service

a. Consultant in Geriatric Medicine and Long Term Care, State of Alaska, Departments of Administration Law, Health and Social Services, 1991 - 2004

b. Consultant in Gerontology and Geriatric Medicine, University of Alaska, both at the Anchorage and Sitka campuses, 1994 – present.

c. Board of Directors, California Association of Medical Directors, 1992-1999.

d. Citizen's Financial Oversight Committee – California Stem Cell Research & Cures Act, 2007 – Present.

e. Board of Directors, USC Friends of Music, 1989 – 1997.

f. Task Force on Elder Abuse, City of Los Angeles, 2001 – 2004.

g. California Rare Fruit Growers, 1988 – Present.

h. Pennsylvania Horticulture Society, 1992 – 2007.

i. Affenpinscher Club of America, 2002 – Present.

j. Kennel Club of Pasadena, 2004 – 2007.

k. Board of Directors, Musica Angelica 2006 – 2010.

l. Trustee, Board of Trustees, Crocker Art Museum Association, 2013 – Present.

m. CoTrustee, Board of CoTrustees, Crocker Art Museum 2013 – Present.

n. Trustee, Board of Trustees, Palm Springs Art Museum, 2014 – Present.

o. Board of Directors, Western Art Council, Palm Springs Art Museum, 2012 – Present.

p. Chairman, Board of Directors, Western Art Council, Palm Springs Art Museum, 2014 – Present.

5. Military Service

   1971 – 1973   Active duty as Surgeon – U.S.P.H.S. serving as Research Associate (Protein Chemistry) in the Laboratory of Chemical Biology with Dr. Robert Goldberger and Dr. Christian Anfinsen, NIAMDD, NIH: Inactive Reserve U.S.P.H.S. 1969 – 1971, 1973 – 1979.

6. Other Activities

   a. Editor for ENDOCRINOLOGY for Diabetes and Intermediary Metabolism, 1985 – 1986.

   b. Member of the Committee of Interdisciplinary Geriatric Education, Association for Gerontology in Higher Education, 2002 – 2006.

   c. Reviewer for:     AMERICAN JOURNAL OF PHYSIOLOGY
                        ANNALS OF INTERNAL MEDICINE
                        ARCHIVES OF INTERNAL MEDICINE
                        BIOCHEMICAL MEDICINE
                        DIABETES
                        ENDOCRINILOGY
                        EXPERIMENTAL GERONTOLOGY
                        JOURNAL OF CLINICAL ENDOCRINOLOGY AND METABOLISM
                        JOURNAL OF GERONTOLOGY
                        HORMONE AND METABOLISM RESEARCH
                        JOURNAL OF THE AMERICAN GERIATRICS SOCIETY
                        DRUGS AND AGING
                        NEW ENGLAND JOURNAL OF MEDICINE

D.   Society Memberships.

   1.   Local
            Cross Town Endocrine Club
            Professional Staff Association of LAC/USC Medical Center
            Center Fellow of the UCLA/USC Long Term Care Gerontology Center
            Far Eastern Study Center USC/UCLA
            California Association of Medical Directors

   2.   Regional

Western Society for Clinical Investigation
Western Section of the American Federation for Clinical Research

3.  National

Sigma Xi, Phi Beta Kappa, Phi Lambda Upsilon
The Johns Hopkins Medical and Surgical Society
The Johns Hopkins History of Medicine Club
The Associates of the Countway Library
The American Association for the History of Medicine
American Federation for Clinical Research
American Diabetes Association
The Endocrine Society
American Physiological Society
The Gerontological Society of America
The American Geriatric Society
The American Federation for Aging Research
American Gerontological Association
American Association of Medical Directors

E.  Consultantships and Directorships

1.  Consultant in Geriatric Medicine and Supervisor of the Geriatric Program at the Veterans Administration Outpatient Clinic in downtown Los Angeles, 1986 – 2001.

2.  Executive Director of the USC Ambulatory Health Center at Angelus Plaza, 1989 – 1993.

3.  Board of Directors, California Association of Medical Directors, 1992 – 1999.

4.  Board of Director, USC friends of Music, 1989 – 1997.

5.  Consultant in Geriatric Medicine and Long Term Care – State of Alaska 1991 – 2004:

    a.  Department of Administration
    b.  Department of Health and Social Services
    c.  Department of Law
    d.  Mental Health Board

6.  Appointments in Geriatrics – University of Alaska:

    a.  Sitka

I. Adjunct Associate Professor of Human Studies, 2003-2006.
II. Course Director – Care of the Elderly Conference, 1994 Present

b. Anchorage

I. Affiliate Professor, College of Arts and Sciences, Biomedical WWAMI Program, 2006 – April 2012.
II. Consultant, Co-Founder and Medical Director – Alaska Geriatric Institute through the Alaska Geriatric Education Center, 2003 – 2010.
III. Consultant - Institute of Circumpolar Health, 2004 – 2010.
IV. Consultant and Medical Director – National Resource Center for American Indians, Alaska Natives and Native Hawaiian Elders, 2005 – Present.
V. Faculty Consultant in Geriatrics, Alaska Family Residency Program, 2005 - Present
VI. Affiliate Professor, College of Health and Social Welfare, 2006 – April 2012.
VII. Affiliate Professor, Biomedical WWAMI Program, April 2012 – Present.
VIII. Affiliate Professor, College of Health, April 2012 – Present.

7. Consultant, British Columbia Health Foundation, 1994 – 1999.

8. Consultant in Geriatric Medicine and Long Term Care, Silverado Senior Living Centers, San Juan Capistrano, CA 2001 – 2002.

9. Consultant in Geriatric Medicine and Supervisor of the Geriatric Medicine Medical House Staff Training Program, Kern Medical Center, Bakersfield, CA 1986 – 2003.

10. Consultant in Geriatric Medicine and Supervisor of the Geriatric Family Medicine House Staff Training Program, Glendale Adventist Medical Center, Glendale, CA 1998 – 2001

11. Consultant in Geriatric Program Development – Bay Shores Medical Group, Torrance, CA., 1986 – 1989.

12. Consultant in Geriatric Program Development – San Dimas Community, Hospital, 1986 – 1989.

13. Consultant in Geriatric Program Development and Long Term Care - Keiro Services – The Japanese – American Retirement Homes, Los Angeles, CA., 1986 – 1993.

14. Consultant in Geriatric Program Development and Long Term Care – The Motion Picture and Television Home, Woodland Hills, CA 1986 – 1990.

15. Consultant in Long Term Care and Geriatric Medicine, State of California, Department of Social Services, 2000.

16. Consultant in Elder Abuse, Geriatric Medicine and Long Term Care, State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse, 2000 – Present.

17. Consultant in Long Term Care, Elder Abuse and Geriatric Medicine – State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse – Operation Guardians (nursing homes - unannounced inspections) 2000 – 2009.

18. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse – State of New Mexico, Department of Justice, Office of the Attorney General, Medicaid Fraud and Elder Abuse Unit, 2003 – Present.

19. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Justice, Civil Division and Civil Division, 2006 – Present.

20. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Health and Human Services, Office of the Inspector General, 2006 – 2010.

F. **Research Activities**

1. **Research Interests**

   a. Use of medications in the senior populations.
   b. Health care modes for the demented elderly.
   c. Studies in the elderly diabetic patient.
   d. Studies in the elderly hypertensive patient.
   e. Studies in sexual dysfunction in the elderly.
   f. Studies in elder abuse.
   g. Longevity issues in Native U.S. populations.

2. **Research in Progress: Investigations in man**

a. Studies of adverse drug effects in the aging population with special emphasis on the most commonly prescribe medication and psychotropic agents.
b. Studies on care of frail and demented seniors in Alaska.
c. Studies on the prevention and early detection of elder abuse.
d. Studies on decreased longevity in Native U.S. populations.

G. **Long Term Care Experience**

1. Director of the two USC Teaching-Nursing Home Programs, 1999 - 2005

    a. Hollenbeck Home – Los Angeles
    b. Atherton Baptist Home – Alhambra

2. Member and Member Board of Director, California Association of Medical Directors, 1992 – 1999.

3. Consultant – State of Alaska, Department of Administration, Division of Longevity Services (Aging Programs and State of Alaska Long Term Care Facilities – the Pioneers' Homes). 1991 – 2004.

4. Affiliate Professor, College of Health and Social Welfare and College of Arts and Sciences, University of Alaska, Anchorage. Areas of involvement – Alaska Geriatric Education Center, Geriatric Assessment, Pre-med and Medical Education, Long Term Care, 2006 to Present.

5. Consultant – University of Alaska, Sitka. Areas of involvement – Care of Elderly Conference – Director, 1994 – 2010.

6. Consultant in Long Term Care, Elder Abuse and Geriatric Medicine – State of Alaska, Department of Law, 2000 - 2003

7. Consultant in Long Term Care and Geriatric Medicine – State of California, Department of Social Services. 2000.

8. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse – State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse, 2000 – Present.

9. Consultant in Long Term Care – State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse – Operation Guardians (nursing home- unannounced inspections), 2000 – 2009.

10. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse – State of New Mexico, Department of Justice, Office of the Attorney General, Medicaid Fraud and Elder Abuse Unit, 2003 – Present.

11. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Justice, Civil Rights Division and Civil Division, 2006 – Present.

12. Primary care provider for Geriatric Medicine for Long Term Care Patients – Hollenbeck Home, Los Angeles, California, 1998 – 2004.

13. LAC/USC Medical Center Clinic – Adult Protective Team – Geriatric Medicine – Clinic Co-director, 2000 – 2004.

14. Member of the American Association of Medical Directors, 2005 - 2008.

15. USC – Angelus Plaza – Senior Clinic – Founding Director and care provider (1989 – 1992). (The largest low-income senior housing project in the Western United States).

16. Consultant in Geriatric Medicine and Long Term Care – Silverado Senior Living Centers, San Juan Capistrano, 2001 – 2002.

17. Consultant in Geriatric Program Development and Long Term Care – Keiro Services – The Japanese American Retirement Homes, Los Angeles, 1986 – 1994.

18. Consultant in Geriatric Program Development and Long Term Care – The Motion Picture and Television Home, Woodland Hills, CA, 1986 – 1990

H. Significant Invited Lectures (Since July 1984 – selected from over 3,500 lectures given)

1. Harbor General Hospital – U.C.L.A. Medical Center, 7/84.
   Medical Grand Rounds – new concepts in the treatment of Type II Diabetes.

2. Harbor General Hospital – U.C.L.A. Medical Center, 7/84.
   Endocrine Grand Rounds – The newer oral agents.

3. Martin Luther King General Hospital, Los Angeles, CA, 7/84
   Medical Grand Rounds – The approach to the patient with NIDDM.

4. Nisei Awareness Day, Little Tokyo, Los Angeles, CA, 7/84
   Health issues for the elderly. Keynote speech.

5.	The Cleveland Clinic, 9/84. Symposium on Diabetes Mellitus –
The Treatment of the Patient with NIDDM.

6.	American Academy of Family Practice, Kansas City, MO, 10/84
National Meeting, Invited Speaker:
	a.	Nutrition in the elderly
	b.	New concepts in the therapy of the Type II diabetic patient.

7.	Associates of the Countway Library, Harvard Medical School, 11/84.
Biannual History of Medicine lecture – "The Black Death Comes to
America."

8.	Washington University of St. Louis and St. Louis V.A. Hospital, 11/84.
Symposium on Diabetes Mellitus – The treatment of hypertension in the
patient with Diabetes Mellitus.

9.	The Jackson Laboratory, Bar Harbor, Maine, 12/84.
Visiting Scientist – Insulin secretion in aging.

10.	Gordon Research Conference, Oxnard, CA, 2/85. The biology of aging –
Invited Speaker – Cyclic AMP and insulin secretion in aging.

11.	Thorndike Rounds, Beth Israel Hospital, Boston, MA 3/85.
The approach to the treatment of diabetes mellitus in the elderly
individual.

12.	Division on Aging, Harvard Medical School, 3/85.
Grand Rounds – Hyperosmolar coma – a complication of diabetes mellitus
in the Elderly.

13.	The University of New Brunswick, Saint John, N.B., 3/85.
Visiting professor of Biology, Lecture topics:

	a.	The role of calmodulin in insulin secretion.
	b.	The exciting new approaches to the treatment of diabetes
		mellitus.

14.	Beth Israel Hospital, Boston, MA, 3/85
Endocrine Grand Rounds – Sex and the diabetic.

15.	The Johns Hopkins University Scholl of Medicine, Baltimore, MD, 3/85.
Visiting Professor of the History of Medicine. Lecture topic – "Black
Death Come to America."

16.	Brigham-Women's Hospital, Boston, MA, 3/85
Endocrine Grand Rounds – Insulin secretion in aging.

17. Yale University School of Medicine, New Haven, CT, 4/85
    Endocrine Research Conference – Insulin secretion in aging.
    Hypertension Grand Rounds – Special problems of hypertension in
    the diabetic patient.

18. University of Florida, Gainesville, FL 4/85
    Geriatric Medicine Grand Rounds – The older diabetic patient.

19. University of California at Los Angeles School of Medicine, 4/85. Family
    Medicine Grand Rounds – Treatment of diabetes mellitus in the elderly.

20. Stanford University of Medicine – V.A. Hospital, Menlo Park, CA, 5/85,
    Clinical Conference – Sexual dysfunction in the elderly.

21. University of Pittsburgh School of Medicine, Pittsburgh, PA, 6/85.
    Symposium on Diabetes Mellitus – The older diabetic patient.

22. University of Hawaii School of Medicine, Honolulu, HI, 8/85
    Medical Grand Rounds – Diabetes in the elderly.

23. Department of Public Health and Social Welfare, Guam, 8/85
    Special Lecture – Wellness and pathology in the elderly.

24. American Academy of Family Practice, Anaheim, CA. 10/85.
    National Meeting – Invited Speaker – Diabetes in the elderly.

25. University of California at San Francisco – Valley Medical Center,
    Fresno, CA, 11/85. Endocrine symposium – Sexual Dysfunction in the
    elderly.

26. Mayor's Conference on Aging, Los Angeles, CA, 3/86. Treatment of
    chronic diseases in the elderly.

27. V.A. Hospital, Martinez, CA and U.C. Davis School of Medicine, 4/86.
    Medical Grand Rounds – Treatment of hypertension in diabetic patients.

28. Pasadena Council on Alcoholism, Pasadena, CA, 4/86. Symposium on the
    Older Alcoholic Patient. Pathology and normalcy in aging.

29. Brown University Medical School, Providence, RI 4/86. Medical Grand
    Rounds – Hypertension in the elderly.

30. Medical Board Drug Review, Sacramento, CA, 5/86. Invited Speaker –
    The new oral agents.

31. Conference – Scientific Basis of Sexual Dysfunction – Sponsored by NIH and the National Kidney Foundation, Baltimore, MD, 6/86.

32. F.D.A. Symposium of Bioequivalence of Solid Preparations, Washington, D.C., 10/86. Invited Speaker – Oral sulfonylurea agents.

33. University of Nevada, Reno, NV, 2/87. Visiting Professor of Medicine, Lecture topic – Sex after 60.

34. University of Guam, Guam, USA, 4/87. Symposium on Care of the Elderly – Symposium Leader.

35. National Council on Hypertension, Biannual Meeting, Las Vegas, NV, 4/87. Invited Speaker – Antihypertensive medications and sexual dysfunction.

36. American Hospital Pharmacists Association, Washington, D.C. 5/87. Invited Speaker – Aging in America – Wellness vs. Disease.

37. University of California, Davis – School of Medicine, 6/87. Course on Medicine, Invited Speaker – Hypertension in the elderly.

38. University of Nevada, Las Vegas, Nevada, 10/87. Visiting Professor of Medicine, Lecture Topics: Geriatric Medicine Today, Geriatric Course Planning.

39. California Pharmacy Association, San Francisco, CA, 11/87. Invited Speaker – Endocrinology of aging.

40. Evanston Hospital, Northwestern University School of Medicine, Evanston, IL, 11/87. Visiting Professor of Medicine, Topic – Sex after 60.

41. Conference on Pathogenesis and Treatment of Pressure Sores. Kansas City, MO, 1/88. Invited Speaker.

42. Conference on "What Pharmaceuticals are Needed for the Elderly?" Phoenix, AZ, 2/88. Invited Speaker.

43. Conference on "Post Retirement Health Care Funding" sponsored by I.R.I., New York, NY, 3/88. Invited Speaker – The geriatric imperative.

44. Board Review Course: Geriatrics Update, 1988, U.S.C. School of Medicine, Pasadena, CA, 3/88. Two and one-half day symposium on geriatrics. Director, Moderator and Presenter for the course.

45. Symposium on Geriatric Medicine – Motion Picture and Television Retirement Home And Hospital, Woodland Hills, CA, 4/88. Moderator and Presenter.

46. American Geriatric Society National Meeting, Symposium and Physician – Patient Communication, Anaheim, CA, 5/88. Co-moderator and presenter.

47. Symposium on Geriatric Medicine, San Dimas Community Hospital, San Dimas, CA, 9/88, Moderator and Presenter.

48. American Society for Enteral and Parental Nutrition Conferences: Ethics and Nutrition, New York, NY, 10/88

49. Symposium on Nutrition in the Elderly, California Medical Center, Los Angeles, CA, 12/88. Moderator and Presenter, Topic – Nutrition in the Elderly.

50. California Academy of Family Medicine, Annual Meeting, San Francisco, CA 2/89. Invited Keynote Speaker, Topic – Dementia.

51. Kansas University Medical Center, Family Medicine Grand Rounds, Kansas City, KS, 5/89. Visiting Professor, Topic – Drugs in the elderly.

52. California Association for Homes for the Aged, Annual Meeting. Symposium on Drugs In the Elderly, San Diego, CA, 5/89. Invited Speaker, Topic – Medical Aspects of Drugs in the Elderly.

53. Symposium on Geriatric Care, Motion Picture and Television Home, Woodland Hills, CA, 6/89. Moderator and Presenter, Topic – Tests and exams periodically needed for Senior health

54. Symposium of Diseases Affecting Extended Care Management of the Elderly, California Federation on Aging, Newport Beach, CA, 6/89. Moderator.

55. Symposium of Diabetes in the Elderly, USC School of Medicine, Los Angeles, CA, 8/89. Moderator.

56. V.A. Medical Center, Phoenix, AZ, 9/89. Medical Grand Rounds, drugs in the Elderly.

57. Geriatric Medicine Symposium, Hawaii Medical Association, 9/89, Invited Speaker, Topic – Hypertension in the Elderly.

58. University Medical Center of Kansas City, Kansas City, MO, 9/89. Medical Grand Rounds – Sex after 60.

59. National Conference of Consulting Actuaries, Hot Springs, VA, 9/89. Invited Speaker.

60. California Pharmacists Association, Los Angeles, CA, 10/89. Endocrinology in the Elderly. Program Director.

61. Family Medicine Program, Santa Rosa, CA, 11/89. Visiting Professor of Geriatric Medicine.

62. Symposium on Geriatric Medicine. Tacoma General Hospital, Tacoma, WA, 1/90. Course Director and Speaker.

63. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 2/90. Course Director and Speaker.

64. University of Nevada School of Medicine, Reno, NV, 3/90. Visiting Professor of Geriatric Medicine.

65. USC Geriatric Review Course, USC School of Medicine, Los Angeles, CA, 3/90. Two and one-half day intensive course in geriatric medicine. Course Director and Speaker.

66. Eisenhower Hospital, Rancho Mirage, CA, 3/90. Medical Grand Rounds – Drugs in the Elderly.

67. American Geriatric Society Annual Meeting, Atlanta, GA, 5/90. Symposium on Syndrome X: The correlation of diabetes and hypertension.

68. American Diabetes Association Symposium, Santa Barbara, CA, 6/90. Diabetes in The Mexican American Population. Invited Speaker.

69. Loma Linda University School of Medicine, Loma Linda, CA, 7/90. Grand Rounds, Drugs in the Elderly.

70. American Heart Association/ American Diabetes Association Symposium, Santa Barbara, CA, 9/90. Treatment of the hypertensive diabetic patient. Keynote Speaker.

71. Baylor College of Medicine, Houston, TX, 10/90. Symposium on the Complicated Diabetic. Invited Speaker.

72. City of Hope, Duarte, CA, 1/91. Medical Grand Rounds, Diabetes in the Elderly.

73. Providence Hospital, Anchorage, AK, 2/91. Medical Grand Rounds, Sex after 60.

74. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/91. Course Director and Speaker.

75. U.C.S.F. – Valley Medical Center, Fresno, CA, 3/91. Medical Grand Rounds, Sex after 60.

76. U.C.D. – Sacramento, CA, 4/91. Medical Grand Rounds, Sex after 60.

77. Chicago Medical College, Chicago, IL, 5/91. Medical Grand Rounds, Drugs in the Elderly.

78. Symposium of Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 2/92. Course Director and Speaker.

79. Department of Administration, State of Alaska, 4/92. Invited Speaker, Assisted living in long term care.

80. International Institute for Research Symposium: Utilities and FAS 106, Washington, D.C., 7/92. Keynote Speaker, Drugs in the retired population.

81. Alaska Geriatric Institute, Anchorage, AK, 2/93, Keynote Speaker.

82. University of Oklahoma, Tulsa, OK, 3/93. Family Medicine Grand Rounds, Drugs in the elderly.

83. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/93. Course Director and Speaker.

84. Department of Administration, State of Alaska, 4/93. Invited Speaker, Medications in the nursing home population.

85. Dallas Business Group on Health, 5/93. Invited Speaker, Medications in the Elderly.

86. Symposium on Retirement Healthcare Benefits, Chicago, IL, 9/93. Invited Speaker, Medications in the elderly.

87. University of Hawaii, Division of Geriatric Medicine, Honolulu, HI, 10/9/93. Visiting Professor of Geriatric Medicine, Diabetes in the elderly, Use of drugs in the elderly.

88. Providence Hospital, Anchorage, Alaska. Medical Grand Rounds, 2/94. Dementia.

89. Nevada Academy of Family Medicine, Annual Meeting. Lake Tahoe, Nevada, 2/94. Keynote Speaker – Sex after 60.

90. University of Colorado Affiliated Hospital. Medical Grand Rounds, 3/94. Drugs in the Elderly.

91. University of Kentucky Affiliated Hospital. Geriatric Medical Grand Rounds, Lexington, Kentucky, 4/94. Dementia.

92. Alaska Psychiatric Institute – API 2000 Meeting, Anchorage, Alaska, 6/94. Plans for the Future – Consultant and Facilitator.

93. USC School of Medicine, Los Angeles, California – Medical Grand Rounds, 9/94. Drugs in the elderly.

94. Alaska State Mental Health Board – Quarterly Meeting, Dilingham, Alaska, 9/94. Invited Speaker, The Alaska Geriatric Institute.

95. Alzheimer's Society of Northern California, Sacramento, CA, 10/94. Speaker, Research in dementia.

96. Alaska Geriatric Institute, Anchorage, Alaska, 2/95. Organizer and Keynote Speaker. The largest health care symposium in the history of the state of Alaska.

97. V.A. Medical Center Westwood and UCLA – Medical Grand Rounds, 2/95.

98. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/95. Course Director and Speaker.

99. Nevada Academy of Family Medicine, Annual Meeting, Lake Tahoe, Nevada, 3/95. Keynote Speaker – Dementia

100. Idaho Academy of Family Medicine, Annual Meeting, Sun Valley, Idaho, 5/95. Keynote Speaker – Dementia: Sex after 60.

101. Martin Luther King, Jr. Medical Center, Los Angeles, CA, 6/95. Medical Grand Rounds – Dementia.

102. Martin Luther King, Jr. Medical Center, Los Angeles, CA, 8/95. Medical Grand Rounds – Sex after 60.

103. University of Alaska, Southeast – Sitka Geriatric Symposium, Sitka, Alaska, 9/95. Organizer, Keynote Speaker.

104. V.A. Outpatient Clinic, Las Vegas, NV, 10/95. Medical Grand Rounds, Dementia.

105. V.A. Outpatient Clinic, Los Angeles, CA, 11/95. Grand Rounds – Dementia.

106. V.A. Outpatient Clinic Los Angeles, CA, 12/95. Grand Rounds – Sleep disorder in the elderly.

107. State of Alaska, Division of Senior Services, 2/96. Lectures and site visits to six State of Alaska nursing homes.

108. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/96. Course Director and Speaker.

109. Family Medicine Training Program, Spokane, Washington, 3/96. Lecture – Dementia.

110. Family Medicine Training Program, Central Montana, 4/96. Lecture – Drugs in the Elderly.

111. University of Utah Affiliated Programs, Salt Lake City, 4/96. Lecture – Depression in the Elderly.

112. State of Alaska, Department of Administration, Division of Senior Services, Course Coordinator for visits of 16 Alaskan State officials to USC School of Medicine, Andrus Gerontology Center and affiliated local Southern California Geriatric Programs. Duration – one month, early May to early June, 1996, Los Angeles, CA.

113. State of Alaska, Division of Senior Services, Department of Administration. Site visit to Administrative offices for review of Geriatric Programs. Juneau, Alaska, 6/96. Outside Consultant and Lecturer.

114. University of Alaska, Southeast Sitka. Care of the Elderly Symposium, Sitka, Alaska, 9/96. Course Director and Lecturer.

115. Boise Health Consortium – Medical Grand Rounds, Boise, Idaho, 11/96. Sex after 60.

116. Symposium on Long Term Care for Providers, Milwaukee, Wisconsin, 2/97. Keynote Speaker – Drugs in the elderly.

117. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/97. Course Director and Speaker.

118. Osteopathic Medical College, Des Moines, Iowa, 4/97. Symposium on diabetes Mellitus, Keynote Speaker – Diabetes in the Elderly.

119. University of Southern Illinois Medical School, Champaign, Urbana, Illinois, 4/97, Medical House Staff Lectures. Topics – Diabetes in the Elderly, Drugs in the Elderly.

120. Allegheny Medical School, Philadelphia, PA, 5/97. Keynote Speaker – Symposium on Diabetes and Lipids in the Elderly.

121. State Senior Care Program, Oklahoma City, Oklahoma, 7/97, Keynote Speaker – State of Oklahoma Senior Care Program.

122. Eastern Carolina University Medical School, Greensboro, North Carolina, 8/97. Medical Grand Rounds.

123. University of Alaska, Southeast Sitka. Care of the Elderly Symposium, Sitka, Alaska, 9/97, Course Director and Lecturer.

124. University of Colorado, Denver, CO, 10/97. University of Colorado Affiliated Programs, Several States, Medical Grand Rounds.

125. Arizona Chapter of the American Gerontologic Society, Phoenix, AZ, 11/97. Sex After 60.

126. Symposium of Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/98. Course Director and Speaker.

127. Medical University of South Carolina, Charleston, South Carolina, 4/98. Family Medicine Grand Rounds, Sex After 60.

128. University of Colorado, Denver, CO, 4/98, University of Colorado Affiliated Programs, Several Sites, Medical Grand Rounds.

129. Eisenhower Medical Center, Rancho Mirage, CA, 4/98. Medical Grand Rounds, Drugs in the Elderly.

130. University of Alaska and U.S.C., Sitka, Alaska, 9/98. Care of the Elderly Symposium, Course Director and Speaker.

131. University of South Carolina School of Medicine, Charleston, South Carolina, 10/98. Family Medicine Grand Rounds, Sex After 60.

132. V.A. Outpatient Clinic, Los Angeles, CA, 10/98. Memorial Lecture Series, Medications in the Elderly.

133. V.A. Outpatient Clinic, Los Angeles, CA, 10/98, Memorial Lecture Series Alzheimer's disease.

134. Visiting Professor of Geriatric Medicine, Alaska Geriatric Institute, Anchorage, Alaska, April, 1/99. Multiple Lectures.

135. Visiting Professor of Geriatric Medicine, University of New Mexico School of Medicine, Albuquerque, New Mexico, 6/99, Alzheimer's disease.

136. University of Alaska, Sitka, Alaska, 9/17/99-9/19/99. Care of the Elderly Conference, Course Director and Lecturer.

137. Visiting Professor of Geriatric Medicine, University of Arizona Affiliated Hospitals of Tucson and Phoenix, AZ, 10/20/99-10/23/99.

138. Symposium of the Gerontological Society of America, San Francisco, CA, 11/21/99. Interdisciplinary Approaches to Teaching Geriatrics, Invited Speaker.

139. State of Alaska, Anchorage, Alaska, 2/20/00-2/23/00. Task Force for the Assessment of Assisted Living in the Pioneers' Homes, Leader and Spokesperson.

140. Visiting Professor of Geriatric Medicine, University of Colorado School of Medicine Affiliated Hospitals, Denver, Colorado, 3/7/00-3/8/00.

141. Visiting Professor of Geriatric Medicine, Affiliated Internal Medicine Programs, El Paso, Texas, 4/26/00-4/27/00.

142. Newport Beach, California, 5/5/00. Annual Meeting of the California Association of Medical Directors, Invited Speaker.

143. Antelope Valley Hospital, Lancaster, California. Medical Grand Rounds, 11/17/99. Treatment of Arthritic Pain in the Elderly.

144. Kern County Medical Center, Bakersfield, California. Medical Grand Rounds, 1/7/00. Hazards of Drug Therapies in the Elderly.

145. Hoag Hospital, Newport Beach, California. Medical Grand Rounds, 3/10/00. Sex After 60.

146. Visiting Professor of Geriatric Medicine, Affiliated Internal Medicine Programs, El Paso, Texas. 4/26/00-4/27/00

147. Arrowhead Medical Center, San Bernardino County Hospital, Colton, California, 5/17/00. Medications in the Elderly.

148. "Annual Meeting of the California Association of Medical Directors," Invited Speaker, Newport Beach, California. 5/5/00.

149. Riverside General Hospital, Merino Valley, California, 6/16/06. Medical Grand Rounds, Medications in the Elderly.

150. The Elderly Diabetic. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

151. Treatment of Arthritic Pain. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

152. Depression in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

153. Treatment of Hypertension in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

154. Medications in the Elderly. Continuous Quality Improvement (CQI) in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Anchorage, Alaska, 11/13/00.

155. Falls in the Elderly. Continuous Quality Improvement (CQI) in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Anchorage, Alaska, 11/13/00.

156. Dementia. Memorial Lecture Series, Outpatient Department, Veterans Administration, Los Angeles, California, 1/2/01.

157. Geropsychiatric Assessment of the Elderly. Bureau of Medi-Cal Fraud and Elder Abuse, Department of Justice, State of California, Ontario California, 2/22/01.

158. Treating Chronic Pain in the Elderly. Memorial Lecture Series, Outpatient Department, Veterans Administration Los Angeles, California, 1/2/01.

159. Medications in the Elderly. Continuous Quality Improvement (CQI) and the Risk-Plus Program in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Sitka, Alaska, 5/1/01.

160. Falls in the Elderly. Continuous Quality Improvement (CQI) and the Risk-Plus Program in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Sitka, Alaska, 5/1/01.

161. Sexuality. North American Forum on Women's Health, Los Angeles, California, 6/19/01.

162. Alzheimer's Disease. North American Forum on Women's Health, Los Angeles, California, 6/19/01

163. Geropsychological Evaluation of Seniors. Symposium on Elder Abuse. Department of Justice-Bureau of Medical Fraud and Elder Abuse, Rancho Mirage, California, 9/7/01

164. Depression in the Elderly. Hoag Hospital. Newport Beach, California, 9/7/01.

165. Sleep Disorders in the Elderly. Care of the Elderly Conference. University of Alaska – Sitka, Sitka, Alaska, 9/23/01.

166. Medications in the Elderly. Memorial Hospital, Santa Rosa, California, 10/19/01.

167. Dementia. Medical Grand Rounds, Riverside General Hospital, Marino Valley, California, 11/15/01.

168. Dementia in the Elderly. Medical Grand Rounds, Arrowhead Medical Center, San Bernardino General Hospital, Colton, California, 11/29/01.

169. Patient and Family Satisfaction in Long Term Care. Alaska Pioneers' Home, Anchorage, Alaska. A site visit and symposium, 12/11/01-12/15/01.

170. Normal Aging vs. Disease. Symposium on Geriatric Medicine. Annenberg Center, Rancho Mirage, California, 2/02.

171. Medications in the Elderly, Memorial Lecture Series, Outpatient Department, Veterans Administration, Los Angeles, California, 2/26/02.

172. Life Style Redesign in Elder Care. 2nd Annual North American Forum on Women's Health, Anaheim, California, 3/1/02.

173. Dementia in the Elderly. Memorial Lecture Series, Outpatient Department, Veterans Administration, Los Angeles, California, 3/12/02.

174. Diabetes in the Elderly. Endocrine Grand Rounds. Harbor General Hospital, Torrance, California, 4/1/0/2.

175. Medications in the Elderly. Multi-lecture series, Commission on Aging, State of Alaska, Anchorage and Fairbanks, 4/22/02-4/26/02.

176. Treatment of Pain in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka. Sitka, Alaska, 9/19/02.

177. Treatment of Cardiovascular Risk Factors in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Alaska 9/19/02.

178. Special Issues in Long Term Care. Assessment and Evaluation of the Anchorage Pioneers' Home, Anchorage, Alaska, 12/10-12/14/02.

179. Identification and Treatment of Cardiovascular Risk Factors in the Elderly – A symposium Montgomery Cardiology Programs. Montgomery, Alabama, 3/21/03.

180. Medications in the Elderly. Multi-lecture series, Commission on Aging, State of Alaska, Anchorage and Fairbanks, 4/23-4/26/03.

181. Assessment of Mental Competency and Discussion of an Elder Abuse Case. Symposium on Elder Abuse, Department of Justice – Bureau of Medi-Cal Fraud and Elder Abuse, Squaw Valley, California, 5/27-5/30/03.

182. Medications in the Elderly. Multi-lecture series, Commission on Aging, State of Alaska, Juneau and Ketchikan, 6/27-6/29/03.

183. Dementia in the Elderly: Medications in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Sitka, Alaska, 9/18-9/19/03.

184. Dementia. Geriatric Symposium – St. Mary's Hospital and Scan, Long Beach, California, 10/4/03.

185. Senior Assessment for the Care Provider. Public Health Forum – State of Alaska. Anchorage, Alaska, 12/1/03.

186. Senior Assessment Workshop. Alaska Geriatric Education Center, University of Alaska, Anchorage, Alaska, 1/23/04.

187. Sleep Disorders in the Elderly. Coping with Chronic Disease. Care of the Elderly Conference, University of Alaska, Anchorage, Alaska, 9/17/04.

188. Elder Abuse. Coping with Chronic Disease. Cardiovascular Risk Factors in the Elderly. Senior Lives Conference, University of Alaska, Anchorage, Alaska 6/10/05.

189. Assessment of the Chart in Skilled Nursing Facilities. Symposium on Elder Abuse, Department of Justice, Bureau of Medical Fraud and Elder Abuse, Long Beach, California, 6/6-6/9/05.

190. Coping with Chronic Disease. The Chart in the Skilled Nursing Home. Care of the Elderly Conference, University of Alaska, Sitka, 9/16/05.

191. Sex After 60. The Chart in the Skilled Nursing Home. Promoting Best Practices in Aging Conference, University of Alaska, Anchorage – 6/8/06 – 6/10/06.

192. Medical Realities and Diminished Tribal Longevity. New Aspects of Long Term Care. Care of the Elderly Conference, University of Alaska , Sitka, 9/14/06 – 9/16/06.

193. Standard of Care, Symposium on Elder Abuse, Department of Justice, State of California, Bureau of Medi-CAL Fraud and Elder Abuse, San Mateo, California May 2007.

194. Integrated Therapies for Aging. The Therapies, Care of the Elderly Conference, University of Alaska, Southeast, Sitka 9/25/08 – 9/27/08.

195. Human Biology 596 Course University of Washington Medical School - WWAMI Program – Multi-Disciplinary and Ethnicity in Gerontology and Geriatrics. Lectures to Alaskan Medical Students, University of Alaska, Anchorage, April 2009 and October through December 2009.

196. WWAMI Program Lecturer – in Laraime and Cheyenne, WY to Medical Students and Family Practice House Staff – April 2009.

197. Mental Health and Dementia. Inter-disciplinary Practice in Geriatrics Sex After 60. Prompting Best Practices in Aging Conference, University of Alaska, Anchorage, 6/3/09 – 6/5/09.

198. Care of the Elderly Conference. Co-Director. University of Alaska, Southeast, Sitka 9/26/09 – 9/28/09.

199. WWAMI Course Human Biology 598, Co-Director Lectures to Alaskan Medical Students, April 2010.

200. Alaska Medical Summit, April 2010, Lecture – Role of Geriatric Medicine.

201. Claremont Graduate University, Lecture May 2010. Diminished longevity in native peoples in America.

202. WWAMI Course Human Biology 598, Co-Director Lectures to Alaskan Medical Students, April 2011.

203. Alaska Medical Summit, April 2011, lecture – Unique issues in senior care.

204. WWAMI Course Human Biology 598, Co-Director Lectures to Alaskan Medical Students, April 2012.

205. School of Community and Global Health, Claremont Graduate University, Symposium on diminished longevity of native peoples in America, May 2012.

206. WWAMI Course Human Biology 598, Co-Director Lectures to Alaska Medical Students, April 2013.

207. WWAMI Course Human Biology 598, Co-Director, Lectures to Alaska Medical Students, April 2014.

## I. PUBLICATIONS

Papers – Peer Review

1. McCleverty, J.A. and Wilkinson, G. (Submitters), Lipson, L.G., Maddox, M.D. and Kaesz, H.D. (Checkers): Dichlorotetracarbonyldirhodium. Inorganic Synthesis Vol. VIII, oltzclaw, H.F., Jr. (Ed) McGraw-Hill, New York, 1966, pp.211-214.

2. McCleverty, J.A. and Wilkinson, G. (Submitters), Lipson, L.G., Maddox, M.D. and Kaesz, H.D. (Checkers): Chlorocarbonylbis (triphenylphospine) rhodium and chlorocarbonylbis (triphenylarsine) rhodium. Inorganic Synthesis Vol. VIII, Holtzclaw, H.G. Jr. (Ed), McGraw-Hill, New York, NY 1966, pp214-217.

3. Lipson, L.G., Capuzzi, C.M. and Margolis, S.M: Effect on method of cell isolation on the metabolic activity of isolated rat liver cells. J. CellSC. 10:167-179, 1972.

4. Lipson, L.G.: Plague in San Francisco in 1900, Ann. Int. Med. 77:303-310, 1972.

5.  Kohler, T.R., Lipson, L.G., Flores, J., Witkum, P.A., Fischer, J.B., and Sharp, G.W.G.: Sequence of events in the activation of adenylate cyclase by cholera toxin. Bull Schweitz. Akad. Med. Wiss. 32-223-232, 1976.

6.  Beiteins, I.Z., Lipson, L.G. and McCarthur, J.W.:Luteinizing hormone, follicle stimulating hormone and their subunits released in culture by human pituitary tumors. J. Clin. Endo. Metab. 45:1271-1280, 1977.

7.  Fischer, J.B., Kohler, T.R., Lipson, L.G., Flores, J., Witkam, P.A., and Sharp, G.W.G.: Studies on the time course and rate limiting steps in the activation of adenylate cyclase by cholera toxin. Biochem. J. 173: 59-64. 1978.

8.  Lipson, L.G., Beitins, I.Z., Kornblith, P.D., McArthur, J.W., Friesen, H.G., Kliman, B. and Kjelberg, R.N.: Tissue culture studies on human pituitary tumors: Radioimmunoassay of anterior pituitary hormones in culture medium. Acta. Endocrin. 88:239-249, 1978.

9.  Lipson, L.G. and Sharp, G.W.G.: Insulin secretion in pregnancy: Studies on adenylate Cyclase, phosphodiestarase, protein kinase and phosphoprotein phosphotase in Isolated islets of Langerhans of the rat. Endocrinology 103:1272-1280, 1978.

10. Lipson, L.G., Beitins, I.Z., Kornblith, P.D., McArthur, J.W., Friesen, H.G., Kliman, B. and Kjelberg, R.N.: Tissue culture studies on human pituitary tumors: Long-term release of anterior pituitary hormones. Acta. Endocrin. 90:421-433, 1979.

11. Lipson, L.G., Siegal, E., Wohlheim, C.B. and Sharp, G.W.G.: Insulin release in fasting: Studies on adenylate cyclase, phosphodiestarase, protein kinase and phosphoprotein phosphatase in isolated islets of Langerhans of the rat. Endocrinology 105:702-717, 1979.

12. Lipson, L.G., Bush, M.J., Tietjen, G.E. and Yoon, A.: Role of the adenylate cyclase system in altered insulin release from islets of Langerhans of aging rats. Acta. Endocrin. 96:222-226, 1981.

13. Lipson, L.G., Bobrycki, V.A., Bush, M.J., Tietjen, G.E. and Yoon, A.: Insulin release in aging: Studies on adenylate cyclase, phosphodiestarase and protein kinase in islolated islets on Langerhans of the rat. Endocrinology 108: 602-624, 1981.

14. Lipson, L.G., Moore, D., Pope, A.M., Todd, G.J., and Avila, S.: Sexual dysfunction in Hypertensive diabetic patients. J. Cardiovascular Med. 6: Supp. 1, 30-37, 1981.

15. Cotton, D.B., Strassner, H.G., Lipson, L.G., and Goldstein, D.A.: The effects of terbutaline on acid-base, electrolytes and glucose homeostasis during the management of preterm labor. Am. J. Obstet. And Gyn. 141: 617-624, 1982.

16. Oldham, S.B., Lipson, L.G. and Tietjen, G.E.: Evidence for the presence of calmodulin in human parathyroid tissue. Mineral and Electrolyte Metabolism 7: 273-280, 1982.

17. Lipson, L.G., Oldham, S.B.: The presence of calmodulin – stimulatable phosphodiestarase in pancreatic islets of Langerhans of pregnant and normal female rates. Life Sciences 32: 775-780, 1983.

18. Mircheff, A.C., Conteas, C.N., Lu, C.C., Santiago, N.A., Gray, G.M. and Lipson, L.G.: Basal-lateral and intracellular membrane populations of the rate exorbital lacrimal gland. Am. J. Physiol. 245: G 133-142, 1983.

19. Premdas, F.H., Molina, J.M. and Lipson, L.G.: Insulin release in aging: Role of glyceraldehydes. Acta. Endocrin. 103: 539-543, 1983.

20. Lipson, L.G. and Lipson, M.: Treatment of the obese maturity onset diabetic patient, Arch. Int. Med. 144: 135-138, 1984.

21. Oldham, S.B., Molloy, C. and Lipson, L.G.: Calcium inhibition of adenylate cyclase in the parathyroid gland. Endocrinology 114: 207-214, 1984.

22. Lipson, L.G.: Sexual dysfunction in the diabetic patient with hypertension. Am. J. Cardiol. 53: 46A-50A, 1984.

23. Lipson, L.G.: Special problems in the treatment of hypertension in the patient with diabetes mellitus. Arch. Int. Med. 144: 1829-1831, 1984.

24. Oldham, S.B., Rude, R.K., Molloy, C. and Lipson, L.G.: The effect of magnesium on calcium inhibition of parathyroid adenylate cyclase. Endocrinology. 115: 1883-1890, 1984.

25. Molina, J.M., Premdas, F.H., Klenck, R.E., Eddlestone, G., Oldham, S.B. and Lipson, L.G.: The dynamic insulin secretory response of isolated pancreatic islets of the diabetic mouse: Evidence for a gene dosage effect on insulin secretion. Diabetes 33: 1120-1123.

26. Eddlestone, G.T., Oldham, S.B., Lipson, L.G., Premdas, F.H. and Beigelman, P.M.: Electrical activity, cAMP concentration and insulin

release in mouse islets of Langerhans, Am. J. Physiol. 248: C 145-153, 1985.

27.    Molina, J.M., Premdas, F.H. and Lipson, L.G.: Insulin release in aging: Dynamic response of isolated islets of Langerhans of the rat to D-glyceraldehyde. Endocrinology 116: 821-826, 1985.

28.    Oldham, S.B. and Lipson, L.G.: The high affinity calcium inhibition of parathyroid adenylate cyclase is not calmodulin-dependent. Calcif, Tissue Int. 38: 275-281, 1986.

29.    Bailey, C.J., Day, D., Bray, G.A., Lipson, L.G. and Flatt, P.R.: Role of adrenal glands in the development of the abnormal glucose and insulin homeostasis in genetically obese (ob/ob) mice. Hormone and Metabolism Research. 18: 357-360, 1986.

30.    Prochazka, M., Premdas, F.H., Leiter, E.H. and Lipson, L.G.: Estrone treatment dissociates primary versus secondary consequences of "diabetes" (DB) gene expression in mice. Diabetes, 35: 725-728, 1986.

31.    Lipson, L.G.: Diabetes in the elderly: Diagnosis, pathogenesis, and therapy. Am. J. Med. 80: Supp. 5A: 10-21, 1986.

32.    Fadda, G.Z., Akmal, M., Premdas, F.H., Lipson, L.G. and Massry, S.G.: Insulin release from pancreatic islets: Effects of CRF and excess PTH. Kidney Int. 33: 1066-1072, 1988.

33.    Leiter, E. H., Premdas, F.H., Harrison, D.H. and Lipson, L.G.: Aging and glucose homeostasis in C57BL/6J male mice. FASEB Journal. 2: 2807-2811, 1988.

34.    Fadda, G.Z., Akmal, M., Lipson, L.G., Soliman, A. and Massry, S.G.: Correction of glucose intolerance and the impaired insulin release of chronic renal failure by verapamil. Kidney Int. 36: 773-770, 1989.

35.    Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Direct effect of parathyroid hormone secretion from pancreatic islets. Am. J. Physiol., 258 (Endocrinol. Metab. 21): E975-E984, 1990.

36.    Mulligan, R., Lipson, L.G. and Heaton, S. G.: Detecting diabetes in an elderly dental patient population. Special care in Dentistry: Feature Article: September-October, 142-147, 1990.

37.    Xin-Gin, Z., Fadda, G.Z., Lipson, L.G. and Massry, S.G.: Phosphate depletion impairs insulin secretion by pancreatic islets. Kid. Int. 39: 120-128, 1991.

38. Fadda, G.Z., Hajjar, S.M., Perna, A.F., Chau, X.J., Lipson, L.G. and Massry, S.G.: On the mechanisms of impaired insulin secretion in chronic renal failure. Jour. Clin. Invest. 87: 225-261, 1991.

39. Clark, F. Carlson, M., Zimke, R., Frank, G., Patterson, K., Larson, B., Rankin-Martinez, A., Hobson, L., Crandall, J., Mandel, D. and Lipson, L.G.: A qualitative study of the life domains and adaptive strategies of the low income, well elderly. Am. J. Occup. Therapy, 1994

40. Clark F. Carlson, M., Zimke, R., Frank, G., Patterson, K., Ennevor, B., Rankin-Martinez, A., Hobson, L., Crandall, J., Mandel, D.and Lipson, L.G.: Life domains and adaptive strategies of a group of low-income, well older adults. Am. Jr. of Occupational Therapy, 99-108, 1995.

41. Rho, Jay P. and Lipson, L.G.: Focus on acetylcholinestrerase inhibitor for the treatment of Alzheimer's disease. Formulary, Vol. 32, 677-684, 1997.

42. Clark, F., Azen, S.P., Zemke, R., Jackson, J., Carlson, M., Mandel, D., Hay, J., Josephson, K., Cherry, B., Hessle, C., Palmer, J. and Lipson, L.G.: Occupational Therapy for Independent-Living Older Adults. JAMA, 278: 1321-1326, 1997.

43. Clark, F., Azen, S.P., Carlson, M., Mandel, D., LaBree, L., Hay, J., Zemke, R., Jackson, J. and Lipson, L.G.: Embedding health-promoting changes into the daily lives of independent-living older adults: Long-term follow-up of occupational therapy intervention. Journal of Gerontology: Psychological Sciences, 56B, pp. 60-63, 2001.

Requested Chapters, Papers, and Monograms

1. Sharp, G.W.G., Fisher, J.G., Lipson, L.G., Kohler, T.R., Flores, J. and Witkum, P.A.: Time course studies on the mechanisms of action cholera toxin. Hormonal Receptors in Digestive Tract Physiology. In Bonfils, S., Fromageot, P., Rosselin, G. (eds.), Eldevier-North Holland Biomedical Press, Amdsterdam, pp.447-454, 1976.

2. Sharp, G.W.G., Wiedenkeller, D.E., Lipson, L.G., Oldham, S.B., Krausz, Y., Janjis, D., Pian-Smith, M.C.M. and Wollheim, C.B.: Multiple roled of calmodulin, the endocrine pancreas and the control of insulin secretion. Proceedings of the 11th Congress of the International Diabetes Federation. Int. Congress Series #600: Excerpta Medica, Princeton, N.J., Mngola, En.N. (Ed.) pp 329-336, 1983.

3. Lipson, L.G.: Hypertension and diabetes mellitus. Diabetes forecast 38:53, 1985.

4.   Lipson, L.G.: Diabetes mellitus in the elderly: Special problems, special approaches. Co. Medical, New York, N.Y., pp. 1-20, 1985.

5.   Lipson, L.G.: Diabetes after sixty-five. Diabetes Forecast. Vol. 39, No. 7, 54-58, 1986.

6.   Lipson, L.G.: Diabetes in the elderly: A multifaceted problem. Am. J. Med. 80: supp. 5A:1-2, 1986.

7.   Lipson, L.G. and Bray, G.A." Energy intake and utilization in aging man: Chen (ed.), Nutritional Aspects of Aging, Vol. 1, CRC press, Inc., Boca Raton, FL. Pp. 184-185, 1986.

8.   Lipson, L.G.: Diabetes and aging. In Beigelman, P.M. and Kuman, D., (Eds), Diabetes Mellitus for the house officer. Williams and Wilkins, Baltimore, MD., pp. 184-185, 1986.

9.   Lipson, L.G. and Kumar, D.: Oral hypoglycemic agents. In Beigelman, P.M. and Kumar, D. (Eds.) Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MC..Pp. 112-118, 1986.

10.   Lipson, L.G.: Dental problems in the diabetic patients. In Beigelman, P.M. and Kumar, D. (Eds.) Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MD., pp. 181-183, 1986.

11.   Lipson, L.G.,: Hypertension in the diabetic patient. In Beigelman, P.M. and Kumar, D., (Eds.) Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MD., pp 160-163, 1986.

12.   Lipson, L.G.: Hypertension in the diabetic patient. In Beigelman, P.M. and Kumar, D., (Eds.), Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MD., pp. 173-175, 1986

13.   Dinwiddie, R. and Lipson, L.G.: Improved control of serum glucose in obese, new-onset Insulinopenic non-insulin dependent diabetes mellitus: Partial respiration of Norman dynamic insulin secretion. Roerig Division, pp. 1-6, 1986.

14.   Lipson, L.G. and Kato-Palmer, S.: Diabetes in Asians. Diabetes Forecast, Vol. 41, No. 9, 48-51, 1988.

15.   Lipson, L.G., Kato-Palmer, S., Boggs, W.L., Moore,D., and ppe, A.: Diabetes in the Black population. Diabetes Forecast Vol. 41, No. 9, pp. 34-38, 1988.

16. Williams, B.R., Nichol, M.B., Lowe, B.F., McCombs, J.S., Yoon, P.S. and Lipson, L.G.: pharmacist intervention residential care facilities. In Rowe, J.W. and Ahronheim, J.C. (Eds.) Annual Review of Gerontology and Geriatrics; Focus on Medications and the Elderly. Springer Publishing Co. New York, N.Y., pp. 150-162, Vol. 12, 1992.

17. The Use of Medications: A Training and Reference Manual Developed for Staff in Residential Care Facilities for the Elderly, 1195. Lipson, L.G. – Project Co-Director.

18. Weiner, J. and Lipson, L.G.: Human diseases as models of accelerated aging. In Rosen, C., Glowacki, J. and Bilezikian, J. (Eds.) The Aging Skeleton, Academic Press, Chapter 6: pp. 51-58, 1999.

19. Raghaven, D., Weiner, J. and Lipson, L.G.: Cancer in the elderly : principles of treatment in Soulhami, R.L. et al (Eds.), Oxford Textbook Oncology, 2nd Edition, Oxford University Press, Oxford, London, 1999.

Films and Videos

1. Discharge Planning for the Elderly Hospitalized Patient: I. What to do when you go Home. Hospital Satellite Network, 1986. 15 min. L.G. Lipson – Moderator and Context Exper.

2. Discharged Planning for the Elderly Hospitalized Patient: II. The patient with acute medical problems after discharge. Hospital Satellite Network, 1986, 15 min. L.G. Lipson – Moderator and content expert.

3. Discharge Planning for the Elderly Hospitalized Patient: III. The chronically disabled patient. Hospital Satellite Network, 1986, 15 min. L.G. Lipson – Moderator and content expert.

4. Discharge Planning for the Elderly Hospitalized Patient: IV. Community programs for the elderly. Hospital Satellite Network, 1986, 15 min. L.G. Lipson – Moderator and content expert.

5. Normal Aging Versus Disease. Physician Journal Update. Lifetime Network, 1987, 15 min. L.G. Lipson – Content expert.

6. Drugs and the Elderly. Physician's Journal Update. Lifetime Network, 1987, 15 min. L.G. Lipson – Content expert.

7-26. Caring for and Aging Society. 20 videos on various aspects of Geriatrics and Gerontology. Each 30 minutes in length. Producer – Neil Steinberg Productions, Executive Producers – Hospital Satellite Network and Age

Wave, Sponsor – Marion Laboratories. 1987-1988. L.G. Lipson – Technical advisor and content expert.

## CARING FOR AN AGING SOCIETY

### SHOW TITLES AND NUMBER

| NSP# | HSN# | TITLE | EXPERT |
|---|---|---|---|
| 001 | 8649X | NEW IMAGES OF AGING (F) | DYCHTWALD |
| 002 | 0462X | HOW TO TALK TO YOUR DOCTOR (F) | LIPSON |
| 003 | 5733X | GERIATRIC ASESSMENT (F) | BUTLER |
| 004 | 8648X | DRUGS AND THE ELDERLY (F) | LAMY |
| 005 | 7716X | ACUTE CARE GERIATRIC NURSING (F) | FULMER |
| 006 | 5734X | HEART DISEASE AND THE ELDERLY (F) | SWAN |
| 012 | 8650X | PRINCEPLES OF AGING (F) | HAZZARD |
| 013 | 5735X | PRESENTATION OF DISEASE (F) | ABRASS |
| 014 | 5736X | GEROPSYCHIATRIC FOUNDATIONS (W) | OLSEN |
| 015 | 5737X | PHYSICIAN'S ROLE IN DRUG THERAPY (F) | VESTAL |
| 016 | 8652X | ETHICAL ISSUES IN ELDERCARE (F) | CASSEL |
| 017 | 7717X | GEROPSYCHIATRIC NURSING (W) | WYKLE |
| 018 | 6725X | THE HUB CONCEPT (W) | DYCHTWALD |
| 019 | 6726X | ELDERCARE FINANCING (W) | DYCHTWALD |
| 020 | 6727X | ELDERCARE: MODELS OF SUCCESS (F) | DYCHTWALD |
| 021 | 5738X | DIABETES IN THE ELDERLY (W) | LIPSON |
| 022 | 8651X | GERIATRIC DISCHARGE PLANNING (F) | WERTHEIMER |
| 023 | 0473X | PROMOTING WELLNESS (W) | FARQUHAR |
| 024 | 0475X | SELF-MEDICATION IN THE ELDERLY (W) | SIMONSON |
| 025 | 0474X | FAMILY ROLES IN HEALTHCARE FOR THE ELDERLY | BRATTER |

27. Medical Checkup: Health Awareness '88. Aging in the Black Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

28. Medical Checkup: Health Awareness '88 Aging in the Hispanic Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

29. Medical Checkup: Health Awareness '88. Aging in the Asian Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

30. Medical Checkup: Health Awareness '88. Diabetes Mellitus in the Black Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

31.    Medical Checkup: Health Awareness '88. Diabetes Mellitus in the Asian Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

32.    Medical Checkup: Health Awareness '88. Diabetes Mellitus in the Hispanic Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

33-38. Diet and Exercise – Lifestyles for Aging. Hospital Satellite Network. Six 10-minute Segments, 1989. L.G. Lipson – content expert.

39.    How to Talk to the Older Patient. Baylor Hospital and Age Wave, 1989. L.G. Lipson – Medical Moderator and content expert.

40-41. The Aging Skin. Age Wave, 1991. L.G.Lipson – Medical Editor.

42.    Diabetes and the Elderly. Living with Diabetes: Diabetes on the Air, 1991.

43.    Sex and Sexuality in Seniors – A Documentary, 1999 L.G. Lipson – Guest Expert.

## Abstracts

*1.    Lipson, L.G., Margolis, S.M. and Capuzzi, D.M.: Comparison of acetate and amino acid incorporation in rat liver cells isolated by three techniques. Fed. Proc. 28:336 (abst. 607), 1969.

2.    Lipson, L.G., Ackerman, I.P. and Kliman, B.: simultaneous acromegaly and partially suppressible adrenocortical function in a patient with a pituitary tumor. Clin. Res. 24: 274A, 1976.

3.    Lipson. L.G., Beitins, I.Z., Kornblith, P.D., McArthur, J. W., Friesen, H.G., Kliman, B. and Kjelberg, R.N. Hormone secretory patterns of human pituitary tumors in tissue culture. Clin. Res. 328A, 1976.

4.    Lipson, L.G., Forristall, C.A. and Sharp, G.W.G. Phosphorylation and dephosphorylation in the control of the insulin release: Islet phosphoprotein phosphatase. Diabetes 25: Supp. 1,374 (abst. 213), 1976.

*5.    Lipson, L.G., Vachon, C., Forristall, C.A., and Sharp, G.W.G.: Stimulation of specific protein phosphorylation in intact rats islets of Langerhans by both 3-isobutyl-l-methlxanthine and D-glucose. Clin. Res. 26:530A, 1978.

6.    Lipson, L.G. and Sharp, G.W.G.: Insulin release in pregnancy; Relationship to protein and phosphorylation. Endocrinology 102: (abst. 711), 1978.

7. Lipson, L.G. Wollheim, C.B. and Sharp, G.W.G.: Insulin release in fasting. Diabetes 27: Supp. 2, 489 (abst. 236), 1978.

8. Lipson, L.G., Bobrycki, V.A., Bush, M.J., Gross, E. and Inouyte, D.: Role of adenylate cyclase system in altered insulin release from islets of aged rats. Clin.Res. 28:51A, 1980.

*9. Cotton, D.B., Strassner, H.G., Lipson, L.G. and Goldstein, D.A.: Effect of terbutaline on serum concentrations of glucose, insulin, potassium, ionized and total calcium lactate, and colloid osmotic pressure. Gyecol. Invest. 1980.

*10. Lipson, L.G., Bush, M.J., Tietjen, G.E. and Yoon, A.: Insulin release in aging: the role of adenylate cyclase system. Endocrinology 106: (abst. 34), 1980.

11. Mircheff, a.C., Lipson, L.G., Bush, M.J., Yoon, A. and Barish, J.J.: Analytical fraction of B-cells. Diabetes 29: Supp. 2, 109A (abst. 425), 1980

12. Moore, D., Pope, A.M., Todd, G.J., Rosenquist, R.J., and Lipson, L.G.: Treatment of hypertensive diabetic patients with prazosin. Diabetes 29: Supp. 2, 67A (abst. 267) 1980.

*13. Oldham, S.B., Lopson, L.G. and Tietjen, G.E.: Evidence for the presence of calmodulin in human parathyroid tissue. VIII International Conference in Calcium Regulating Hormones, 1980.

*14. Lipson, L.G., Bush, M.J. and Bobrycki, V.A.: The role of the adenylate cyclase system in the decreased glucose-stimulated insulin release from isolated islets of Langerhans of aging rats. Gordon Research Conference – The Biology of Aging. 1980.

15. Lipson, L.G. Oldham, S.B. and Bush, M.J.: Calmodulin – stimulatable phosphodiestarase in isolated islets of Langerhans of the rat. Clin. Res. 29:56A, 1981.

16. Lipson. L.G., Moore, D., Pope A.M., Todd, F.J. and Avila, S.: Incidence of hypertension in male diabetic populations. Clin. Res. 29:413A. 1981.

17. Lipson, L.G. and Oldham, S.B.: Colmodulin-stimulatable phosphodiestarase in pancreatic islets of the pregnant rat. Clin. Res. 29-413A, 1981.

*18. Conteas, C.N., Lipson, L.G. and Mircheff, A.C.: Basal lateral membranes from rat parotid acinar cells. Gastroenterology 80: 1128A, 1981.

19. Lipson, L.G. and Oldham, S.B.: The presence of a calmodulin-stimulatable phosphodiestarase in pancreatic islets from pregnant and normal female rats. Endocrinology 108:343, (abst. 1942), 1981.

20. Lipson, L.G. Bush, M.J. and Najdziuk, J.: Insulin release in aging: Role of glyceraldehydes. Diabetes 30: Supp. 1 (abst. 296), 1981.

*21. Lipson, L.G.: Insulin release in aging. Gordon Research Conference – The Biology of Aging. 1982.

22. Lipson. L.G., Moore, D., Pope, A.M. and Todd, G.J.: Sexual dysfunction in hypertensive diabetic patients: The role of prazosin in its prevention. Diabetes 31: Sup. 2 (abst. 365), 1982.

*23. Oldham, S.B. and Lipson, L.G.: Biphasic inhibition of parathyroid adenylate cyclase activity by calcium. Calif., Tissue int. 34:S43, 1982.

*24. Lipson, L.G., Premdas, F.H., Molina, J.M.:Studies on dynamic insulin release in aging. The physiologist 25: 288 (abst. 47.8), 1982.

*25. Molina, J.M., Premdas, F. H. and Lipson, L.G.: Dynamics of insulin secretion in aging Clin.Res. 31:58A, 1983.

*26. Sharp, G.W.G., Wolheim, C.B., Siegel, E., Lipson, L.G. and Kraus, Y.: The role of calmodulin in insulin secretion. International Diabetes Fed. Meeting in Kenya, November 1982.

*27. Eddlestone, G.T., Oldham, S.B., Lipson, L.G. and Beigelman, P.M.: Forskolin increases cyclic AMP and potentiates electrical activity in the mouse pancreatic B-cell. Fed. Proc. 42: 897, (abst. 3544), 1983.

*28. Eddlestone, G.T., Oldham, S.B., Lipson, L.G. and Beigelman, P.M.: Forskolin potentiation of the B-cell response to glucose. Diabetes 32: Supp. 1(abst. 552), 1983.

*29. Oldham, S.B. and Lipson, L.G.: The effects of ionic calcium on magnesium activation of parathyroid adenylate cyclase. Calcif. Tissue Int. 35:686, 1983.

*30 Premdas, F.H., Molina, J.M. and Lipson, L.G.: Restoration of normal dynamic insulin in secretion in aging rats. The Physiologist 26:A50, (abst. 32.1), 1983.

*31. Oldham, S.B. and Lipson, L.G.: Calcium inhibition of parathyroid adenylate cyclase: Is calmodulin medicated? VIII-International Conference on Calcium Regulation Hormones, Kobe, Japan, October, 1983.

32. Johnson, M.D. and Lipson, L.G.: Prevalence of Hypertension and sexual dysfunction in diabetic women: Clin. Res. 32:48A, 1984.

*33. Molina, J.M., Premdas, F.H., Lipson, L.G., Klenck, R., Eddlestone, G. and Oldham, S.B.: Comparison of dynamic insulin release to D-glucose and D-glyceraldehyde in isolated pancreatic islets from the db/db mouse. Clin. Res. 32:51A, 1984.

*34. Oldham, S.B. and Lipson, L.G.: Ionic control of parathyroid adenylate cyclase activity. UCLA symposium 1984 on Membrane Receptors and Cellular Recognition.

35. Lipson, L.G., Liebig, P.S. and Sloane, R.B.: Training of faculty mentors and advocates in geriatrics. Annual Meeting of Gerontological Society of America. November, 1984, San Antonio, Texas.

*36. Lipson, L.G., Premdas, F.H., Molinas, J.M. and Lewis, D.: Cyclic AMP and insulin secretion. Gordon Research Conference – The Biology of Aging, 1985.

*37. Fadda G., Akmal, M., Premdas, F.H., Lipson, L.G. and Massry, S. G.: Direct evidence of an inhibitory effect if parathyroid hormone (PTH) on insulin release in chronic renal failure (CRF). Kidney International. 31:348, 1987, American Society of Nephrology, Washington, D.C., 1986.

*38. Fadda G., Akmal, M., Premdas, F.H., Lipson, L.G. and Massry, S. G.: Correction of glucose intolerance (GINT) and the impaired insulin release o chronic renal failure (CRF) by verapamil. American Society of Nephrology, San Antonio, Texas 1988.

39. Palmer, S.K., Madison, R.E. and Lipson, L.G.: Self-reported prevalence and associated factors in type II diabetes in Japanese Americans in Los Angeles. Diabetes: 37:150A (abst. 587), 1988.

*40. Garcia, D.L., Palmer, S.K., Boggs, W.L. and Lipson, L.G.: Challenges in-patient compliance of elderly Mexican American Diabetics. Diabetes: 37:68A (abst. 269), American Diabetes Association, New Orleans, L.A., 1988.

41. Schwam, W.J., Lefevre, T.M. and Lipson, L.G.: Falls in the elderly: The use of multiple balance tests. Nov. 1988 meeting of Gerontological Society of America.

*42. Oldham, S.B., Eddlestone, G.T., Premdas, F.H. and Lipson, L.G.: the influence of age on glucose and forskolin – stimulated insulin release from islets of the diabetic mouse. No. 1988 meeting of Gerontological Society of America.

*43. Lipson, L.G.: Caring for an aging society – twenty 30 minute videos on gerontology and geriatrics. Nov. 1988, meeting of Gerontological Society of America.

*44. Palmer, S.K., Madison, R.E. and Lipson, L.G.: Diabetes in older Japanese-Americans. November 1988 meeting of Gerontological Society of America.

*45. Boggs, W.L., Garcia, D.L., Palmer, S.K., and Lipson, L.G.: Patient compliance in an ethnic population: Diabetes care in elderly Mexican-Americans, Nov. 1988, meeting of Gerontological Society of America.

*46. Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Correction of Glucose Intolerance (GINT) and the impaired insulin release of chronic renal failure (CRF) by Verapoamil. Kidney Int. 35:427, 1989, 1989 Meeting of the 21st National Kidney Foundation scientific Symposium.

*47    Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Evidence for a direct effect of parathyroid hormone (PTH) on pancreatic islets. Kidney Int. 37:466, 1990, 1990 meeting of the 22nd National Kidney Foundation Scientific Symposium.

*48    Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Mechanism of impaired insulin secretion in chronic renal failure. Kidney Int. 37:505, 1990. 1990 meeting of the 22nd National Kidney Foundation Scientific Symposium.

*49.    Comunale, R., Fadda, G.Z., Premad, F.H., Thanakitcharu, P, Lipson, L.G. and Massry, S.G.: Reduced K-induced insulin secretion in chronic renal failure (CRF) contribute to impaired extrarenal disposal of K: Role of excess PTH. Am. Soc. Nephrol. 1:624, 1990.

*50    Williams, B., Lowe, B., Nichol, M., McCombs, J., Yoon, P. and Lipson, L.G.: Improving drug therapies in residential care facilities. 1994 Annual Meeting of the American Geriatric Society, Los Angeles, CA.

*51.    Lipson, L.G., McCombs, J., Jelliffe, R., Williams, B., and Wilson, P.: Medications I the elderly: problems, policies and new solution, a symposium. 1995 Annual Meeting of the Gerontological Society of America, Los Angeles, CA.

*52.    Lipson, L.G. and Kohn, J.: Governmental responsiveness to changes in demographics of aging disease: A unique state approach to geriatric ADRD care and treatment. 1996 Annual Meeting of Southern Medical Association, Baltimore, Maryland.

53.    Symposium Annual Meeting of Gerontological Society of America, San Francisco, California, 1998.

*Presented

## I.   Grants and Research Funding (1975-2010)

1.    National Research Service Awards in Diabetes, 1975-1977.
NIAMDD, NIH. 1F32 AM 05219 MET.

2.    Clinical Investigator Award in Diabetes. 1977-1978. NIAMDD, NIH. 1 KOB AM 0320 MET. Two additional years of support were given up in order to change institutions.

3.    Daland Fellowship in Clinical Medicine (Diabetes Research) of the American Philosophical Society, 1975-1978.

4.    NIH research Grant – "Pregnancy: Its role in altered insulin release." NICHID, NIH 1/79 through 12/81, $134,000. 1RO1 HD 12517. L.G. Lipson, P.I.

5.    American Diabetes Association Grant – "Mechanism of Insulin Release." 3/79 through 8/80. L.G. Lipson, P.I.

6. American Cancer Society Pilot Project Grant – "Tissue Culture Studies on Human Pituitary Tumors." 10/78 – 9/79. L.G. Lipson, P.I.

7. Los Angeles County Medical Association Auxiliary Grant – "Research in Clinical Diabetes." 7/78-1/82. L.G. Lipson, P.I.

8. NIH Research Grant – "Calcium modulated proteins in the parathyroid." NIAMDD, NIH 1R01 am 27816. 12/80 through 6/85. *205,000 L.G. Lipson, Co-P.I.

9. NIH Training Grant – "Training in Endocrine Hypertension and Endocrinology – Metabolism." NIAMDD, NIH. T 32 AM 07119. 7/80 THROUGH 6/85 $414,500. L.G. Lipson, Instructor.

10. NIH Training Grant – "Training in the Endocrinology and Neurobiology of Aging." NIA, NIH, 9/82 through 8/87, $803,882. L.G. Lipson, Co-director. AG 00093.

11. NIH Research Grant – "Microencapsulation: A novel transplantation technique." NIA, NIH. 3/83-2/85. L.G. Lipson, P.I.

12. American Diabetes Association Grant – "The role of cyclic AMP in insulin secretion in the diabetic mouse." 8/83 through 1/85. L.G. Lipson, Co-P.I.

13. DHHS Center Grant – "Geriatric Education Center Grant." DHHS 1D31 AH 69000. $952,000. 10/83 through 9/88. L.G. Lipson, Faculty Coordinator and Member of the Steering Committee.

14. NIH Center Grant – "Southern California Consortium for the Study of Alzheimer's Disease." NIA, NIH. 1/85 through 12/89. $750,000/year. L.G. Lipson, Clinical Investigator.

15. John A. Hartford Senior Scholar Award in Geriatric Medicine – at Harvard Medical School. 9/84 through 8/85. L.G. Lipson, Awardee.

16. Research Grant from Roerig, Pfizer Pharmaceuticals, "Diabetes in Elderly Mexican Americans." 1/86 through 7/87. $80,000 L.G. Lipson, M.D., P.I.

17. Research Grant from Ross Laboratories, "Diet and Dementia." 1/88 through 12/89. $37, 500. L.G. Lipson, M.D., P.I.

18. Research Grant from Hoechst Pharmaceuticals – "Neuropathy in the Elderly." 1/88 through 12/89, $27, 500. L.G. Lipson, M.D., P.I.

19. Research Grant from Boehringer Ingelheim Pharmaaceuticals – "Control of Mild Hypertension in the Elderly Inner – City Population." 6/88 through 12/88. $45, 000. L.G. Lipson, M.D.,P.I.

20. Research Grant from Marion Laboratories – "A New Treatment for Pressure Sores." 6/88 through 3/89. $15,000 L.G. Lipson, M.D., P.I.

21. Research Grant from Roerig Pharmaceuticals – "Diabetes in the Elderly." 7/1/89 – 12/31/90. $15,000, L.G. Lipson, M.D., P.I.

22. Research Grant from the John A. Hartford Foundation – "Prescribing Habits of Physicians in Retirement Housing." 2/89 through 1/93. $487,000. L.G. Lipson, M.D., P.I.

23. DHHS center Grant – "Geriatric Education Center." 10/89 through 9/92. $450,000 L.G. Lipson, M.D. Clinical Site Coordinator, Key Faculty Member, and Member of the Steering Committee.

24. Geriatric Medicine Fellowship Grant from the Japanese Retirement and Skilled Nursing Facilities (Keiro Services), 7/88 through 7/90. $170,000. L.G. Lipson, M.D., P.I.

25. Geriatric Medicine Fellowship Grant from the Motion Picture and Television Retirement Home and Hospital. 7/87 through 6/90. $50,000/year. L.G. Lipson, M.D., P.I.

26. NIH Research Grant – NIDDK – "Subtle Disturbances of Cobalamin Status." 2R01-DK32640-07. 2/1/91 through 1/31/95. $235,827. L.G. Lipson, M.D., Co-Investigator.

27. Development Grant – USC Irvine Foundation. Diversity Project. Course Development. "Diversity in Aging: Roles in Ethnicity, Gender, Biology and Environment." 1992-onward, $5,000. L.G. Lipson, M.D., Course Director and P.I.

28. NIH Research Grant – "Multicenter Trail of Prednisone in Alzheimer's Disease." 1995, $80,000. L.G. Lipson, M.D., Co-P.I.

29. State of Alaska – Educational Grant "Training of Administrators in Long Term Care Institutions and Health Care Providers and Planners in Special Topics of Gerontology and Geriatrics." 3/1/96 – 5/20/96, $16,000. L.G. Lipson, M.D., Director.

30. Glendale Adventist Medical Center – "Family Practice Residency Training in Geriatric Medicine." 7/1/96 – 6/30/00, $6,000/year. L.G. Lipson, M.D., Director.

31. Research Grant from G.D. Searle and Co. ' "Controlled Onset Verapamil Investigation of Cardiovascular Endpoints." 5/97 through 5/02. $75.000. L.G. Lipson, M.D., P.I.

32. State of Alaska, "Training in Geropharmacy, Fall Prevention, and Quality Assurance in the frail and demented elderly." 4/98- 1/1/02, $200,000. L.G. Lipson, M.D., P.I.

33. Research Grant from Pfizer Pharmaceuticals, - "Studies in Fine Motor Coordination in Alzheimer's Disease." 6/98-10/99, $97,000. L.G. Lipson, M.D., P.I.

34. Research Grant from the Keck Foundation "Studies on the Use of Medications in the Elderly." 9/30/02, $4,000. L.G. Lipson, M.D., P.I.- 12/31/02.

35. State of Alaska, "Training in Geropharmacy: Quality Assurance in the Frail and Demented Elderly: CQI of Pioneers' Homes," 1/1/02-12/31/02. $100,000. L.G. Lipson, M.D., P.I.

36. State of Alaska, "Training in Quality Assurance of the Frail and Demented Elderly: CQI of Pioneers' Homes," 1/1/03-12/21/03. $100,000 L.G. Lipson, M.D., P.I.

37. State of Alaska – University of Alaska. Alaska Geriatric Education Center – Consultant 7/1/03 – 12/31/04. $18,000.

38. State of Alaska – University of Alaska, Alaska Geriatric Education Center – Consultant 10/1/07 – 6/30/08. $10,000.

39. State of Alaska – University of Alaska, Alaska Geriatric Education Center – Consultant 7/1/08 – 6/30/09. $10,000.

40. State of Alaska – University of Alaska Geriatric Education Center – Consultant 7/1/09 – 6/30/10  $5,000.

**APP 5**

Exhibit "A" to October 10, 2014 Report of Dr. Lipson

Report of Loren G. Lipson, MD, regarding the care of Sylvia Ramos at Trisun Care Center Windcrest

## I.    Qualifications

I, Loren G. Lipson, declare as follows:

1. I am a physician licensed and currently practicing in the State of California. I have personal knowledge of the matters set forth in this report and if called upon to testify to such matters, I could and would do it competently.

2. I have been Board-Certified in Internal Medicine, Geriatric Medicine, and Utilization Review and Quality Assurance. I have been Director of the USC Teaching Nursing Home Program and have been Co-Director of the Los Angeles County USC Medical Center Adult Protection Team-Geriatric Assessment Clinic.

3. I have been Chief of the Section of Geriatric Medicine at the Keck School of Medicine at the University of Southern California. At this institution, I was Associate Professor of Medicine, Gerontology, Clinical Pharmacy, Medical Dentistry and Public Health, and Occupational Science and Occupational Therapy. I have been at this institution for over 29 years. I am now Professor Emeritus of Medicine. I am also Affiliate Professor at the University of Alaska, Anchorage in the College of Health and in the WWAMI Program for Alaskan Medical Students. I am also Adjunct Professor at the School of Community and Global Health, Claremont Graduate University.

4. In addition, I am a consultant to the Departments of Justice, State of California and New Mexico, and U.S. Department of Justice in areas of geriatric care and elder abuse. I have served as a Consultant to the Departments of Administration, Health and Social Services and Law, State of Alaska, in the areas of geriatric medicine and long term care. I also have been the Physician Advisor to USC University Hospital in areas of utilization management and quality assurance.

5. I have extensive personal experience in primary medical care as well as in subspecialty consultation and long-term care. I personally have provided care for patients in addition to my academic teaching, research, and administrative responsibilities. My background is more fully described in my curriculum vitae, a copy of which is attached to this report.

6. Based upon my education, training, and experience, I am familiar with the diagnosis, care, and management of patients presenting with similar problems to those of Sylvia Ramos. I am aware of standards of care in the community for the evaluation and treatment of physical conditions presented by Sylvia Ramos, as well as the standards of care in acute care hospitals, assisted living, facilities, and skilled nursing facilities. I am familiar with State and Federal Regulations and Codes pertaining to these facilities in the State of Texas.

## II.    Records Reviewed

7. My opinions expressed in this report are based upon my review of records concerning the care of Ms. Ramos provided to me by the Marynell Maloney Law Firm, PLLC. These included:

   a.  The death certificate of Sylvia Ramos;
   b.  The Bexar County Medical Examiner's autopsy report for Sylvia Ramos;
   c.  The Texas Department of Aging and Disability Services' most recent survey and citations regarding Trisun Care Center Windcrest;
   d.  Medicare's staffing chart information, staffing standards, staffing reports, and health inspection summaries regarding Trisun Care Center Windcrest;
   e.  Vitas Innovative Hospice Care – Letter from Vitas dated July 25, 2012;
   f.  Two Trisun Care Center Windcrest Handout Packets and their "Rights of Nursing Facility Residents";
   g.  Northeast Baptist Hospital medical records for Ms. Ramos;
   h.  Chronology of care and treatment; and
   i.  Trisun Care Center Windcrest medical records for Ms. Ramos.

8. The provided records are possibly incomplete records, and I reserve the right to modify this report with additional records if they exist and are provided to me.

9. It is important to be aware that my opinions, presented below, are expressed within a reasonable degree of medical certainty. This report constitutes a fair summary of my opinions as of the date of this document and given the materials outlined above regarding applicable standards of care, the manner in which the care rendered by Trisun Care Center Windcrest failed to meet standards and the causal relationship between the failures and the injury, harms, and damages claimed on behalf of Sylvia Ramos.

## III.    History

10. The facility in this case is Trisun Care Center Windcrest at 8800 Fourwinds Dr., San Antonio, Texas 78239 (hereinafter referred to as "Trisun" or the "facility").

11. In brief, Sylvia Ramos (date of birth June 28, 1945), was 61 years old at the time of her admission to the facility, on September 25, 2006. She resided there until her transfer to Northeast Baptist Hospital on July 16, 2012. On July 18, 2012, she was admitted to Vitas Innovative Hospice Care, where she died on August 1, 2012, at the age of 67.

12. Ms. Ramos' medical history included coronary artery disease, hypertension, dementia, possible Lewy body disease with short term memory loss, and decreased cognition.

13. Her initial social assessment demonstrated that she was forgetful, alert, confused, friendly, and cooperative. She required total assistance with her activities of daily living.

14. Ms. Ramos fell numerous times while at the Trisun. Ms. Ramos fell on 1/29/07 and was found on her left side with her arm tucked under her torso, which required further evaluation at the NIX Medical Center Hospital, where she diagnosed with acute vertebral compression fracture. On 2/20/11 Ms. Ramos fell, injured her head, and was transferred to Northeast Baptist Hospital for evaluation. Ms. Ramos suffered a scalp hematoma and elbow injury. Additional falls were noted on 1/30/07, 5/29/07, 6/1/07, 6/20/07, 9/6/07, 9/7/07, 9/12/07, 2/18/08, 8/1/08, 9/07/08, 10/14/08, 10/15/08, 11/3/08, 11/12/08, 3/11/08, 8/30/09, 11/20/09, 6/12/10, 9/12/10, 10/30/10, 5/1/11, 5/16/11, 6/26/11, 8/6/11, 8/24/11, 4/13/12, 5/1/12, 6/16/12, and 6/17/12. Ms. Ramos was noted to have fallen in the past 30 days on 4/9/07, 10/8/07, 1/14/08, 4/17/08, 9/27/08, 10/09/08, 12/04/08, 1/6/09, 1/15/09, 1/21/09, 1/28/09, 2/18/09, 4/7/09, 9/26/09, 10/05/09, 12/09/09, 2/22/10, 5/17/10, 6/14/10, 6/22/10, 6/30/10, 7/05/10, 9/29/10, 9/30/10, 10/28/10, 12/09/10, 2/3/11, 2/17/11, 6/18/11, 7/25/11, 5/2/12, 5/11/12, and 6/19/12.

15. Ms. Ramos's continual wandering was noted on the following dates: 9/29/06, 1/08/07, 1/10/07, 4/13/07, 4/18/07, 7/1/07, 7/5/07, 7/11/07, 7/12/07, 8/1/07, 9/1/07, 10/1/07, 10/06/07, 10/24/07, 11/1/07, 12/1/07, 1/22/08, 4/23/08, 6/1/08, 7/16/08, 7/23/08, 7/24/08, 9/27/08, 10/06/08, 10/08/08, 1/08/09, 1/10/09, 2/1/09, 3/1/09, 3/9/09, 4/1/09, 4/15/09, 4/28/09, 5/1/09, 6/1/09, 7/8/09, 8/1/09, 10/14/09, 1/1/10, 1/13/10, 4/7/10, 5/1/10, 6/1/10, 7/1/11, 7/14/10, 8/1/10, 9/1/10, 9/29/10, 12/1/10, 12/22/10, 1/1/11, 2/23/11, 3/22/11, 3/30/11, 4/1/11, 5/1/11, 6/1/11, 7/1/11, 8/1/11, 8/29/11, 9/1/11, 9/7/11, 10/1/11, 10/21/11, 10/28/11, 11/1/11, 12/1/11, 1/1/12, 2/1/12, 3/1/12, 4/1/12, 4/29/12, 5/1/12, 5/9/12, 6/1/12, and 6/19/12.

16. Ms. Ramos' care plan on 5/14/07 noted that she "needs constant supervision on the locked unit." Additionally, her Case Conference record further clarified that "she has avoided provoking other residents to attack her less, but requires close supervision and a closed unit."

17. In addition to the falls, other incidents in which Ms. Ramos was subjected to extreme risk for harm while at the facility included at least 12 instances of physical aggression involving other residents, including but not limited to the following: 4/3/07, 5/6/07, 4/7/07, 4/11/06, 4/19/07, 4/24/07, 6/20/07, 11/09/07, 12/06/07, 5/12/09, 6/8/09, and 9/21/09.

18. Ten additional physical altercations were documented throughout Ms. Ramos' medical records. On 10/5/06, a resident in Room 28 yelled, pulled, pushed, and hit Ms. Ramos. On 6/1/07, another resident grabbed Ms. Ramos by the arm and threw her to the ground. On 11/3/08, a resident turned Ms. Ramos' chair over with her in it knocking her to the ground. On 11/5/08, a resident pushed Ms. Ramos onto the ground. On 3/09/09 and 8/30/09, Ms. Ramos was again knocked out of her chair by another resident. On 8/12/10, Ms. Ramos was grabbed and shoved to the floor by a resident from 13B causing her to hit her head on the wall railing. On 12/1/10, a resident picked up a wet floor sign and hit Ms. Ramos in the face with it. On 2/19/11, Ms. Ramos was pushed into the wall by another resident causing her to strike her head on the rail and sustain a large hematoma. On 5/1/11, patient "Natividad" pushed Ms. Ramos to the floor.

19. Ms. Ramos was diagnosed with a urinary tract infection ("UTI") while at the facility on 2/3/07.

20. In December of 2007 Ms. Ramos was diagnosed with institutional scabies and was treated with Elimite 5%. She was also given Elimite 5% on 3/20/09 and 9/9/09. On 9/1/11, the medical record evidenced three cases of scabies as diagnosed and that Ms. Ramos was again provided Elimite 5%.

21. A RAP worksheet dated 9/26/09 stated "environmental concerns included proximity to aggressive resident."

22. On 12/11/09, the records indicated Ms. Ramos suffered a significant decline following her pelvic fracture, including a decline in ambulation.

23. On 12/28/09 – 12/30/09 and 1/4/10, Ms. Ramos was noted to have small amounts of bright red vaginal bleeding.

24. On 7/16/12, Ms. Ramos was standing in the hallway when Resident 11191 pushed Ms. Ramos causing her to fall and strike her head. Ms. Ramos was transferred to Northeast Baptist Hospital where she was diagnosed with an intracranial hemorrhage.

25. On 7/18/12, Ms. Ramos was transferred to Vitas Innovative Hospice Care for hospice care and died on August 1, 2012.

26. The autopsy report signed by the Bexar County Medical Examiner's Office indicated that Ms. Ramos died as the result of complications of an acute hemorrhagic stroke following a fall with blunt force injury of the head. Her manner of death was listed as a homicide.

27. In summary, Ms. Ramos' experience during her residence at Trisun was one of increasing debility and extreme suffering, which led to her death under violent circumstances. Ms. Ramos suffered numerous hematomas, abrasions, a pelvic fracture, continual threats to her safety by other residents, numerous physical altercations with other residents, dozens of falls, an acute vertebral compression fracture, fracture of the left 5th metacarpal, institutional scabies, repeated head trauma, signs and symptoms of sexual assault resulting in vaginal bleeding, pain, suffering, mental anguish, and a hemorrhagic stroke.

28. The egregious deviations in the standard of care and failures of the staff and administration of the facility in the assessment, monitoring, and care of Ms. Ramos included but were not limited to the following deficiencies:

## IV.  The Standard of Care and Failures in the Standard of Care

### A.  Institutional Scabies

29. The standard of care requires the facility's staff to establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment, and to help prevent the development and transmission of disease and infection. (42 CFR 483.65). The standard of care requires the facility's staff to perform basic hygiene to prevent the spread of infection, such as washing of their hands and the hands and body of the residents, disinfecting common areas, isolating infected individuals, investigating the source of the infection, and timely treating the infection. New patients and employees should be screened carefully and evaluated for any skin conditions that could be compatible with scabies. Skin scrapings should be obtained and examined carefully by a person who is trained and experienced in identifying scabies mites. Appropriate isolation and infection control practices (e.g. gloves, gowns, avoidance of direct skin-to-skin contact, etc.) should be used when providing hands-on care to patients who might have scabies. Epidemiologic and clinical information about confirmed and suspected scabies patients should be collected and used for systematic review in order to facilitate early identification of and response to potential outbreaks. Skin-to-skin contact with scabies patients should be avoided for at least 8 hours after treatment. Infection control personnel and dermatologists should be involved as soon as scabies is suspected in a nursing home. A nursing home-wide information program should be implemented to instruct all management, medical, nursing, and support staff about scabies, the scabies mite, and how scabies is and is not spread.

30. Until successfully treated, patients with crusted scabies should be isolated from other patients who do not have crusted scabies. Assigning a cohort of caretakers to care only for patients with crusted scabies can reduce the potential for further transmission. The patient's room should be cleaned thoroughly. Bedding and clothing used by a person with scabies should be machine-laundered using the hot water and hot dryer cycles. All staff, volunteers, and visitors who may have been exposed to a patient with crusted scabies, or to clothing, bedding, or furniture used by such a patient, should be identified and treated. Treatment should be strongly considered even in equivocal circumstances because of the complexity of controlling an institutional outbreak and the low risk associated with treatment. All suspected and confirmed cases, as well as all potentially exposed patients, staff, visitors, and family members should be treated at the same time to prevent re-exposure. Topical treatment with permethrin or oral treatment with ivermectin has been used successfully.

31. Trisun breached the aforementioned standards of care by failing to establish and maintain an effective infection control program designed to provide a safe, sanitary, and comfortable environment, and to prevent the development and transmission of disease and infection. There is no evidence of any appropriate control and preventative measures being taken in Ms. Ramos' medical records. Had Trisun met the aforementioned standards of care, Ms. Ramos would not have suffered from institutional scabies on four different occasions: 12/07; 3/20/09; 9/9/09; and 9/1/11.

32. It is my opinion that in reasonable medical probability, Ms. Ramos' multiple incidents of contracting institutional scabies were a consequence of the aforementioned failures by Trisun's staff to prevent and control the spread of scabies to its residents.

### B. Falls

33. Thousands of falls occur annually in US nursing homes with reports showing that up to 20% of these falls result in serious injuries including fractures. Fall risk factors include intrinsic risks of cognitive, vision, gait or balance impairment, high-risk/contraindicated medications, and/or the extrinsic risks of assistive devices, inappropriate footwear, restraints, use of non-sturdy furniture or equipment, poor lighting, uneven or slippery surfaces. The standard of care requires that the staff at Trisun identify residents at risk for injuries, especially with respect to falls and to implement precautions to prevent them. Fall risk factors to consider during individual resident assessment would include:

1) Advancing age, especially if older than 75 years;
2) History of a recent fall;
3) Specific co-morbidities: dementia, ulnar fracture, Type II diabetes;
4) Functional disability: use of assistive device;
5) Alteration in level of consciousness or cognitive impairment, poor memory, loss of judgment and insight;
6) Gait, balance, or visual impairment, deterioration of motor function;
7) Use of medications which may exacerbate a risk for falls (such as Depakote, Ativan, Alprazolam, Namenda, Aricept, Effexor, which Ms. Ramos was taking);
8) Urinary incontinence;
9) Bare feet or inappropriate footwear;
10) Failing to provide appropriate assistance for ambulation;
11) Failing to implement timed toileting program exercises;
12) Failing to provide bed and wheelchair alarms;
14) Failing to properly document, assess, and address wandering behaviors;
15) Failing to institute a wanderguard; and
16) Failing to identify risks for significant injury due to current use of anticoagulants such as Coumadin, Plavix, or aspirin and/or those with osteoporosis or risks for osteoporosis.

34. The standard of care requires the nursing staff at Trisun to provide a safe environment for the facility residents and to institute proper precautions, including implementation of an appropriate care plan, to prevent injuries due to falls. The standard of care requires the nursing staff at Trisun to assess and evaluate the patient-care environment routinely for extrinsic risk factors to fall and institute corrective action:

1) Floor surfaces for spills, wet areas, unevenness;

2) Proper level of illumination and functioning of lights (night light works);

3) Table tops, furniture, beds are sturdy and are in good repair;

4) Grab rails and grab bars are in place in the bathroom;

5) Use of adaptive aides work properly and are in good repair;

6) Locks on bed wheels and wheelchairs are in working order;

7) Patient gowns/clothing do not cause tripping; and

8) Exercise due care when in proximity of residents, so as to avoid causing the resident to fall.

35. In caring for residents, and particularly for those with dementia like Ms. Ramos, it is the standard of care for the nursing staff to monitor the resident closely. Poor memory and loss of judgment and insight as well as progressive deterioration of motor function places the resident with dementia at extremely high risk for injury.

36. When a patient is determined to be at risk for falls, the standard of care requires a number of interventions by the staff to prevent a resident from falling, including, but not limited to the following: The environment should be kept clutter free with call bells within reach; Beds should be kept in the lowest position with the wheels locked in place; Side rails should be up when the resident is in bed and in good working order; Confused residents should be oriented frequently to their environment to prevent wandering—this may include the following: placing a clock and calendar in the room, providing habit and routine for the resident, improving environmental design (good signage, enhancement of visual access, control of stimuli, safe outside space, rooms with different functions, familiar building style, small size), implementing memory boxes by a resident's door which include cue for orientation, and furnishing the resident's room with personal belongings he/she will recognize; In ambulatory residents, foot wear should be properly fitting and with a skid free sole; If the resident has glasses, they should be clean, maintained and within close reach; Assisting with elimination, i.e., timed toileting can minimize the chance that a resident will try to get up by him or herself for toileting and subsequently fall— because many falls in the elderly population are related to attempts to use the toilet implementing regular toileting exercises reduces the amount of toileting attempts the resident may make on their own; A resident with balance problems should never be left in a shower or bathroom unattended; Nutrition and hydration should also be maintained--a hungry or thirsty resident is more likely to get up without assistance to meet this basic need; Finally, residents with known gait or balance issues and or generalized muscle weakness should be supervised and assisted with mobility at all times. In cases in which residents are suffering from dementia, they may not remember to ask for assistance or may frequently try to get out of bed or out of a wheelchair without assistance, thus increasing their risk for falls. While this issue can be addressed with use of bed or wheelchair alarms, these alarms are not a substitute for proper supervision.

37. Following the initial patient assessment at admission and each follow-up assessment, the standard of care requires that there be an implementation of a care plan. An appropriate care plan creates an organized approach to meeting a resident's needs. Clearly written care plans are essential to assure that the staff understands what care each resident needs and how, when and why it is to be given. Where, as in Ms. Ramos' case, the resident is

at risk for falling, the care plan serves to tell nursing staff what they should do with respect to implementation of interventions to prevent falls, and as a reinforcement tool to remind nursing staff of the need to implement interventions to prevent falls.

38. The standard of care requires that when a physician orders the use of protective measures, those orders must be followed by the nursing staff, unless they somehow put the resident at risk, at which point in time the standard of care requires that the staff bring their concerns to the attention of the physician. Finally, the standard of care requires that the licensed nursing staff i.e., the RN or LVN supervise the actions of the non-licensed nursing personnel in carrying out their assignments. This includes ensuring that nursing assistants are adequately trained and are competent to perform assigned duties. It also includes the delegation of assigned tasks such as feeding, grooming, or transfers that the licensed nurse must supervise. If a licensed nurse determines that a nursing assistant or other unlicensed nursing staff member is unable to fulfill an assigned duty, then he or she is responsible to delegate this task to another member who is capable of doing so.

39. Should a resident sustain a fall at a facility, the standard of care requires the nursing staff to perform a physical assessment of the patient at the time of the fall, including vital signs (which may include orthostatic blood pressure readings), neurological assessment, and evaluation for head, neck, spine, and/or extremity injuries. The standard of care additionally requires that following a resident fall, a facility such as Trisun is to perform a post fall resident assessment to identify possible fall causes (if possible, begin the identification of possible causes within 24 hours of a fall) as determined during the immediate, interim, and longitudinal post-fall intervals. Because of known incidences of delayed complication of falls, including fractures, observe all patients for about 48 hours after an observed or suspected fall.

40. Once the assessment rules out any significant injury, the standard of care requires the nursing staff to investigate the circumstances around the fall to include: 1) obtain a history of the fall by the resident or witness description and document 2) note the circumstances of the fall: location, activity, time of day, and any significant symptoms 3) review of underlying illness and problems 4) review medications 5) assess functional, sensory, and psychological status 6) evaluate environmental conditions and 7) review risk factors for falling.

41. The staff at Trisun breached the standard of care by failing to fully and completely assess her fall risk on admission to the facility and to implement an appropriate care plan to address her risk for falls. Even after dozens of falls the staff continued to breach the standard of care by failing to implement an individualized care plan for fall risk. The staff breached the standard of care by failing to investigate causes for many of the multiple falls of Ms. Ramos and failed to implement appropriate actions to prevent further fall events. The staff breached the standard of care by failing to dress Ms. Ramos consistently with proper skid-free footwear. The staff breached the standard of care by failing to properly supervise activities of Ms. Ramos such that multiple un-witnessed falls occurred when she was left unattended. The staff breached the standard of care by failing to properly document Ms. Ramos' fall incidents so that each fall risk

may be addressed adequately and completely. The nursing staff breached the standard of care by failing to implement timed toileting exercises in order to minimize fall risks. The nursing staff breached the standard of care by failing to properly orient Ms. Ramos with her environment as described above. The facility breached the standard of care by failing to supply the residents with sufficient staff to supervise and provide for the care needs of its residents. As a result of these failures, Ms. Ramos was placed at increased risk for falls, resultant fractures, hematomas, and abrasions, which she did sustain and which in reasonable medical probability caused her pain and significant injuries.

42. I am familiar with the fall type acute vertebral compression fracture that Ms. Ramos sustained on or about 2/1/07. An acute vertebral compression fracture is a collapse of a vertebra due to trauma or weakening of the vertebra, which may manifest with symptoms including, severe back pain, numbness, tingling, difficulty walking, and problems with posture. This type of injury often occurs when a person falls and sustains trauma to their back. On 2/1/07 Ms. Ramos was diagnosed with an acute vertebral compression fracture, which manifested in complaints of lower back and right hip pain, following a series of falls that occurred in the previous ten days. The acute vertebral compression fracture is consistent with a fall injury.

43. In reasonable medical probability, Ms. Ramos' acute vertebral compression fracture on 2/1/07 was proximately caused by the aforementioned breaches of the standard of care, including Trisun's failure to adequately monitor, supervise, and assess Ms. Ramos, as well as document, and implement an individualized care plan for Ms. Ramos. Had the facility met the aforementioned standards of care, Ms. Ramos would not have suffered a series of falls over the previous 10 days, which resulted in her acute vertebral compression fracture.

44. I am familiar with the fall type of pelvic fracture that occurred to Ms. Ramos on or about 11/20/09. A pelvic fracture is a disruption of the bony structure of the pelvis, including the hip bone, sacrum and coccyx. The most common cause of this fracture in the elderly is from a fall. Diagnosis is made on the basis of history, clinical features, and x-rays and CTs. Signs and symptoms may include swelling, bruising, and pain. Ms. Ramos' pelvic fracture was consistent with a fall mechanism of injury. On 11/20/09 a staff member at Trisun bumped Ms. Ramos causing her to fall. On 12/09/09 Ms. Ramos was diagnosed with a left superior and inferior pubic fracture.

45. In reasonable medical probability, Ms. Ramos' pelvic fracture was proximately caused by the aforementioned breaches of the standard of care, including Trisun's failure to exercise due care, which resulted in a staff member knocking Ms. Ramos over. Had the facility met the aforementioned standards of care, Ms. Ramos would not have suffered her fall, which resulted in a superior and inferior pubic fracture.

46. I am familiar with the fall type of fifth metacarpal fracture that occurred to Ms. Ramos on or about 3/20/10. A fracture of the fifth metacarpal is a break in the fifth metacarpal bones transverse neck. This type of break commonly occurs as the result of falls, and

symptoms may include pain, swelling, tenderness, limited mobility, and bruising. On 3/20/10 a nurse identifies swelling and bruising on Ms. Ramos' left hand, which is later x-rayed and diagnosed as a fracture of the left fifth metacarpal. Although no explanation is given as to the cause of the fracture, Ms. Ramos' 3/23/10 nursing summary indicates she sustained falls within the last thirty days.

47. In reasonable medical probability, Ms. Ramos' fifth metacarpal fracture was proximately caused by the aforementioned breaches of the standard of care. Had Trisun met the aforementioned standards of care, Ms. Ramos would not have suffered her fall, which resulted in a fracture of her left fifth metacarpal.

C. Threats, Physical Altercations, Sexual Assault, and Homicide

48. Abuse is non-accidental use of force against an elderly person that results in physical pain, injury, or impairment. Such abuse includes not only physical assaults such as hitting or shoving, but may also include verbal abuse, which results in fear, anxiety, and behavioral changes.

49. The standard of care requires that bruises found on a patient in a nursing home be documented, investigated, reported to the appropriate chain of command, and upon determination of the source of the bruising, the facility should implement an appropriate care plan in the best interests of the resident. Bruises (actually pools of blood beneath the skin caused by broken capillaries) heal slowly in people with poor circulation. Older people do bruise more easily, but every bruise should be questioned. Any bruise or cut requires both medical attention and an evaluation to determine its cause.

50. Obvious signs of abuse to look for include:

- unusual bruising or bleeding
- open wounds, bed sores or cuts
- burns and abrasions
- sudden and unexplained change in weight
- soiling, poor hygiene, smell of urine or feces
- infections
- loss of hair
- torn, stained, or bloody clothing or bedding

51. Less obvious signs of abuse may consist of:

- listlessness or unresponsiveness
- infantile or other strange behaviors
- physical or emotional withdrawal
- disappearance of personal items
- sudden and unusual financial transactions

52. Verbal abuse may include insults, humiliation, threats, intimidation, and attempts to frighten the resident; it can also be an act of omission, as when the resident is ignored, disregarded, and/or isolated against his or her will. Nursing home residents are frequent targets of physical abuse because they are physically weaker than their abuser and because their memory is subject to question. Some abusers abuse residents because their dementia won't let them remember being hurt.

53. The standard of care requires a facility provide staff adequate in numbers, adequately trained, and adequately supervised to provide for the care needs of their residents (As is enunciated in 42 CFR 483.30(a)). In caring for residents, such as Ms. Ramos, it is critical for sufficient staff to be present to monitor, assess, and supervise the resident closely and meet the level of care required for the resident. The standard of care requires a facility to properly evaluate and assess a resident upon admission to the facility to ensure that it can meet all the appropriate needs of the resident. If those needs cannot be met, it is vital that the facility transfer the resident to a healthcare provider that can meet the level of care required.

54. Additionally, the staff should implement an appropriate care plan, so as to ensure the care needs of the resident are being met and to prevent future incidents, such as sexual assaults, threats, and incidents of resident-on-resident abuse. The standard of care requires that a written plan of care must be established and maintained for each individual admitted to custodial care, and the care provided to an individual must be accordance with the plan. (As is enunciated in 42 CFR 483(k)). The standard of care requires the Trisun nursing staff to provide an individualized plan of care for Ms. Ramos. The standard of care requires the development of a comprehensive care plan for each resident that includes measurable short-term and long-term objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment. (As is enunciated in 42 CFR 483.25(f)), (As is enunciated in 42 CFR 483.25(l)). The care plan must describe the services that are to be furnished to each patient to attain or maintain the resident's highest practicable physical, mental, and psychosocial well-being. The comprehensive care plan must be developed after completion of the comprehensive assessment, and prepared by an interdisciplinary team that includes the attending physician, a registered nurse with responsibility for the resident, social worker, and other appropriate staff disciplines as determined by the resident's needs. The care plan must be periodically reviewed and revised by a team of qualified persons after each assessment, and the care plan must be made available to all direct care staff.

55. The standard of care requires a facility to provide a safe, comfortable, and homelike environment for its residents (As is enunciated in 42 CFR 483.15(h)(1)) (As is enunciated in 42 CFR 483.70(h)) and to promote care for them in a manner and in an environment that maintains or enhances their dignity. (As is enunciated in 42 CFR 483.15(a)). Moreover, the standard of care requires a facility to prevent accidents and threats and attacks by other residents and provide adequate supervision and assistance to prevent such accidents, sexual assaults, threats, and abuse. (As is enunciated in 42 CFR 483(h)). This includes maintaining an environment free from any actual or perceived threats or

hazards, including dangerous or threatening residents. In terms of psychological environment, it should be non-threatening and the resident should feel comfortable and safe without fear of injury or abuse from staff or other residents. Further, the staff should identify residents, like Ms. Ramos, who are at risk for injuries, especially with respect to abuse or threats, and implement appropriate precautions to prevent them, such as those listed below. The staff should also identify dangerous residents, and make efforts to meet the level of care they require, and if unable to do so, discharge them to a higher level of care. Such efforts make include, adjusting medication levels, identifying and removing triggers for aggressive behavior, counseling, continual orientation, conducting investigations into aggressive behavior, and increasing supervision and monitoring.

56. The staff is bound to maintain the rights of the resident and to protect the resident from any form of abuse. If abuse is suspected, it is the duty of the staff to investigate the abuse, intervene when appropriate and to report the abuse to the appropriate authorities. In Texas, the law requires a nursing home to report any episodes of abuse. (As is enunciated in 42 CFR 483.13(c)(2-4)). (As is enunciated in T.A.C. Title 40 Part 1 Ch. 92 Subchapter F §92.102(a)). In addition, acts of abuse should also be reported to local police authorities as a criminal charge may be warranted.

57. The standard of care requires that the staff assess and evaluate the patient-care environment for extrinsic risk factors that may elicit threats from other residents, sexual assaults, and attacks by other residents and institute corrective action, such as:

   a. Increasing supervision;
   b. Avoiding close proximity to aggressive residents;
   c. Monitoring and readjusting medications;
   d. Identifying triggers for threats and attacks by other residents;
   e. Implementing a care plan to avoid triggers for threats and attacks by other residents;
   f. Investigating the cause of the injury/threat and implementing a care plan to address the cause;
   g. Ensuring staff training on corrective measures when it is suspected that a resident has been threatened or attacked;
   h. Ensuring there is an adequate number of staff;
   i. Frequently orienting confused residents so as to prevent wandering;
   j. Removing potentially dangerous residents from the facility; and
   k. Monitoring and modifying the environment as needed.

58. The standard of care requires a facility to ensure Ms. Ramos' right to be free from sexual, physical, and mental abuse. (42 CFR 485.13(b)). If sexual abuse is suspected, the standard of care requires that the facility train its staff to detect and identify signs of sexual assault, including unusual bruises, broken bones, difficulty walking or sitting, torn or stained clothing, fear, stress, anxiety and unexplained changes in behavior, vaginal bleeding, transmission of sexual diseases/infections. Upon assessment of the foregoing signs and symptoms of sexual abuse, the standard of care requires the staff to interview the victim and anyone witnesses. If sexual abuse is suspected, it should be reported to the

appropriate State agency, documented, and investigated thoroughly, so as to prevent future harm to the resident.

59. Should a resident sustain a sexual assault or attack at a facility, the standard of care requires the staff to perform a physical assessment of the patient at the time of the injury, including vital signs, neurological assessment, and evaluation for head, neck, spine extremity injuries, and if necessary, evidence of vaginal tears or bleeding. The standard of care additionally requires that following an injury, the staff is to perform an assessment to identify possible causes. Once the assessment rules out any significant injury, the standard of care requires the staff to investigate the circumstances around the assault or attack.

60. The standard of care requires the facility's staff to ensure that injuries of unknown source, threats, suspected sexual assaults, and abuse, including Ms. Ramos' homicide at the facility, are reported immediately to the administrator of the facility and to other State officials in accordance with Texas State law. (As is enunciated in 42 CFR 483.13(c)(2)). The standard of care requires the facility to provide evidence of quality assurance and oversight given the pattern of six years of falls, physical altercations, threats, signs and symptoms of sexual assault, and unknown injuries involving Ms. Ramos and other residents.

61. The standard of care requires that a long-term facility initiate an investigation into the source of the abuse, contact the Texas Department of Aging and Disability Services within 24 hours of notification of possible abuse of a patient by a staff member, or any other person, take appropriate action against the suspected employee, if the complaint is substantiated, and safeguard the physical and mental health and safety of the resident through counseling, communication, and an appropriate care plan.

62. While a resident at Trisun Ms. Ramos suffered numerous unexplained bruises, fractures, and vaginal bleeding. No investigation into the source of these injuries was initiated by the nursing staff. Additionally, Ms. Ramos sustained approximately 30 documented falls, as well as dozens of threats, and many physical altercations and attacks from other residents, which resulted in numerous injuries and ultimately her violent death.

63. I am familiar with the type of mental anguish that occurs when a resident is under persistent threats and attacks by other residents, similar to those Ms. Ramos continually experienced during her residency at Trisun. Signs and symptoms of resulting mental anguish include, fear, anxiety, agitation, anger, non-responsiveness, confusion, unexplained bruises, depression, defensive behavior, and changes in behavior. Ms. Ramos' medical chart is replete with instances of attacks and threats by other residents directed toward Ms. Ramos.

64. In reasonable medical probability, Ms. Ramos suffered mental anguish as a result of the constant threats and attacks on her by other residents at the facility, which were proximately caused by Trisun's breaches of the standard of care, including but not limited to: failing to provide Ms. Ramos with a safe environment free of abuse and

neglect, failing to initiate an investigation into the source of previous altercations and attacks, failing to direct attention up the chain-of-command regarding previous attacks, threats, and altercations to, failing to determine through an investigation the source of the previous attacks, threats and altercations, failing to implement an appropriate care plan to prevent further risk to the safety and wellbeing of Ms. Ramos, failing to increase supervision and monitoring, failing to adjusting medications, failing to identify triggers for threats, altercations, and attacks, failing to frequently orient Ms. Ramos and other residents, and failing to ensure proper training of staff and sufficient numbers of staff were present to provide the level of care needed. Had Trisun met the aforementioned standards of care, Ms. Ramos would not have suffered continual threats, altercations, and attacks by other residents and would not have suffered mental anguish, including significant and persistent emotional trauma, such as, fear, agitation, confuses, changes in mood, anxiety, depression, and defensive behavior.

65. I am familiar with signs and symptoms of sexual assault, including vaginal tears, unexplained vaginal bleeding, bruises, torn clothing, changes in behavior (fear, anxiety, nervousness, depression, isolation), and specifically those signs and symptoms Ms. Ramos exhibited during December 2009. Between 12/28/09 and 12/31/09 the staff documented unexplained blood coming from Ms. Ramos' vaginal area each day. Ms. Ramos' labs also noted large occult blood. However, the staff performed no assessment of the location or etiology of the bleeding. The staff did not report the bleeding to Ms. Ramos' physician or initiate any investigation.

66. In reasonable medical probability, Ms. Ramos suffered the signs and symptoms of sexual assault, which were proximately caused by the aforementioned breaches of the standard of care, including the facility's failures to properly monitor, supervise, implement a care plan, and perform investigation into incidents such as this. Had Trisun met the aforementioned standards of care, Ms. Ramos would not have suffered the signs and symptoms of sexual assault.

67. I am familiar with resident-on-resident assault type injuries that occurred to Ms. Ramos throughout her residency, and specifically the large occipital hematoma that occurred on 2/19/11. An occipital hematoma is a collection of blood in the occipital region (at the bck of the head), and may be either subdural or epidural. An occipital epidural hematoma is often caused by a blow to the head. The bleeding typically stems from an injury to a vein or a branch of the posterior meningeal artery. Ms. Ramos' large occipital hematoma was consistent with the resident-on-resident assault wherein she fell and sustained a blow to her head against the railing.

68. In reasonable medical probability, Ms. Ramos' large occipital hematoma was proximately caused by the aforementioned breaches of the standard of care, including but not limited to: failing to provide Ms. Ramos with a safe environment free of abuse and neglect, failing to initiate an investigation into the source of previous altercations and attacks, failing to direct attention up the chain-of-command regarding previous attacks, threats, and altercations to, failing to determine through an investigation the source of the previous attacks, threats and altercations, failing to implement an appropriate care plan to

prevent further risk to the safety and wellbeing of Ms. Ramos, failing to increase supervision and monitoring, failing to adjusting medications, failing to identify triggers for threats, altercations, and attacks, failing to frequently orient Ms. Ramos and other residents, and failing to ensure proper training of staff and sufficient numbers of staff were present to provide the level of care needed. Had Trisun met the aforementioned standards of care, Ms. Ramos would not have suffered continual threats, altercations, and attacks by other residents and would not have suffered the assault on 2/19/11, which resulted in a large occipital hematoma.

69. I am familiar with the fatal intracranial hemorrhage Ms. Ramos suffered on July 16, 2012. An intracranial hemorrhage is a hemorrhage that occurs within the skull. Intracranial bleeding occurs when a blood vessel within the skull is ruptured, leaks or is otherwise damaged. Intercranial bleeding can be caused by falls as a consequence of blunt force trauma to the brain. Signs and symptoms include: headache, concussion, loss of consciousness, behavioral changes, seizure, vision problems, numbness, muscle ache, eye discomfort, and stiff neck. Ms. Ramos' intracranial hemorrhage was consistent with the mechanism of blunt force head trauma as the result of her assault and subsequent fall.

70. On 7/16/12 Resident 11191 pushed Ms. Ramos which resulted in her falling and striking her head. She was admitted to Northeast Baptist Hospital where she was diagnosed with an intracranial hemorrhage. Ms. Ramos was then discharged to hospice care at Vitas Innovative Hospice Care on 7/17/12 where she died on 8/1/12. The Bexar County Medical Examiner classified Ms. Ramos' death as a homicide and concluded that Ms. Ramos died due to complications of an acute hemorrhagic stroke following a fall with blunt force injury to the head.

71. In reasonable medical probability, Ms. Ramos' death was proximately caused by Trisun's aforementioned breaches of the standard of care, including but not limited to: failing to provide Ms. Ramos with a safe environment free of abuse and neglect, failing to initiate an investigation into the source of previous altercations and attacks, failing to direct attention up the chain-of-command regarding previous attacks, threats, and altercations to, failing to determine through an investigation the source of the previous attacks, threats and altercations, failing to implement an appropriate care plan to prevent further risk to the safety and wellbeing of Ms. Ramos, failing to increase supervision and monitoring, failing to adjusting medications, failing to identify triggers for threats, altercations, and attacks, failing to frequently orient Ms. Ramos and other residents, and failing to ensure proper training of staff and sufficient numbers of staff were present to provide the level of care needed.

72. The foregoing breaches in the standard of care resulted in Resident 1191 pushing Ms. Ramos, such that she fell, sustained fatal blunt force trauma to her head, and suffered fatal complications due to acute hemorrhagic stroke. Had the facility met the aforementioned standards of care, Ms. Ramos would not have suffered her fatal assault, which resulted in her untimely and eminently preventable death.

## V.   Conclusion

73. Shockingly, the foregoing deviations were not isolated incidents, but were repeated with egregious frequency throughout Ms. Ramos' residency. Due to and as a result of these repeated deviations in the standard of care, within a reasonable degree of medical certainty, Ms. Ramos suffered abuse and neglect resulting in injuries including but not limited to:

    a.   Numerous falls;
    b.   Numerous hematomas;
    c.   A pelvic fracture;
    d.   Continual threats to her safety by other residents;
    e.   Incidents of physical aggression from other residents;
    f.   Acute vertebral compression fracture;
    g.   Fracture of the left 5th metacarpal;
    h.   Repeated head trauma;
    i.   Institutional scabies;
    j.   Signs and symptoms of sexual assault;
    k.   Overall physical and mental decline;
    l.   Pain and suffering;
    m.   Mental anguish;
    n.   An intracranial hemorrhage; and
    o.   Death.

74. The care provided at Trisun demonstrated a course of conduct and/or systemic problems which evidenced willful and callous disregard for the health and safety of Ms. Ramos, and in all reasonable medical certainty, caused her extreme pain, suffering, mental anguish, injuries, and her untimely death.

75. All of the above-cited incidents played a direct or proximal role in the physical altercation that occurred on 7/16/2012 involving Resident 11191 and Ms. Ramos, at which time she suffered head trauma and was put at risk for aspiration from her change in condition resulting in subarachnoid and subdural hemorrhages and cerebral hemorrhagic stroke and avoidable bronchopneumonia, which resulted in her death.

76. It is my opinion, to a reasonable degree of medical probability all of the above-cited injuries, mental anguish, pain and suffering, and death were the proximate result of Trisun's deviations from the standards of care as outlined above.

77. Moreover, it is my opinion that the above-cited incidents, when taken together, constitute negligence, gross negligence, and conscious indifference to Ms. Ramos' circumstances, and as such, are reckless, oppressive, and inexcusable deviations from the standard of care.

78. All of the opinions stated in this report are expressed within a reasonable degree of medical certainty and are based on the records reviewed, my education, knowledge, training, research, clinical practice, teaching, reading, and professional experience.

79. This report is by no means to be construed as an exhaustive recitation of all of my opinions with regard to the care and treatment that Ms. Ramos received while she was a resident of Trisun. I expressly reserve my right to amend, modify, and/or supplement the opinions expressed herein upon the review of additional information.

LOREN G. LIPSON, M.D.

**APP 6**

FILED
10/31/2014 4:39:37 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Consuelo Gomez

CAUSE NO. 2014-CI-06284

| | | |
|---|---|---|
| SANDRA SCHROEDER AND | § | IN THE DISTRICT COURT |
| DUANE J. RAMOS, INDIVIDUALLY AND | § | |
| AS ALL HEIRS TO THE ESTATE OF | § | |
| SYLVIA RAMOS, DECEASED | § | |
| | § | |
| VS. | § | |
| | § | 288TH JUDICIAL DISTRICT |
| PM MANAGEMENT – WINDCREST NC, | § | |
| LLC D/B/A TRISUN CARE CENTER | § | |
| WINDCREST, GERALD HARRINGTON, | § | |
| M.D., SETTERS MEDICAL GROUP, P.A., | § | |
| RUDOLFO ZARATE, M.D. AND ZARATE | § | |
| MEDICAL GROUP, P.A. | § | BEXAR COUNTY, TEXAS |

## DEFENDANT GERALD HARRINGTON, M.D.'S OBJECTIONS TO PLAINTIFFS' EXPERT REPORT PURSUANT TO SECTION 74.351 OF THE TEXAS CIVIL PRACTICE & REMEDIES CODE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW GERALD HARRINGTON, M.D., a Defendant in the above-entitled and numbered cause, and files these his Objections to Plaintiffs' purported Section 74.351, expert report pursuant to the Texas Civil Practice & Remedies Code, and in support thereof would respectfully show onto the Court the following:

I.

### BRIEF BACKGROUND

**On or about June 29, 2014,** Plaintiffs filed Plaintiffs' First Amended Original Petition in the above-entitled and numbered cause. Such petition adds Defendant Gerald Harrington, M.D. as a Defendant. Such petition alleges a health care liability claim against Defendant Gerald Harrington, M.D., among others.

26

On or about **August 6, 2014,** Defendant Gerald Harrington, M.D. filed his Original Answer in this cause.

On or about **October 13, 2014,** Defendant Gerald Harrington, M.D., was served with the report of Loren G. Lipson, M.D., purportedly served pursuant to Section 74.351 of the Texas Civil Practice & Remedies Code.

On or about **October 31, 2014,** within twenty-one (21) days of receiving the report, Defendant Gerald Harrington, M.D. files these his Objections to Plaintiffs' Expert Report Pursuant Section 74.351(a) of the Texas Civil Practice & Remedies Code.

## II.

## APPLICABLE STATUTE

**Section 74.351 of the Texas Civil Practice & Remedies Code** provides, in pertinent part, as follows:

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition is filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.

(b) **If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:**

(1) **awards to the affected physician or health care provider reasonable attorney's fees and costs of**

court incurred by the physician or health care provider; and

(2)    dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

**Section 74.351(r)(5) of the Texas Civil Practice & Remedies Code** provides, in pertinent part, as follows:

"Expert" means

(A)    with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

. . .

(C)    with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

**Section 74.351(r)(6) of the Texas Civil Practice & Remedies Code** provides, in pertinent part, as follows:

"Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

III.

## OBJECTIONS

Although Plaintiff timely served an expert report, purportedly served pursuant to

Section 74.351 of the Texas Civil Practice & Remedies Code, such report does not fully

comply with the statute's expert report requirements as to this Defendant. Accordingly, Defendant Gerald Harrington, M.D. files these his objections to Plaintiffs' purported expert report pursuant to Section 74.351(a), as the report is inadequate to meet the strict requirements of Section 74.351(r)(6) as to this Defendant.

A.    Report of Loren G. Lipson, M.D.

Pursuant to Section 74.351(a), Defendant Gerald Harrington, M.D. specifically objects to Dr. Lipson's report on the basis that, while the report does set out what Dr. Lipson believes to be the standard of care for Defendant Gerald Harrington, M.D. and while the report does set out what Dr. Lipson believes to be breaches of that standard of care by Gerald Harrington, M.D.; her report fails to adequately identify and explain any causal link between the alleged breaches of the standard of care by this Defendant and Plaintiffs' alleged injuries and damages. Instead, the report contains only conclusory statements regarding causation by Dr. Lipson. Also, there is no showing that Dr. Lipson is competent to testify as an expert witness, as defined by §74.351(r)(5), on the issue of causation.

Accordingly, Defendant Gerald Harrington, M.D. hereby requests this Court to sustain his objections, pursuant to Section 74.351(a) of the Texas Civil Practice & Remedies Code.

WHEREFORE, PREMISES CONSIDERED, Defendant GERALD HARRINGTON, M.D. pray that this Court sustain this Defendants' objections to the expert report of Loren G. Lipson, M.D.; and grant him such other and further relief, at law or in equity, to which this Defendant may be justly entitled.

Respectfully submitted,

HOLE & ALVAREZ, L.L.P.
P. O. Box 720547
McAllen, Texas 78504-0547
Telephone: (956) 631-2891
Telecopier: (956) 631-2415
E-Mail: Mail@HoleAlvarez.com


By: /s/ Ronald G. Hole
      Ronald G. Hole
      State Bar No. 09834200

**ATTORNEYS FOR DEFENDANT
GERALD HARRINGTON, M.D.**

## CERTIFICATE OF SERVICE

I, Ronald G. Hole, hereby certify that a true and correct copy of the above Objections to Plaintiffs' Expert Report Pursuant to Section 74.351 of the Texas Civil Practice & Remedies Code has, on this the **31st** day of **October 2014**, been served via **electronic transfer through an online filing service,** to the following counsel of record:

*Attorneys for Plaintiffs*
**E-MAIL: Mikem@maloneylawgroup.com**
Mr. Michael Maloney
**E-MAIL: Ericam@maloneylawgroup.com**
Ms. Erica Maloney
**E-MAIL: Byron@maloneylawgroup.com**
Mr. Byron B. Miller
Marynell Maloney Law Firm, PLLC
115 East Travis Street, 18th Floor
San Antonio, Texas 78205

*Attorney for Defendants*
*PM Management – Windcrest NC, LLC*
*d/b/a Trisun Care Center Windcrest*
Ms. Emily J. Davenport
Kemp Smith, LLP
816 Congress Avenue, Suite 1260
Austin, Texas 78702-2443
**E-Mail: edavenport@kempsmith.com**

*Attorneys for Defendant*
*Setters Medical Group, P.A.*
Mr. W. Richard Wagner
Wagner & Cario, LLP
7705 Broadway
San Antonio, Texas 78209
**E-Mail: rwagner@wagnercario.com**

*Attorneys for Defendants*
*Rodolfo Zarate, M.D. and*
*Zarate Medical Group, P.A.*
Ms. Lisa A. Rocheleau
Boone & Rocheleau, P.L.L.C.
10101 Reunion Place, Suite 600
San Antonio, Texas 78216
**E-Mail: lrocheleau@br-lawfirm.com**

/s/ Ronald G. Hole

Ronald G. Hole

BCC:RAM-HAR\PLD

**APP 7**

# REPORTER'S RECORD
## TRIAL COURT CAUSE NO. 2014-CI-06284
## VOLUME 2 OF 3

| | | |
|---|---|---|
| SANDRA SCHROEDER AND | * | IN THE DISTRICT COURT |
| DUANE J. RAMOS, | * | |
| INDIVIDUALLY AND AS ALL | * | |
| HEIRS TO THE ESTATE OF | * | |
| SYLVIA RAMOS, DECEASED | * | |
| | * | |
| V. | * | 131ST DISTRICT COURT |
| | * | |
| PM MANAGEMENT - WINDCREST | * | |
| NC, LLC D/B/A TRISUN CARE | * | |
| CENTER WINDCREST, GERALD | * | |
| HARRINGTON, M.D., SETTERS | * | |
| MEDICAL GROUP, P.A., | * | |
| RUDOLFO ZARATE, M.D., AND | * | |
| ZARATE MEDICAL GROUP, P.A. | * | BEXAR COUNTY, TEXAS |

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
3/23/2015 7:52:52 AM
KEITH E. HOTTLE
Clerk

----------------------------------------------------

## MOTION TO DISMISS

----------------------------------------------------

On the 2nd day of March, 2015, the following proceedings came on to be heard before the Court, in the above-numbered and styled cause, and the following proceedings were had before THE HONORABLE JOHN D. GABRIEL, Judge Presiding, held in the 131st District Court, San Antonio, Bexar County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

**MR. MICHAEL MALONEY,** SBOT #12883300
**MR. BYRON MILLER,** SBOT #24074716
**MS. ERICA O. MALONEY,** SBOT #24085698
Law Offices of Pat Maloney, P.C.
322 W. Woodlawn Ave.
San Antonio, Texas  78212
Phone No.:  210/735-2233
            REPRESENTING THE PLAINTIFF, SANDRA SCHROEDER
                 AND DUANE J. RAMOS


**MR. RONALD G. HOLE,** SBOT #09834200
HOLE & ALVAREZ, L.L.P.
P. O. BOX 720547
McAllen, TX  78504-0547
Phone No.:  956/631-2891
            REPRESENTING THE GERALD HARRINGTON, M.D.


**MR. PETER CARIO,** SBOT #24000138
Wager & Cario, L.L.P.
7705 Broadway
San Antonio, TX  78209
Phone No.: 210/979-7555
            REPRESENTING SETTERS MEDICAL GROUP.

# I N D E X

March 2, 2015                                    PAGE      VOL

Appearances . . . . . . . . . . . . . . . . .  . .    2        2

Court Reporter's Certification . . . . . .  . . .  52        2

* - * - *

## EXHIBIT INDEX

DEFENDANT'S EXHIBITS:

| NO. | DESCRIPTION | O | A |
|-----|-------------|------|------|
| 1 | Dr. Loren Lipson's Report | 5,20 | 20 |
| 2 | Curriculum Vitae of Dr. Lipson | 5,20 | 20 |
| 3 | Notification of Service | 11,20 | 21 |
| 4 | Proof of Submission | 11,20 | 21 |

## P R O C E E D I N G S

THE COURT: For the record, this is Cause Number 2014-CI-6284, styled Sandra Schroeder, Et Al v. PM Management-Windcrest. I will take announcements for the record.

MR. HOLE: Ronald Hole on behalf of Dr. Gerald Harrington.

MR. CARIO: Peter Cario on behalf of Setters Medical Group.

MR. MILLER: Byron Miller on behalf of the Plaintiffs, Sandra Schroeder and Duane Ramos.

MS. E. MALONEY: I'm Erica Maloney also on behalf of the Plaintiffs.

MR. M. MALONEY: Michael Maloney in the same capacity, Judge.

THE COURT: Okay. Everybody is going to talk today? We'll see.

Whose motion is it today?

MR. HOLE: It's Dr. Harrington's motion, Judge.

THE COURT: Mr. Hole? Okay.

MR. CARIO: And Setter's Medical Group, similar motion.

THE COURT: Okay. Everybody ready to proceed?

MR. HOLE: Yes, Your Honor. And you heard one of these earlier on the same case but for a co-defendant. What we've got for the hearing in part is Hearing Exhibits 1 and 2. We want to offer Hearing Exhibits 1 and 2 at this time, Your Honor.

(Hearing Exhibit Nos. 1 and 2 offered)

THE COURT: Any objections?

MR. M. MALONEY: Judge, the only issue we have is that there's an issue of service of expert reports, and I think that's probably preliminary to the issues relating to substance. We don't believe he ever served us the --

MR. HOLE: You're talking about --

MR. M. MALONEY: -- objections.

MR. HOLE: I'm sorry. -- objections, not that it's the -- the expert report?

MR. M. MALONEY: Yes. Exactly.

MR. HOLE: Okay.

MR. M. MALONEY: And so the problem we have is that, ostensively, service was issued through some type of online electronic filing. It's clear that we did not receive it, and that it was not served within the 21-day period to object. And so the first matter we have simply is to resolve that issue. We've asked for Mr. Hole to clarify or provide us with some proof of

service. And we have checked our e-mail services. We've checked with his service, and they have reported that our names were not on file with his service, hence, we never received it.

THE COURT: Mr. Hole?

MR. HOLE: Judge, this was -- it was filed and file-stamped copied. They were hand-delivered a copy on the 24th, if nothing else. During the last hearing, on last Tuesday, I got a copy and hand-delivered it him.

MR. MILLER: Judge, the clerk of the court hand-delivered us a copy four months after the 21-day deadline to serve these objections. So we received them approximately four months late.

THE COURT: Four months?

MR. HOLE: And just to be clear, it wasn't -- the clerk gave it to me, I hand-delivered it to him. So there was service. But it wasn't late, Judge. It was filed. And service is considered completed upon providing it to the electronic service.

Well, I've got a thing that indicates the file time, that I already sent to counsel, that shows the objections were filed actually a little early, and then were also served on Byron Miller, Emily Davenport, Lisa Rocheleau and Michael Maloney.

MR. M. MALONEY: Judge, the problem is he has to register with his service the correct e-mail addresses. Our e-mail addresses were not registered by him.

THE COURT: And you agree with that, Mr. Hole?

MR. HOLE: No, Your Honor.

THE COURT: You don't? Okay.

MR. HOLE: In fact, I can't register. What I can do is put in their name and search, and if it has their name, it will put whatever e-mail address they've given. I'm the one that assigns my e-mail address to eFile of Texas. You can't just give a name and -- so whatever name they had. And it does show that it did go to Byron Miller, and so that's -- you know, it was served.

MR. MILLER: Judge, may I approach?

THE COURT: Sure. Yes, sir.

MR. MILLER: I'm showing you the certificate of service that Defendant Harrington filed for his Chapter 74 objections. You can very clearly see that he has our correct e-mails, that's Byron@MaloneyLawGroup. Those are, in fact, our correct e-mails. He had them on the date that he filed it but never served us.

In addition, we had our correct e-mail on file with the e-filing service, and here is proof of that. On September 25, 2014, you can see that is my e-mail. And Erica's e-mail is on there, and it's the same e-mail. So we had the correct e-mails on file with the e-filing service. He said he sent notice. His notice of service says that he served us at those e-mails when, in fact, he did not. I can hand you my ProDoc eFiling database account for the date he said he served us. May I approach?

THE COURT: Yes, sir.

MR. MILLER: On the 31st we have one filing from Evans and --

THE COURT: Is this what you received?

MR. MILLER: Yes, sir.

THE COURT: Is that what you're saying?

MR. MILLER: That's our e-filing account. That's everything that was served on us on October 31st, the date he said he served us. It's not on there. The proof that he's provided us is a Visa receipt, basically the receipt that he paid to e-file it. It lists a few of the parties in the case. It leaves out Wagner and Cario entirely.

THE COURT: It leaves out who? I'm sorry?

MR. MILLER: It lists a few parties. The

case doesn't include everybody. It just states our names on it. It doesn't include how it was served, when it was served, what e-mail was served to, whether it was served by e-mail. It does not constitute proof under 21a.

Rule 21a -- may I approach and hand you 21a, Judge?

THE COURT: Yes.

MR. MILLER: And I've highlighted the relevant portions for eFiling service, the necessary requirements. He has to serve the attorney or party on record. He has to serve it with the e-mail on record, according to (1), part of 21a.

Additionally, the proof of service, under (e), requires that he has to file the notice of service, which he did, which is actually incorrect. His e-filing service sends him a confirmation that he has served the correct parties. He has proof that he has served the incorrect parties in this case. When I called his e-filing service, File Team, it told me that he filed Chapter 74 objections, but they were, in fact, served on dellak, not an attorney in this case, and Byron@MarynellMaloneyLawGroup, which is an e-mail that is defunct, not active, and there's no way I could have received it. And that's a former e-mail I had months

prior to this.

So there's no way that anyone -- any attorney on record with the plaintiffs received those objections until four months after the fact.

THE COURT: Mr. Hole, it does say you're supposed to get confirmation from your filing manager.

MR. HOLE: I'm sorry?

THE COURT: It does say electronic service is complete --

MR. HOLE: Upon filing -- upon serving this.

THE COURT: But it says the electronic manager will send confirmation of service to the serving parties.

MR. HOLE: Correct, Your Honor.

THE COURT: So did you get confirmation?

MR. HOLE: In fact, I have one where I just recently served somebody, and then I'll get a thing that says service undeliverable and it will give the contact name of who it wasn't delivered to.

On this one, I've got marked as Exhibits 3 and 4, the confirmations that we received, showing that the service was effected. If it's a defunct e-mail, it won't be effected, but it will come back undeliverable.

THE COURT: Okay. So let's see what you

have.

MR. MILLER: And, Judge, it's not an active e-mail. I'm not at that firm, so I don't know how you can receive it. He had the correct e-mails. He had them in his notice of service, which is incorrect, and it's a misrepresentation to the Court that he served those e-mails. We had the correct e-mails on file with our e-filing service. He just didn't check them.

THE COURT: Let's see what the confirmation is.

MR. HOLE: We'd offer 3 and 4 for the purpose of showing -- if I can approach, Your Honor?

(Hearing Exhibit Nos. 3 and 4 offered)

THE COURT: Yes.

MR. HOLE: This is the one I received from my filing thing that shows that I filed it and who it was sent to, and then I get notification of service that has the filing details and it showed all the people that were served. And the problem was, Judge, originally -- I guess this -- they filed a motion to substitute and they changed firms or something, but the e-file system still showed the old one. And when I get one back, if it's undeliverable you'll get a service undeliverable, and it will say who it was served to and who it wasn't served to. This one shows it was served to all. And so

that's the only information I have.

Plus, previously, Judge, we mentioned an e-mail to them about the fact that we filed the objections. There was no notice at all that they didn't get them, and certainly there's no harm because it's -- they got them well before the hearing, if there was anything. The rule requires them to be filed within 21 days. They were filed.

THE COURT: Mr. Miller?

MR. MILLER: And, Judge, now, the rule requires that they're filed and served, that is a complete fabrication of what the rule requires. I just -- the e-mail that I handed you dated September 25th, a month -- more than a month before his objections, shows the following are service contacts on this filing.

THE COURT: Okay. What are you referring to? I'm sorry?

MR. MILLER: I'm sorry. It's the e-mail dated September 25, 2014. I think I handed you that.

THE COURT: Are you talking about this? What are you talking about?

MR. MILLER: May I approach?

THE COURT: Yes, sir.

MR. MILLER: And it shows that these are

the e-mail contacts for the party. That shows that my e-mail, Byron@maloneylawgroup, the one that's mentioned and is notice of service, is the same one. So there's no issue as to, oh, well, there was an old service contact on file with the Court, because there wasn't. Ron had it. He just didn't serve it. There's no exceptions to 21a for mistake or anything like that. It's a very, very inflexible rule.

THE COURT: Okay. Well, the only other question I have is, I know it has your name up there and it says you longer have the e-mail. What about Mr. Maloney?

MR. M. MALONEY: I never received it, Judge. I've checked my e-mail, and the service sent no confirmation that I received it. And same thing with Erica.

MS. E. MALONEY: And, Judge, my name is on the certificate of service, and my name isn't even on that confirmation.

MR. M. MALONEY: Yes. We can both represent that while representation was made we were served, we were not served.

MR. MILLER: And, Judge, FileTime, when we called them, that's Ron's eFiling service, they said they didn't serve our correct e-mails, the ones that are

on file with --

THE COURT: Who are you talking about?

MR. HOLE: Obviously we're going to object to any hearsay. Obviously, none of this is testimony anyway.

MR. MILLER: Judge, we can call his filing service because we know that they sent him confirmation that he didn't serve Byron@Maloneylawgroup. He served incorrect e-mails. He has proof of that. He has withheld it. He failed to bring it today to this court.

MR. HOLE: Okay. Well, first of all, Judge, this is the same issue as the last one you've had where they served Marynell something Maloney, I think. This is the same exact situation. At that time, they went forward with that last one. I don't know why they're not doing it this time, because they did get service, Judge. We've got the -- it was proven upon the -- by my receipt of the electronic filing. And if they say they actually, for some reason, didn't get it, well, then they got reserved more than seven days -- six days before this hearing. If they need more time, they can certainly get more time. But that's -- I don't think they need any more time.

MR. MILLER: Judge, actually, the last Chapter 74 objections that were served on Marynell

Maloney Law Firm for Dr. Zarate, Marynell brought those by hand delivery to us. His objections were never brought to us until four months after the deadline to serve those Chapter 74 objections. The burden is on him to show that he has proof of service. We've shown that he has, in fact, not served us. Rule 21a is very clear, as is 74.351. Chapter 74 objections must be served before 21 days or they are waived.

The courts and the court of appeals are very clear on this. This is a hard requirement. There's no, oops, I made a mistake. There's nothing like that, Judge.

THE COURT: This is an issue whether he got served or not. And, obviously, you said the service provider knows whether it's been done. I mean, we need to hear from somebody else. I mean, it's an issue for them whether you guys received the objections and I'm trying to figure it out.

You're saying you didn't receive it, he says he's got notice.

MR. HOLE: And then they were hand-delivered a copy anyway. They certainly have it by now.

MR. MILLER: Four months after the fact.

MR. HOLE: But, Judge, they were filed

timely.  And it's just like anything that you're supposed to file, you're supposed to serve.  And there's a provision that if you didn't get service as you're supposed to and if you need extra time or whatever, then you can ask for it.  I don't think they've asked for it.

MR. MILLER:  Judge, that is a complete misrepresentation of the rule.  74.351 says you have to file and serve.  Ron has conveniently left that off.

THE COURT:  It does say "and serve."

MR. HOLE:  You have to file and serve everything.  If you file an original petition -- we filed our answer to the exact same addresses and no problem.  The problem was that they changed firms and didn't supplement or change the e-mail address.  I'm not allowed to go in there -- when I go in there, at least with FileTime, when I went in there and put in a name, that's the name that came up.  I don't get an e-mail address, I get a name, and it said that's the name and it was sent off, and then I get confirmation.

MR. M. MALONEY:  Judge, the certificate of service contradicts everything that he's saying.  On the certificate, he put the correct e-mail.

Now he's saying that we changed it somehow.  What happened is, he did not properly register the e-mail address with his service company.  I mean,

that's what happened. I mean, if you look at his certificate of service, it has all of our correct e-mails. The problem is, he didn't serve us at those e-mails. And so this idea that they changed firms -- I never changed firms, and I never received it. So I have no idea what he's talking about. It's just simply not -- it's not true.

THE COURT: Well, I guess Mr. Hole is suggesting that, I guess, the e-mail service providers should have those or it's up to them to have the correct e-mails?

MR. HOLE: Service is complete upon providing the document to the e-mail service provider, that is correct.

MR. M. MALONEY: That's not true.

MR. HOLE: I think if you -- may I see the rule that he just gave you?

THE COURT: Sure.

MR. M. MALONEY: And, Judge, the only reason we're adamant about this is the defendant always uses this when the plaintiffs mess up. And they say, oh, my god, we can't change it. You didn't serve your report under 21a. There's case law to that effect. The same should apply to Mr. Hole. Unfortunately, he made a mistake and now he's saying, well, I served it after 21

days. That doesn't cut it.

MR. HOLE: And the expert report requires service only. It doesn't require filing it. It's served on the defendant. That's a very different situation. This is filed, it's of record. They have -- they're supposed to have constructive knowledge of everything that's filed.

But, anyway, Judge, it says right here, "Documents filed electronically. A document filed electronically under 21a must be served electronically. Electronic service is complete on transmission of the document to the serving party's electronic filing service provider," which is what we've done. And that's what e-File has come back and said it's been served.

And that's the confirmation that we received. If it has his name, for whatever, you know -- if it was a no good address, we would get a note back that says "service undeliverable."

MR. M. MALONEY: You did.

MR. MILLER: Judge, we had the correct e-mails on file, we have the e-mail showing you that. He knew them. He had them in his notice of service. He failed to serve them correctly.

Bachtaria (phonetic) and Amaya, two Court of Appeals in Texas, are very unforgiving as to 21a,

74.351 requirement, you have to serve objections within 21 days.

In *Amaya*, they served them three days after 21 days, and they waived them.

In *Bachtaria*, they supplemented objections after 21 days, and the Court would not allow them to supplement.

THE COURT: The issue is served. It's obvious we've gone back and forth and whether you guys say he didn't receive them, and Mr. Hole believes he's done everything properly. I mean, I wouldn't mind hearing from the -- we can just reset this. I mean, it's a big issue whether the service people said that y'all got it or not. I mean, you're saying Mr. Hole has information and provided the Court.

I have a question about the service, Mr. Hole. I wouldn't mind hearing from somebody whether these guys got served or not. So I think I'd have to reset it. If you want to provide somebody that tells me they got served, I guess we can look at it.

Mr. Miller?

MR. MILLER: Judge, I have no problem going forward on the substance of the Chapter 74 report. I feel that we would win on the service issue; however, I feel that the Chapter 74 report is more inadequate for

what the rules require. So I'm prepared to talk about that, if you would like.

THE COURT: Okay. If you want to go forward, then that's okay with me.

MR. HOLE: And, Judge, since we wasted a lot of time, I'll be brief. Again, here's 1, 2, 3 and 4. We'd ask that all of those be admitted, Judge.

(Hearing Exhibit Nos. 1, 2, 3 and 4 offered)

THE COURT: They're offering 1 and 2. Any objections? He's offering 1 and 2.

MR. MILLER: No. No objections.

THE COURT: 1 and 2 are admitted.

(Hearing Exhibit Nos. 1 and 2 admitted)

MR. HOLE: And also 3 and 4, Judge.

THE COURT: 3 and 4, I guess this has to do with the service issue. Any objections at this time, gentlemen?

MR. MILLER: As to?

THE COURT: It has to do with service, 3 and 4.

MR. MILLER: I have to object, just based on the basis that the Visa receipt is not proof of service. It doesn't come close to meeting the requirements of 21a.

MR. HOLE:  That would be 4?

THE COURT:  Which one?

MR. HOLE:  Let me see.  I thought you saw them.

MR. MILLER:  No, we didn't.  Exhibit Number 3, I guess.

MR. HOLE:  No objection to 3?

MR. MILLER:  Well, I object on the grounds that that isn't proof of service, and neither is 4, if that's what you're trying to produce.

MR. HOLE:  This is notification of service that we received.  We offer Exhibits 3 and 4 and --

THE COURT:  You know, I can only admit what you've received.

Mr. Hole apparently has an issue whether -- the issue is when they got served.  I know they're kind of proceeding forward.

For the record, I'll admit 3 and 4 as what you received.

*(Hearing Exhibit Nos. 3 and 4 admitted)*

MR. HOLE:  Thank you, Judge.

With respect to the expert report, I'll be really brief.  They have to -- under *Palacios*, have to timely file -- excuse me -- have to timely serve an expert report that meets three things:  It has to set

out the standard of care, how the defendant breached the standard of care, and how that proximately caused the damages.

In this case, they timely filed the report. The report adequately sets out what the standard of care is with Dr. Harrington, and how he breached it. The only problem is causation and the expert's qualifications.

With respect to the expert report, basically, this is a case where a lady was at a nursing home, Dr. Harrington would see her on occasion, and the expert report basically sets out that Dr. Harrington has violated the standard of care in certain different ways, including, and among other things, failing to document certain things, and failing to transfer her out of the facility. But there's no evidence showing he had the right to transfer her out of the facility, and there's no showing how that documentation actually caused her death.

In this case, according to the plaintiffs, this lady was murdered; that's what they call it. She was in the nursing home, evidently was assaulted by another resident of the nursing home and eventually soon thereafter died.

There's no way to show or to tie how the

doctor failing to write something in a record in 19- -- excuse me -- in 2009 caused her death. There's no showing how he did anything in 2010 to cause her death. All these deviations from the standard of care that they point out don't really have anything to do with this lady's death. You can't just basically say that there's a "but for" argument, but for the fact that she was in this nursing home she wouldn't have died.

One of the most recent cases on file that we have on this issue is out of the Houston Court of Appeals, it's *Quintero v. Houston Methodist*, decided February 26, 2015. This is an appeal from a court dismissing a motion -- a claim because of failure to comply with 74.351. And it specifically provides that -- under causation, they have to specifically provide a basis for the conclusion that the alleged negligence proximately caused the death. And they said, specifically, if but for causation was sufficient under Chapter 74, almost any action taken by a health care provider would be -- said to be adequate. And they're saying it clearly wasn't.

In this case, it was -- a person listed M.D. Anderson and they were saying, well, if they hadn't been referred to M.D. Anderson, she wouldn't have lost her eye and the doctor's negligence in referring her to

M.D. Anderson, and so therefore, there's causation. And the Court specifically said, no, that's not the case. And that's the same as we have here.

May I approach, Judge?

THE COURT: Yes, sir.

MR. HOLE: And there are certainly older cases and more cases that talk about causation. They have to get the facts and relate them to the cause of death. In this case, the cause of death was an intracranial bleed. Nothing in the record shows how the doctor could have prevented that or didn't prevent that.

And then finally, with respect to his qualifications, if you look at his report he talks about how he -- it seems like a lot of it is past tense: I have been board certified in internal medicine -- it doesn't indicate he currently is; I have served as director; I have been the physician adviser; I have served here.

And then he just says, I'm currently practicing medicine, but we don't have any information that he's currently practicing medicine in the field that's relevant to this particular deal, in this particular cause of action.

And then finally, also, if you look at his CV on the little tab there, it shows that he's only

licensed in California. There's a good argument to be made that 74.351, at least with respect to the expert report, requires the physician to be licensed in the state of Texas.

And so, therefore, we feel that he's not qualified and, therefore, the motion to dismiss should be granted.

THE COURT: Response, Mr. Miller?

MR. MILLER: Judge, let me hand you two of the cases. I think I handed you at the previous hearing Dr. Zarate's objections based on the same grounds, that the expert wasn't qualified, that the conclusion -- that causation was conclusory. Those were overruled. And so I have the same case law to hand you today. May I approach?

THE COURT: Sure.

MR. MILLER: And these are two Fourth Court of Appeals cases that are exactly on point. They deal with the same issues, qualifications, and whether causation is conclusory.

Just to give you a brief history about the case, Ms. Ramos was a resident at Trisun Nursing Home for approximately seven years, since 2006, I believe, until 2012. During the course of her stay, she experienced horrific abuse and neglect: Over 36 falls,

20-something altercations with other residents, sexual abuse, fractures, back fractures, hand fractures, which ultimately culminated in her homicide.

According to her death certificate in the medical examiner's report, she died of a homicide. A fellow resident shoves her, she fell over, hit her head and died. To say that causation is complex in this case would be a complete misrepresentation. It's very clear what happened.

So regarding the objections on file, the standards to review these Chapter 74 reports are very simple. To comply with the Chapter 74 report, the report need only provide enough information to fulfill two purposes: To inform the defendant of the specific conduct called into question, and to provide a basis for the trial court to prove the claims have merit. And that's according to the Supreme Court in *Transitional Care v. Palacios*.

Additionally, the courts clarified in *Potts*, the Supreme Court in 2013, that if you have one adequate negligence theory in the expert report, the suit can proceed.

May I approach, Your Honor?

*THE COURT:* Yes, sir.

*MR. MILLER:* I have our expert report and

his 50-page CV attached to the back, and I've highlighted the relevant portions having to do with qualifications and causation in this case. And we have multiple theories of negligence because she had such a horrific amount of abuse and neglect. There were so many things to go through the record to talk about. So we have at least one viable theory of negligence included in that expert report.

Moreover, our expert, Dr. Lipson, is extraordinarily qualified. It's readily apparent from the Chapter 74 report. According to the Texas Supreme Court, an expert is qualified to testify if the expert has knowledge, skill, experience, training or education regarding the specific issues before the Court which would qualify the expert to give an opinion on that subject. And that's *Broders v Heise*. And there's a multitude of Court of Appeals opinions, stating that a medical expert from one specialty may be qualified to testify about another. The Court states that the expert need only have qualifications having to do with the issues that are within the report. And that's *Pediatrics Medical Services v. Delow* (phonetic), and that's El Paso.

Accordingly, the Fourth Court of Appeals case, the *Belding* case is directly on point. That was a

pediatric cardiologist who was able to testify as to neurological damage, so causation in the case. The doctor doesn't have to be a neurologist to testify about head trauma. It's not a requirement. Every court of appeals has said that.

*Livingston v. Montgomery*, the gynecologist was qualified to apply a causal relationship between labor and delivery and complications, including neurological injuries.

*Comstock v. Clark*, Texas Appeals Court in Beaumont, the anesthesiologist was qualified to express causal opinions that depravation of oxygen caused brain injury.

And most recently, the court that I mentioned, the *Bellview* case, in the Fourth Court of Appeals. Dr. Lipson very clearly meets this threshold. He's not a neurologist but he doesn't need to be. The report very clearly details his extensive background in geriatric care and internal medicine, as well as his clinical experience treating patients with similar injuries.

Even the Court in *Baker v. Regency*, Court of Appeals in Texas, said that a geriatrician is allowed to testify as to causation for death. That's the same instance in this case.

And the report, if I can read it into the record. He said he's board certified in Internal Medicine, Geriatric Medicine, Utilization Review and Quality Assurance. He's Director of the University of California Teaching Nursing Home Program. He has worked with the Keck School of Medicine for over 29 years at USC. He's Chief of the Section of Geriatric Medicine, Associate Professor of Medicine, Gerontology, Clinical Pharmacy, Medical Dentistry and Public Health. He's a consultant to the Department of Justice, State of California, New Mexico, U.S. Department of Justice in the areas of geriatric care and elder abuse. Then it goes on and on to state that he is specifically familiar with the issues and the injuries in this case.

"Additionally, as a subject (sic) of my education, training and experience, I am competent to testify as an expert on the subject of medical causation. I am specifically familiar with the types of problems experienced by Sylvia Ramos, including but not limited to falls, wandering, resident on resident abuse, signs of sexual abuse, neglect, institutional scabies, fractures, head trauma and intracranial hemorrhage," which ultimately caused her death.

And so the report goes on and on detailing how he's familiar with these injuries. And he has, you

know, 40, 50 years of experience treating these types of patients with similar injuries. And it goes on and on to talk about -- and just to talk about one theory that is undoubtedly sufficient in this case is the fact that she was murdered at the nursing home. She was pushed by a resident, she fell over, she suffered intracranial hemorrhage and died. It's on the death certificate, it's on the medical examiner's report. Our expert reviewed all this and put within the report very clearly what happened as to her death.

And I can read into the record: "Through my education, training and experience, I am familiar with the type of fatal intracranial hemorrhage Ms. Ramos suffered on July 16, 2012." And he goes on to describe what an intracranial hemorrhage is, the signs and symptoms, how he's familiar with it. It's consistent with the mechanism of blunt force trauma that resulted from her assault.

And he states, In my medical opinion, had Drs. Zarate and Harrington met the aforementioned standards of care, in reasonable medical probability Ms. Ramos would not have suffered continual threats, altercations, attacks, including the final one on July 16, 2012 that resulted in her death. And it describes in the standard of care everything that

Dr. Harrington was required to do.

Mr. Hole misrepresented it as, oh, well, we just state that he didn't document correctly and that's not enough. Well, we go on much more than that to talk about Gerald Harrington. It states that he's required to assist the facility in providing input into the resident care plan. So when a resident is faced with repeated falls, injuries and attacks, the standard of care requires the physician to assist the facility in providing input in the care plan to address these problems accordingly.

It goes on to state that Dr. Harrington should have given appropriate input in the deficiencies of her care plan. And it goes on to state exactly what those deficiencies are, and how he should have provided -- deficiencies in the timed toileting programs, regularly orienting Ms. Ramos. And there's a huge list stating what he failed to do.

It goes on to state that he failed to perform timely and adequate assessments. The report goes on and on about his breach into the standard of care and how they're connected to the death. It's hard to say that this report is deficient.

To wrap it up, Judge, the report isn't conclusory, according to the *Jelinek* case: If the

expert has claimed the basis of his statements and leads to the conclusions to the facts, the report is not deficient. An expert report is not conclusory if it strikes what the appellate should have done and what happened because he or she failed to do it.

That is the Texas Appeals Court from Dallas. We have that, it describes how he failed it. Had he done all these things, she wouldn't have died. That's exactly the requirements that are set forth in the Court of Appeals and the Supreme Court of Texas.

THE COURT: Mr. Hole, anything else?

MR. HOLE: I'll be real briefly, Your Honor.

THE COURT: Sure.

MR. HOLE: First of all, the problem is he does set out a lot of things about how he should have had quality plans, and all these other things. He doesn't tie that to how she got murdered, according to them. And I think if you use the word "murder," that always interrupts any chain of causation. You have something that's completely not there. But he has to tie it in.

One of the most recent cases out of San Antonio that deal with this is, is if the San Antonio court found the expert report to be

adequate -- may I approach, Your Honor?

THE COURT: Yes, sir.

MR. HOLE: Is a case styled *Legend Oaks - South San Antonio v The Estate of Rocamontes*, and that was February 18th of 2015, this year, Judge. And in this particular case, they found the report to be adequate because the doctor in his expert report actually took the breaches and showed how that would have made a difference on the wound care, and because they didn't, the wound became infected, and that delayed her getting appropriate medical care, and then that infection delayed treatment, actually went and caused her to die of sepsis.

In this case, they're just saying but for the fact that she was in this resident facility, if she hadn't been here this resident wouldn't have pushed her. That's the "but for" argument that the previous court, that I gave you, said you can't use it. They have to say, well, if the doctor had done some kind of toileting plan to get one of these examples, how would that have prevented this resident from hitting her or knocking her down? It wouldn't. They have to tie at least one of them. And we agree, it only has to be one. But they have to tie one of them to her death, and they can't. He makes a conclusory statement that says, well, if they

had done this, she wouldn't have been in this facility and, therefore, this resident wouldn't have pushed her down, resident 1199, or whatever her name is, or his name.

And so the bottom line is they're just saying "but for." Well, if the family had taken her out of the facility, she wouldn't have had this either. We don't know that it wouldn't have happened in another facility.

Bottom line, Judge, the expert has to actually tie it in -- and I didn't interrupt, so please. The expert has to actually tie in the alleged negligence. And we agree, they set out a plethora of things that they claim the doctor did wrong. But they have to tie at least one of those to her death.

And finally, Judge, with respect to the qualifications, he read to you and said that he's board certified. No, that's not what his thing says. He says, I have been board certified, and I have done all these things. You have to be able to show that he's currently practicing medicine in an area that is relevant to this.

And finally, Judge, with respect to his statements that the Supreme Court talked about what the qualifications are for a testifying expert as to

causation, that's different. That's testifying. And there are specific situations.

But if you look at 74.351, it's got very specific -- may I approach?

THE COURT: Yes, sir.

MR. HOLE: -- qualifications for the person to give expert testimony as to causation in the report. And if you look on the bottom there, where it talks about an expert, it says, specifically, "an expert is," and then it talks about with respect to a -- whether the physician departed, it has to be an expert qualified under Section 74.401. And it says, With respect to a person giving testimony regarding a health care provider, look at 74.402.

But then, with respect to causation, at the top of the next page, this is the one that's critical: A person giving opinion testimony about the causal relationship between the injury, harm or damages claimed and the alleged department -- departure from the applicable standard of care has to be a physician who is otherwise qualified to render opinions.

And, Judge, Section 74.403 specifically defines a physician -- I'm sorry, not 74.403 -- but 74.001 specifically -- may I approach again?

THE COURT: Yes, sir.

MR. HOLE: -- defines the word physician as used there. And it's interesting that the Legislature specifically said for causation is different than the other.

And 74.001 defines physician as a person, who you can see, who is licensed in the state. And his expert report and his CV clearly show that he is only licensed in California.

It says: "Physician, an individual licensed to practice medicine in the state." And so therefore, he fails to comply with even the requirements for a 74.351 report.

Now, as to testifying in trial, that's different. That's a different section. But as far as the report, 74.351 makes it very clear, that it has to be a physician. And they made a very distinct distinction -- a distinct distinction -- they make a very clear distinction as to the difference between standard of care for a health care provider, a physician, and causation has to be a physician. The other two don't. Thank you.

MR. MILLER: Judge, I have to respond to the complete misrepresentation as to the law. If we had to have a licensed physician testify from medical expert reports for Chapter 74 purposes, we would never have a

Chapter 74 expert report. We have to go out of state for all of them. That's just the case. That's not a requirement under Chapter 74 that we have a licensed Texas doctor. The report very clearly clarifies that he is practicing, he's a physician, he's a geriatrician. As opposing counsel mentioned, he has to be familiar with the subject at issue in this case. He's a geriatri- -- he's an internal doctor as well. And the report very clearly spells out what Dr. Harrington should have done, and had he done all these things, Ms. Ramos, in reasonable medical probability, would not have ultimately died.

Dr. Harrington had provided appropriate input with regard to the deficiencies in Ms. Ramos' care plan. Concerning the physical altercations as required by the standard of care, the care plan for Ms. Ramos would have addressed the issue on resident attacks and measures would have been taken to protect Ms. Ramos from future attacks.

If Ms. Ramos continued to suffer attacks on residents -- suffered attacks and threats by other residents and Trisun wasn't able to keep her safe, Dr. Harrington should have discharged her to a facility that could meet her needs. If such measures should have been taken in reasonable medical probability, Ms. Ramos

would not have been pushed by residents on February 9, 2011 or July 16, 2012, and she would not have suffered a large occipital hematoma and intracranial hemorrhage that resulted in her death.

Had Dr. Harrington met the standard of care in reasonable medical probability Ms. Ramos' untimely death would have been prevented.

It's very clear in the report. It's more than sufficient that meets Chapter 74 requirements. These are the same issues that came before you about a month back, same exact issues. So I'll leave it at that, Judge.

MR. HOLE: Since we have the burden to prove, I'll be real brief.

THE COURT: Sure.

MR. HOLE: It's not the same. You've got a different health care provider. This is somebody not affiliated with the situation.

But listen to what he just said. He told you that, basically, he's conclusory. He just said, if she hadn't been at this facility, this wouldn't have happened. That's the "but for" argument. And they're saying if he'd done all these things, he would have transferred her somewhere else. Well, that's not -- that doesn't work. You have to relate this to the

medical care. As the San Antonio Court of Appeals has said, as the Houston Court of Appeals has said, it's a conclusory statement as to causation. And the problem is, he can't tie it to it. He can't say, if you had different things for how she goes to the bathroom, this resident wouldn't have pushed her, because there's nothing there. They can't do the causation. In fact, the murder that he's talking about interrupts any causation argument.

And real quickly, Judge, the statute is very clear, and it's specific that says, with respect to causation, giving an opinion, under 74.351, it has to be a physician. The definition of physician is a resident, a licensee. And hopefully that will be it. Thank you, Judge.

THE COURT: Actually, I don't know if that's been addressed before, with regards to, you know, a physician having to be licensed in the state. I don't know if it's come up before, but I wouldn't mind looking at it. You know, y'all gave me some great arguments. I wouldn't mind looking at the report. I don't see -- I guess it's a different report that I looked at last time. You say it's different issues.

MR. MILLER: Judge, it's the same report.

MR. HOLE: Different defendant.

MS. E. MALONEY: It covers two defendants.

MR. MILLER: Correct.

MR. CARIO: There's another motion, Your Honor, also.

THE COURT: It's been a while. I guess I better just look at it.

And the issue of whether the physician has to be a Texas physician, I wouldn't mind looking at that.

You said there's another motion I need to --

MR. CARIO: Yes, Your Honor. Setters Medical Group has a motion to dismiss also on little different grounds. We can do that really quick.

THE COURT: Okay. That's fine. Go ahead and proceed.

MR. CARIO: Setters Medical Group is the employer of Dr. Harrington, and the employer of some nurse practitioners.

THE COURT: And what is the name of the group? I'm sorry.

MR. CARIO: Setters Medical Group. And we filed a partial motion to dismiss based on no report at all.

Now, there's kind of two issues here. If

this Court or the San Antonio Court of Appeals or the Supreme Court determines that Dr. Harrington's report -- the report as to Dr. Harrington is insufficient and they strike that report or they give them sufficient time to supplement that report and then it's ultimately struck down on the causation issue, then I would be entitled to file another no-report motion to dismiss because there would be no report as to Setters Medical Group.

Right now, the only report before the Court as to Setters Medical Group is the report as to Dr. Harrington. I didn't object to that report because it doesn't mention Setters Medical Group. So I'm not required to object to it, unless I wanted to pursue those same objections, but I don't think it's necessary.

I think if the Court strikes down the report as to Dr. Harrington because the report does not mention Setters Medical Group, there is no report as to Setters Medical Group, so I think I can pursue that argument at any time.

I filed a motion for partial -- partial motion to dismiss any and all claims asserted against the nurses, the nurse practitioners in this case. And there are none named directly as defendants in this case. But in Plaintiff's petition they've asserted vicarious liability against Setters Medical Group for

Dr. Harrington. And their language states at the time of the incident made the basis of this lawsuit, Gerald Harrington, M.D., the nurse practitioners and its nursing staff were caring for Sylvia Ramos and were employees of Setters Medical Group, P.A., working within the course and scope of their employment with Setters Medical Group. As such, Setters is responsible all of Dr. Harrington's -- the nurse practitioners and the nursing staff's negligent acts and/or omissions under the theory of respondeat superior or vicarious liability.

I agree there's case law out there. You've already heard about the *Potts* case today, that says if there is one viable claim against the defendant, all claims are the -- you can move forward with all claims, okay?

The *Potts* case didn't deal with the situation we have here. I think our situation is a little different. The *Potts* case was, the Supreme Court looked at the issue of whether or not they had to dismiss the direct liability claims because all the report covered were vicarious liability issues. And the Court said, Nah, the claim is -- vicarious liability is valid, the report is okay, so we're going to let the claims of direct liability go forward. You don't have

to have a separate report for the direct liability claims.

Since that case, a couple of cases have followed that logic and have said, well, if there's a valid claim against the doctor, then the claim against the nurses is also valid so they don't have to have a separate report on those.

All of the cases talk about that issue involving specific incident that you can look at and say, this is what the nurse did, or this is the care that's in question. They all are at hospitals, they're all involving a short period of time.

What we have in this case is extremely different. We have a period of six or seven years of care. The report against Dr. Harrington covers -- starts talking about issues back in 2008 that he did wrong. The way Setters -- the way the care works in this case is just like with your primary care physician. When a patient is in the nursing home, they require to have a physician that they're admitted under for purposes of getting care if it's needed. The nursing home provides the direct patient care, the doctor is there like a primary care physician. They have to see the patient once every 30 days, unless they're called about different issues as the patient goes through.

Just like you would do if your family primary care physician, if you needed to go see him, you'd go see him. Same thing in a nursing home. If they need to see the primary care physician and they get called by the nursing home, the primary care physician comes to the facility, just like a home visit, instead of them going to the doctor's office. Sometimes they go to the doctor's office.

In this situation, Setters' employees like Dr. Harrington, and also employees of several nurse practitioners, none of them see the patient on the same date, ever. Dr. Harrington may see them on one day, the nurse practitioners may see them on one day. But over this six-year period of time, maybe Dr. Harrington saw them 15 times, and one nurse practitioner saw them five times and another one saw them 15 times.

There's nothing -- there's no way we can look at this report. And for me to prepare a defense on behalf of Setters Medical Group for any claims of vicarious liability against any nurse practitioner or nurse employed by that group for the care they presented to this patient, because there's nothing identified in that report whatsoever that will give me or give this Court the indication that there was improper care on their behalf.

With Dr. Harrington, they go through specific dates of when he saw the patient or when he was called and what he could have done at that time. There's nothing like that with the nurses. All of those cases where the Court says it's okay if they have one viable claim because -- against the health care provider, then all claims are good.

In that case, you can look at the care and the same people are seeing that patient over the same period of time. Here, it's completely different. We don't know what the negligence is for any nurse. There's no way for us to identify that, and because of that, then it's -- it's like they're a separate -- they would have to be a separate defendant, and as a defendant, they're required to have a report against each of them to connect Setters for vicarious liability. That's my contention in the case, that they would have to have a report for each nurse as to what their negligence is in order to hold Setters Medical Group vicariously liable for them.

These cases don't say, well, you name Dr. Harrington in the case, but if you later on decide if there are six other employees against -- or doctors employed by Setters Medical Group, they may have had some negligent act in regard to this care, then you can

sue all of those doctors, and this report is sufficient for that. They would have to go out and get a new report for every one of those doctors they named.

I think it's a similar issue here. I think it's -- I think these cases can be distinguished from the case where it says -- the *Potts* case, and I would ask that those claims against the nurses be dismissed because they didn't provide any evidence of any negligence or any breach of the standard of care or any causal relationship to this plaintiff's death.

THE COURT: Response, Ms. Maloney?

MS. E. MALONEY: We have a Texas Supreme Court case directly on point. So I honestly really don't know why we're here today. I can come hand it to you.

THE COURT: Yes.

MS. E. MALONEY: It was heard at the same time as *Potts*, and it clearly says that if you have a report as to vicarious liability of one person, then it covers any other person that the company may be vicariously liable for.

I heard Mr. Cario's argument today. And the fact that that issue was addressed in a Dallas Court of Appeals case, *Ennis Regional Medical Center v. Crenshaw*. And in one that, the defense is trying to

draw the same distinction, well, there was this kind of time frame, and other allegations were added later. And the Court said neither the Supreme Court in *Moreno* nor the Appellate Court in *Heppers* distinguished between links and factual allegations on the timing of claims. *Ennis Regional's* distinction that *Potts* did not involve new post-expert report allegations appear to have no consequence based on these cases.

And so, really -- and we have a case directly on point, so I don't really know what else I can say. It's pretty well established.

MR. CARIO: May I respond?

THE COURT: Anything else?

MS. E. MALONEY: Oh, yeah. Let me hand you the case on point, Judge.

THE COURT: You may. This is the last one you said?

MS. E. MALONEY: Yes.

THE COURT: Okay. Mr. Cario?

MR. CARIO: The case has nothing to do with the argument I just made or the facts of this case. This is a -- in this case, it involves an admission into a hospital where the patient died two weeks within the admission -- time period of the time where the patient was admitted to the hospital. A year after filing this

suit in the case, the plaintiffs filed an amended petition and included new allegations against the hospital, and the allegations against the hospital which was already a defendant based on issues of vicarious liability, those issues involved allegations against nurses that were not specifically named. And the hospital came back in and said, No, if you're going to -- you have to name those nurses for these specific allegations. Still involving that same two-week period of care and the death of this patient during that two-week period, it is not the same issue in this case.

The Court in that case said, Nah, it's a valid claim against the doctor, and the claim -- the arguments are the same against the nurse for that short period of care. This Court didn't address the short period of care or the timing of the care. It just said, No, you can tell by this report what the allegations are against the nurses, even if they're not identified, and I think it's valid. That's what the Court says in this case. It doesn't go back and say, oh, there's eight years' worth of care and some nurse might have cared for that patient six years ago, and if we don't find Dr. -- this is the problem. If they don't find Dr. Harrington liable at trial in this case, but they find a nurse practitioner responsible in this case, how was I going

to prepare a defense for that nurse practitioner? I have no idea what the criticisms are because they don't provide me that information.

They have to provide me information setting out what the allegations are against those specific individuals that they're claiming my client should be vicariously liable for. And there's no way for me to valuate that. If Dr. Harrington is, in this case, not in this case because his report is determined to be insufficient, then there is no case because there's nothing mentioning Setters Medical Group at all, other than the allegations against Dr. Harrington. It would be inappropriate for the Court to rule on my motion and deny it, and then the Court of Appeals come back or the Supreme Court come back and say there's no causal link here, this report is inadequate. It can never be cured because it's a murder case, not a medical malpractice case. And this is -- you know, this report is not sufficient, then what you would do by granting -- by denying my motion to dismiss now would be saying, okay, but Dr. Harrington gets out of this case and there's no report whatsoever that mentions anybody that's an employee of Setters Medical Group, but I'm going to let the case go forward against them.

MS. E. MALONEY: Judge, these are

preliminary expert reports. We'll designate experts down the road and we'll have more reports.

Mr. Cario is essentially arguing that *Potts* is unfair. And I'm sorry, but *Potts* is directly on point; *Moreno* is directly on point.

In *Moreno*, the Court says, "Because the trial court did not abuse its discretion in finding Moreno's reports adequate as to her theory that Presbyterian is vicariously liable for the doctor's action, her suit against Presbyterian - including her claims that the hospital has direct liability and vicarious liability for the nurses - may proceed."

So here, because they had an expert report that covered the doctor, they had -- there are claims that the nurses were liable could also go forward. So I mean, this case is directly on point, so clear-cut that it's pretty simple.

MR. CARIO: I'm arguing distinguishable, that's what I'm arguing, Your Honor. It's completely different facts.

THE COURT: Mr. Cario makes an excellent point that it's no specific event, it's the years involved. I'd like to look at the cases.

Mr. Hole, you want to say something real quick?

MR. HOLE: We have proposed orders.

THE COURT: Okay. Let me take that under advisement.

MR. HOLE: Mine is granting or denying; he's got one denying.

THE COURT: I've got everything I need, I think. Y'all make some interesting arguments. I would like to look at the report, maybe look at the cases. I can do it this week. We'll go off the record.

*(End of proceedings)*

*STATE OF TEXAS*

*COUNTY OF BEXAR*

I, LETITIA MONCIVAIS, Official Court Reporter in and for the 131st District Court of Bexar County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ 235.00 and was paid by MR. RONALD HOLE.

WITNESS MY HAND, this the 23rd day of March, 2015.

/s/ Letitia Moncivais
LETITIA MONCIVAIS, CSR, RPR
Texas CSR 3416
Official Court Reporter
131st District Court
100 Dolorosa, 4th Floor
San Antonio, Texas   78205
Telephone:  210/335-2521
Expiration:  12/31/2015

**APP 8**

DOCUMENT SCANNED AS FILED



2014CI06284 -0288

CAUSE NO. 2014-CI-06284

| | | |
|---|---|---|
| SANDRA SCHROEDER AND | § | IN THE DISTRICT COURT |
| DUANE J. RAMOS, INDIVIDUALLY AND | § | |
| AS ALL HEIRS TO THE ESTATE OF | § | |
| SYLVIA RAMOS, DECEASED | § | |
| | § | |
| VS. | § | |
| | § | 288TH JUDICIAL DISTRICT |
| | § | |
| PM MANAGEMENT – WINDCREST NC, | § | |
| LLC D/B/A TRISUN CARE CENTER | § | |
| WINDCREST, GERALD HARRINGTON, | § | |
| M.D., SETTERS MEDICAL GROUP, P.A., | § | |
| RUDOLFO ZARATE, M.D. AND ZARATE | § | |
| MEDICAL GROUP, P.A. | § | BEXAR COUNTY, TEXAS |

### ORDER DENYING DEFENDANT GERALD HARRINGTON, M.D.'S MOTION FOR DISMISSAL PURSUANT TO SECTION 74.351 OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE

On this day came on to be considered Defendant Gerald Harrington, M.D.'s Motion for Dismissal Pursuant to Section 74.351 of the Texas Civil Practice & Remedies Code in connection with the above-referenced cause. Plaintiffs appeared by and through their attorneys of record. Defendant appeared by and through his attorney of record.

After reviewing the file, after considering the evidence submitted and after hearing arguments of counsel, the Court is of the opinion that Defendant Gerald Harrington, M.D.'s Motion for Dismissal Pursuant to Section 74.351 of the Texas Civil Practice & Remedies Code should be denied. Accordingly, it is hereby

ORDERED, ADJUDGED and DECREED that Defendant Gerald Harrington, M.D.'s Motion for Dismissal Pursuant to Section 74.351 of the Texas Civil Practice & Remedies Code be, and hereby is, **DENIED**.

SIGNED FOR ENTRY this the _9_ day of _MARCH_, 2015.

_____
Judge Presiding

41

2

COPY TO:

Mr. Ronald G. Hole
Hole & Alvarez, L.L.P.
P. O. Box 720547
McAllen, Texas 78504-0547
Email: Mail@HoleAlvarez.com

Mr. W. Richard Wagner
Wagner & Cario, LLP
7705 Broadway
San Antonio, Texas 78209
E-Mail: rwagner@wagnercario.com

BCC:RAM-HAR\PLD

Mr. Michael D. Maloney
Ms. Erica O. Maloney
Byron B. Miller
Law Offices of Pat Maloney, PC
322 W. Woodlawn Ave.
San Antonio, Texas 78212
E-Mail: michaelm@maloneylawgroup.com
E-Mail: ericam@maloneylawgroup.com
Email: byron@maloneylawfirm.com

Ms. Emily Davenport
Kemp Smith LLP
816 Congress Avenue, Suite 1260
San Antonio, Texas 78205
Austin, Texas 78701-2443
Email: edavenport@kempsmith.com

Ms. Lisa A. Rocheleau
Boone, Rocheleau & Rodriguez, P.L.L.C.
10101 Reunion Place, Suite 600
San Antonio, Texas 78209
E-Mail: lrocheleau@br-lawfirm.com

**APP 9**

*Texas Statutes and Codes* > *CIVIL PRACTICE AND REMEDIES CODE* > *TITLE 4. LIABILITY IN TORT* > *CHAPTER 74. MEDICAL LIABILITY* > *SUBCHAPTER H. PROCEDURAL PROVISIONS*

# § 74.351. Expert Report

**(a)** In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

**(b)** If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

**(1)** awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

**(2)** dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

**(c)** If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice.

**(d)** to (h) [Reserved].

**(i)** Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

**(j)** Nothing in this section shall be construed to require the serving of an expert report regarding any issue other than an issue relating to liability or causation.

**(k)** Subject to Subsection (t), an expert report served under this section:

**(1)** is not admissible in evidence by any party;

**(2)** shall not be used in a deposition, trial, or other proceeding; and

**(3)** shall not be referred to by any party during the course of the action for any purpose.

**(l)** A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

**(m)** to (q) [Reserved].

**(r)** In this section:

**(1)** "Affected parties" means the claimant and the physician or health care provider who are directly affected by

Michael Maloney

an act or agreement required or permitted by this section and does not include other parties to an action who are not directly affected by that particular act or agreement.

(2) "Claim" means a health care liability claim.

(3) [Reserved].

(4) "Defendant" means a physician or health care provider against whom a health care liability claim is asserted. The term includes a third-party defendant, cross-defendant, or counterdefendant.

(5) "Expert" means:

   (A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

   (B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;

   (C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence;

   (D) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a dentist, a dentist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence; or

   (E) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a podiatrist, a podiatrist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

(s) Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for the acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care through:

   (1) written discovery as defined in *Rule 192.7, Texas Rules of Civil Procedure*;

   (2) depositions on written questions under *Rule 200, Texas Rules of Civil Procedure*; and

   (3) discovery from nonparties under *Rule 205, Texas Rules of Civil Procedure.*

(t) If an expert report is used by the claimant in the course of the action for any purpose other than to meet the service requirement of Subsection (a), the restrictions imposed by Subsection (k) on use of the expert report by any party are waived.

(u) Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a).

# History

Enacted by *Acts 2003, 78th Leg., ch. 204 (H.B. 4)*, § 10.01, effective September 1, 2003; am. *Acts 2005, 79th Leg., ch. 635 (H.B. 2645)*, § 1, effective September 1, 2005; am. *Acts 2013, 83rd Leg., ch. 870 (H.B. 658)*, § 2, effective September 1, 2013.

Michael Maloney

**APP 10**

CAUSE NO. 2014-CI-06284

| | | |
|---|---|---|
| SANDRA SCHROEDER AND DUANE J. RAMOS, INDIVIDUALLY AND AS ALL HEIRS TO THE ESTATE OF SYLVIA RAMOS, DECEASED, | § § § § § | IN THE DISTRICT COURT |
| PLAINTIFF, | § § | |
| VS. | § § | 288th JUDICIAL DISTRICT |
| PM MANAGEMENT – WINDCREST NC, LLC D/B/A TRISUN CARE CENTER WINDCREST, GERALD HARRINGTON, M.D., SETTERS MEDICAL GROUP, P.A., RUDOLFO ZARATE, M.D., AND ZARATE MEDICA GROUP, P.A. | § § § § § § § | |
| DEFENDANTS. | § | BEXAR COUNTY, TEXAS |

## ORDER GRANTING MOTION FOR WITHDRAWAL
## AND SUBSTITUTION OF COUNSEL

On this day came to be heard Marynell Maloney's Motion for Withdrawal and Substitution of Counsel, and after reading the documents on file herein and hearing the arguments of counsel, the Court rules as follows:

ORDERED that the Motion for Withdrawal and Substitution of Counsel is hereby GRANTED;

ORDERED that Michael Maloney, Erica Maloney and Byron Miller of Law Offices of Pat Maloney, P.C., 322 West Woodlawn, San Antonio, Texas 78212, are substituted as attorneys-of-record for Plaintiffs Sandra Schoreder and Duane J. Ramos, Individually and as All Heirs of the Estate of Sylvia Ramos, Deceased.

Rendered, signed and ordered entered on _SEP 1 7 2014_____, 2014.

Michael E. Mery
Presiding Judge
37th District Court
_____
PRESIDING JUDGE    Bexar County, Texas

-4-

APPROVED and AGREED:

MARYNELL MALONEY LAW FIRM, P.L.L.C.
115 East Travis Street, Suite 1800
San Antonio, Texas 78205
Telephone No. (210) 212-8000
Facsimile No. (210) 212-8385

BY: _____
      MARYNELL MALONEY
      State Bar No. 12883200
      Marynell@marynellmaloneylawfirm.com
Withdrawing Counsel for Plaintiffs


LAW OFFICES OF PAT MALONEY, P.C.
322 West Woodlawn Avenue
San Antonio, Texas 78212
Telephone No. (210) 735-2233
Facsimile No. (210) 735-8431

BY: _____
      MICHAEL MALONEY
      State Bar No. 12883300
      Mikem@maloneylawgroup.com
      ERICA MALONEY
      State Bar No. 24085698
      Ericam@maloneylawgroup.com
      BYRON MILLER
      State Bar No. 24074716
      Byron@maloneylawgroup.com
Substituting Counsel for Plaintiffs

**APP 11**

*From:* No-Reply@eFileTexas.gov
*Date:* 10/31/2014 4:42:13 PM
*To:* Ron@HoleAlvarez.com
*Subject:* eFileTexas.gov – Notification of Service - 3033218

 **EFILE TEXAS.gov**

# Notification of Service
### Envelope Number: 3033218

This is a notification of service for the filing listed. Please click the link below to retrieve the submitted document.

| Filing Details | |
|---|---|
| **Case Number** | 2014CI06284 |
| **Case Style** | |
| **Date/Time Submitted** | 10/31/2014 4:39:37 PM |
| **Filing Type** | No Fee Documents |
| **Filed By** | Ronald Hole |
| **Service Contacts** | Other Service Contacts not associated with a party on the case: Ronald Hole (Ron@HoleAlvarez.com) Byron Miller (Byron@marynellmaloneylawfirm.com) Emily Davenport (edavenport@kempsmith.com) Lisa Rocheleau (lrocheleau@br-lawfirm.com) Michael Maloney (dellak@swbell.net) |

| Document Details | |
|---|---|
| **File Stamped Copy** | https://efile.txcourts.gov/ViewServiceDocuments.aspx?ADMIN=0&SID=5c35e989-3ea5-4452-a0aa-1b8d7b960801&RID=072be25f-fc40-4348-85f6-a4beba911495 This link is active for 7 days. |

Please do not reply to this email. It was generated automatically by eFileTexas.gov



**APP 12**

# Tex. R. Civ. P. 21

This document is current through March 10, 2015

## _Rule_ 21 Filing and Serving Pleadings and Motions

(a) *Filing and Service Required.* --Every pleading, plea, motion, or application to the court for an order, whether in the form of a motion, plea, or other form of request, unless presented during a hearing or trial, must be filed with the clerk of the court in writing, must state the grounds therefor, must set forth the relief or order sought, and at the same time a true copy must be served on all other parties, and must be noted on the docket.

(b) *Service of Notice of Hearing.* --An application to the court for an order and notice of any hearing thereon, not presented during a hearing or trial, must be served upon all other parties not less than three days before the time specified for the hearing, unless otherwise provided by these _rules_ or shortened by the court.

(c) *Multiple Parties.* --If there is more than one other party represented by different attorneys, one copy of each pleading must be served on each attorney in charge.

(d) *Certificate of Service.* --The party or attorney of record, must certify to the court compliance with this _rule_ in writing over signature on the filed pleading, plea, motion, or application.

(e) *Additional Copies.* --After one copy is served on a party, that party may obtain another copy of the same pleading upon tendering reasonable payment for copying and delivering.

(f) *Electronic Filing.*

    (1) *Requirement.* --Except in juvenile cases under Title 3 of the Family Code, attorneys must electronically file documents in courts where electronic filing has been mandated. Attorneys practicing in courts where electronic filing is available but not mandated and unrepresented parties may electronically file documents, but it is not required.

    (2) *Email Address.* --The email address of an attorney or unrepresented party who electronically files a document must be included on the document.

    (3) *Mechanism.* --Electronic filing must be done through the electronic filing manager established by the Office of Court Administration and an electronic filing service provider certified by the Office of Court Administration.

    (4) *Exceptions.*

        (A) Wills are not required to be filed electronically.

        (B) The following documents must not be filed electronically:

            (i) documents filed under seal or presented to the court in camera; and

            (ii) documents to which access is otherwise restricted by law or court order.

        (C) For good cause, a court may permit a party to file other documents in paper form in a particular case.

    (5) *Timely Filing.* --Unless a document must be filed by a certain time of day, a document is considered timely filed if it is electronically filed at any time before midnight (in the court's time zone) on the filing deadline. An electronically filed document is deemed filed when transmitted to the filing party's electronic filing service provider, except:

        (A) if a document is transmitted on a Saturday, Sunday, or legal holiday, it is deemed filed on the next day that is not a Saturday, Sunday, or legal holiday; and

        (B) if a document requires a motion and an order allowing its filing, the document is deemed filed on the date

Michael Maloney

that the motion is granted.

**(6)** *Technical Failure.* --If a document is untimely due to a technical failure or a system outage, the filing party may seek appropriate relief from the court. If the missed deadline is one imposed by these *rules*, the filing party must be given a reasonable extension of time to complete the filing.

**(7)** *Electronic Signatures.* --A document that is electronically served, filed, or issued by a court or clerk is considered signed if the document includes:

    **(A)** a "/s/" and name typed in the space where the signature would otherwise appear, unless the document is notarized or sworn; or

    **(B)** an electronic image or scanned image of the signature.

**(8)** *Format.* --An electronically filed document must:

    **(A)** be in text-searchable portable document format (PDF);

    **(B)** be directly converted to PDF rather than scanned, if possible;

    **(C)** not be locked; and

    **(D)** otherwise comply with the Technology Standards set by the Judicial Committee on Information Technology and approved by the Supreme Court.

**(9)** *Paper Copies.* --Unless required by local *rule*, a party need not file a paper copy of an electronically filed document.

**(10)** *Electronic Notices From the Court.* --The clerk may send notices, orders, or other communications about the case to the party electronically. A court seal may be electronic.

**(11)** *Non-Conforming Documents.* --The clerk may not refuse to file a document that fails to conform with this *rule*. But the clerk may identify the error to be corrected and state a deadline for the party to resubmit the document in a conforming format.

**(12)** *Original Wills.* --When a party electronically files an application to probate a document as an original will, the original will must be filed with the clerk within three business days after the application is filed.

**(13)** *Official Record.* --The clerk may designate an electronically filed document or a scanned paper document as the official court record. The clerk is not required to keep both paper and electronic versions of the same document unless otherwise required by local *rule*. But the clerk must retain an original will filed for probate in a numbered file folder.

# History

Amended by *Texas* Supreme Court, Misc. Docket No. 13-9165, effective January 1, 2014.

**Annotations**

# Notes

*SOURCE:* Art. 2291.

    *Change by amendment effective January 1, 1978:* The phrase, "if it relates to a pending suit." was deleted from the end of the first sentence. The phrase, "If the motion does not relate to a pending suit," was deleted from the beginning of the second sentence.

    *Change by amendment effective January 1, 1981:* The *rule* is broadened to encompass matters other than motions and to require three-day notice unless the period is shortened.

    *Change by amendment effective September 1, 1990:* To require filing and service of all pleadings and motions on all

**APP 13**

Document: Tex. Civ. Prac. & Rem. Code § 74.001 ⏰  Actions ▾

Results list

◂ Previous                                           Next ▸

# Tex. Civ. Prac. & Rem. Code § 74.001

Copy Citation

This document is current through the 2013 3rd Called Session

**Texas Statutes and Codes** >**CIVIL PRACTICE AND REMEDIES CODE** >**TITLE 4. LIABILITY IN TORT** >**CHAPTER 74. MEDICAL LIABILITY** >**SUBCHAPTER A. GENERAL PROVISIONS**

## § 74.001. Definitions

**(a)** In this chapter:

**(1)** "Affiliate" means a person who, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with a specified person, including any direct or indirect parent or subsidiary.

**(2)** "Claimant" means a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim. All persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant.

**(3)** "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the person, whether through ownership of equity or securities, by contract, or otherwise.

**(4)** "Court" means any federal or state court.

**(5)** "Disclosure panel" means the Texas Medical Disclosure Panel.

**(6)** "Economic damages" has the meaning assigned by Section 41.001.

**(7)** "Emergency medical care" means bona fide emergency services provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious

jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or that is unrelated to the original medical emergency.

**(8)** "Emergency medical services provider" means a licensed public or private provider to which Chapter 773, Health and Safety Code, applies.

**(9)** "Gross negligence" has the meaning assigned by Section 41.001.

**(10)** "Health care" means any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.

**(11)** "Health care institution" includes:

**(A)** an ambulatory surgical center;

**(B)** an assisted living facility licensed under Chapter 247, Health and Safety Code;

**(C)** an emergency medical services provider;

**(D)** a health services district created under Chapter 287, Health and Safety Code;

**(E)** a home and community support services agency;

**(F)** a hospice;

**(G)** a hospital;

**(H)** a hospital system;

**(I)** an intermediate care facility for the mentally retarded or a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act (42 U.S.C. Section 1396n), as amended;

**(J)** a nursing home; or

**(K)** an end stage renal disease facility licensed under Section 251.011, Health and Safety Code.

**(12)** (A) "Health care provider" means any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including:

**(i)** a registered nurse;

**(ii)** a dentist;

**(iii)** a podiatrist;

**(iv)** a pharmacist;

**(v)** a chiropractor;

**(vi)** an optometrist;

**(vii)** a health care institution; or

**(viii)** a health care collaborative certified under Chapter 848, Insurance Code.

**(B)** The term includes:

**(i)** an officer, director, shareholder, member, partner, manager, owner, or affiliate of a health care provider or physician; and

**(ii)** an employee, independent contractor, or agent of a health care provider or physician acting in the course and scope of the employment or contractual relationship.

**(13)** "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

**(14)** "Home and community support services agency" means a licensed public or provider agency to which Chapter 142, Health and Safety Code, applies.

**(15)** "Hospice" means a hospice facility or activity to which Chapter 142, Health and Safety Code, applies.

**(16)** "Hospital" means a licensed public or private institution as defined in Chapter 241, Health and Safety Code, or licensed under Chapter 577, Health and Safety Code.

**(17)** "Hospital system" means a system of hospitals located in this state that are under the common governance or control of a corporate parent.

**(18)** "Intermediate care facility for the mentally retarded" means a licensed public or private institution to which Chapter 252, Health and Safety Code, applies.

**(19)** "Medical care" means any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement.

**(20)** "Noneconomic damages" has the meaning assigned by Section 41.001.

**(21)** "Nursing home" means a licensed public or private institution to which Chapter 242, Health and Safety Code, applies.

**(22)** "Pharmacist" means one licensed under Chapter 551, Occupations Code, who, for the purposes of this chapter, performs those activities limited to the dispensing of prescription medicines which result in health care liability claims and does not include any other cause of action that may exist at common law against them, including but not limited to causes of action for the sale of mishandled or defective products.

**(23)** "Physician" means:

**(A)** an individual licensed to practice medicine in this state;

**(B)** a professional association organized under the Texas Professional Association Act (Article 1528f, Vernon's Texas Civil Statutes) by an individual physician or group of physicians;

**(C)** a partnership or limited liability partnership formed by a group of physicians;

**(D)** a nonprofit health corporation certified under <u>Section 162.001, Occupations Code</u>; or

**(E)** a company formed by a group of physicians under the Texas Limited Liability Company Act (Article 1528n, Vernon's Texas Civil Statutes).

**(24)** "Professional or administrative services" means those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs.

**(25)** "Representative" means the spouse, parent, guardian, trustee, authorized attorney, or other authorized legal agent of the patient or claimant.

**(b)** Any legal term or word of art used in this chapter, not otherwise defined in this chapter, shall have such meaning as is consistent with the common law.

## History

Enacted by <u>Acts 2003, 78th Leg., ch. 204 (H.B. 4)</u>, § 10.01, effective September 1, 2003; am. <u>Acts 2011, 82nd Leg., 1st C.S., ch. 7 (S.B. 7)</u>, § 4.02, effective September 28, 2011.

▼ Annotations

## Notes

2003 Note:

Articles 4, 5, and 8 of Ch. 204 apply to an action filed on or after July 1, 2003. An action filed before July 1, 2003, is governed by the law in effect immediately before the change in law made by Articles 4, 5, and 8, and that law is continued in effect for that purpose. <u>Acts 2003, 78th Leg., ch. 204, § 23</u>.02(c).

**Editor's Notes. --**

**APP 14**

*Texas Statutes and Codes* > *CIVIL PRACTICE AND REMEDIES CODE* > *TITLE 4. LIABILITY IN TORT* > *CHAPTER 74. MEDICAL LIABILITY* > *SUBCHAPTER I. EXPERT WITNESSES*

## § 74.403. Qualifications of Expert Witness on Causation in Health Care Liability Claim

(a) Except as provided by Subsections (b) and (c), in a suit involving a health care liability claim against a physician or health care provider, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(b) In a suit involving a health care liability claim against a dentist, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed if the person is a dentist or physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(c) In a suit involving a health care liability claim against a podiatrist, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed if the person is a podiatrist or physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(d) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the 21st day after the date of the witness's deposition. If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances. The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

## History

Enacted by *Acts 2003, 78th Leg., ch. 204 (H.B. 4)*, § 10.01, effective September 1, 2003.

**Annotations**

## Case Notes

Civil Procedure: Discovery: Disclosures: Mandatory Disclosures
Civil Procedure: Discovery: Methods: Expert Witness Discovery
Civil Procedure: Appeals: Reviewability: Preservation for Review
Evidence: Testimony: Experts: General Overview
Evidence: Testimony: Experts: Admissibility
Evidence: Testimony: Experts: Qualifications
Healthcare Law: Actions Against Facilities: Facility Liability: Nursing Facilities
Healthcare Law: Actions Against Facilities: Standards of Care: Expert Testimony

Michael Maloney

**APP 15**

*Texas Court Rules* > *STATE RULES* > *TEXAS RULES OF APPELLATE PROCEDURE* > *SECTION TWO. APPEALS FROM TRIAL COURT JUDGMENTS AND ORDERS*

## *Rule 45* Damages for Frivolous Appeals in *Civil* Cases

If the court of appeals determines that an appeal is frivolous, it may - on motion of any party or on its own initiative, after notice and a reasonable opportunity for response - award each prevailing party just damages. In determining whether to award damages, the court must not consider any matter that does not appear in the record, briefs, or other papers filed in the court of appeals.

**Annotations**

## Notes

PUBLICATION REFERENCES. --See *Texas* Litigation Guide, Ch. 145, *Overview of the Appellate* Process; Ch. 146, *Analysis of the Appeal*; Ch. 150, *Appellate* Proceedings in Court of Appeals.

Comment to 1997 change This is former *Rule* 84. The limit on the amount of the sanction that may be imposed is repealed. A requirement of notice and opportunity to respond is added.

## Case Notes

*Civil Procedure*: Jurisdiction: Personal Jurisdiction & In Rem Actions: In Personam Actions: Challenges
*Civil Procedure*: Summary Judgment: Time Limitations
*Civil Procedure*: Settlements: Settlement Agreements: General Overview
*Civil Procedure*: Pretrial Matters: Continuances
*Civil Procedure*: Judgments: Entry of Judgments: General Overview
*Civil Procedure*: Remedies: Costs & Attorney Fees: Attorney Expenses & Fees: General Overview
*Civil Procedure*: Remedies: Costs & Attorney Fees: Attorney Expenses & Fees: Statutory Awards
*Civil Procedure*: Sanctions: General Overview
*Civil Procedure*: Sanctions: Baseless Filings: General Overview
*Civil Procedure*: Sanctions: Baseless Filings: Frivolous Lawsuits
*Civil Procedure*: Appeals: *Appellate* Jurisdiction: Interlocutory Orders
*Civil Procedure*: Appeals: Briefs
*Civil Procedure*: Appeals: Costs & Attorney Fees
*Civil Procedure*: Appeals: Dismissals of Appeals: Involuntary Dismissals
*Civil Procedure*: Appeals: Frivolous Appeals
*Civil Procedure*: Appeals: Records on Appeal
*Civil Procedure*: Appeals: Reviewability: Preservation for Review
Constitutional Law: Bill of Rights: Fundamental Freedoms: Freedom of Religion: Establishment of Religion
Criminal Law & *Procedure*: Appeals: Frivolous Appeals
Estate, Gift & Trust Law: Probate: *Procedures* in Probate: Costs & Expenses
Family Law: Child Custody: Modification: Changed Circumstances
Family Law: Child Support: Obligations: General Overview
Family Law: Child Support: Obligations: Modification: General Overview
Family Law: Marital Termination & Spousal Support: Dissolution & Divorce: *Procedures*
Family Law: Marital Termination & Spousal Support: Spousal Support: Enforcement: General Overview

# APP 16

# AFFIDAVIT

STATE OF TEXAS           §
COUNTY OF BEXAR          §

     Before me, the undersigned notary, on this day personally appeared Byron Miller, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

     My name is Byron Miller, an attorney representing Plaintiffs and Appellees, Sandra Schroeder and Duane Ramos, Individually and as all Heirs to the Estate of Sylvia Ramos, and I am capable of making this affidavit. Because we believe Appellant's appeal to be frivolous we have requested the Fourth Court of Appeals to enter damages. I have included a very conservative estimate for my time and cost associated with responding to the appeal, which does not include expenses for additional attorney's time, paralegal costs, or filing expenses.

| Date | Time (hours) | Substance of work | Attorney's fee = $250.00 p/ hour |
|---|---|---|---|
| 5/4/2015 | 6.0 (1:00pm-7:00pm) | Research- case law, statutes, guidelines; Preparing outline | $1,500.00 |
| 5/5/2015 | 6.0 (9:30am-11:30am)(1:00pm-5:00pm) | Preparing rough draft of arguments; case law research | $1,500.00 |
| 5/6/2015 | 8.0 (9:00am-12:00am)(1:00pm-6:00pm) | Writing; editing; researching; adding to rough draft | $2,000.00 |
| 5/7/2015 | 5.5 (10:00am-11:30am)(1:30pm-5:30pm) | Writing; case law research; cuts from the record; editing | $1,750.00 |
| 5/8/2015 | 4.5 (8:30am-10:00am)(2:30pm-5:30pm) | Editing; cite checks; research; proof reading; writing; finalizing draft | $1,250.00 |
| 5/11/2015 | 2.0 (10:30am-12:30pm) | Preparing appendices; proof reading; editing; completing final draft | $500.00 |
| TOTAL: | 32 hours | | $8,500.00 |

Byron Miller

NOTARY PUBLIC, STATE OF TEXAS
Printed Name: _Celeste Gamez Malaise_
My commission expires: _10-28-18_

CELESTE GAMEZ MALAISE
MY COMMISSION EXPIRES
October 28, 2018

**APP 17**

*Texas Statutes and Codes* > *CIVIL PRACTICE AND REMEDIES CODE* > *TITLE 4. LIABILITY IN TORT* > *CHAPTER 74. MEDICAL LIABILITY* > *SUBCHAPTER I. EXPERT WITNESSES*

# § 74.401. Qualifications of Expert Witness in Suit Against Physician

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

    (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

    (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

    (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

(b) For the purpose of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

    (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

    (2) is actively practicing medicine in rendering medical care services relevant to the claim.

(d) The court shall apply the criteria specified in Subsections (a), (b), and (c) in determining whether an expert is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care, but may depart from those criteria if, under the circumstances, the court determines that there is a good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

(e) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the 21st day after the date of the witness's deposition. If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances. The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

(f) This section does not prevent a physician who is a defendant from qualifying as an expert.

(g) In this subchapter, "physician" means a person who is:

    (1) licensed to practice medicine in one or more states in the United States; or

    (2) a graduate of a medical school accredited by the Liaison Committee on Medical Education or the American Osteopathic Association only if testifying as a defendant and that testimony relates to that defendant's standard of care, the alleged departure from that standard of care, or the causal relationship between the alleged

Michael Maloney